# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH KENT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| POOLTOGETHER, INC.; LEIGHTON | ) Case No. 21-CV-6025 |
| CUSACK; KAIN WARWICK; | ) CLASS ACTION |
| STANISLAV KULECHOV; | ) JURY TRIAL DEMANDED |
| DRAGONFLY DIGITAL | ) |
| MANAGEMENT, LLC; NASCENT US, | ) |
| LLC; MAVEN 11 CAPITAL, BV; | ) |
| GALAXY DIGITAL TRADING HK | ) |
| LIMITED; PARAFI CAPITAL, LP; and | ) |
| COMPOUND LABS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**AMENDED COMPLAINT**

1.     Defendant PoolTogether, Inc. (PoolTogether), is currently selling what it describes on its website as "tickets" to win "prizes" in a "lotter[y]" to gamblers all over the world. Each of PoolTogether's lottery tickets is purchased with cryptocurrency, but otherwise this lottery is materially identical to an old-fashioned numbers racket: gamblers give PoolTogether money in exchange for chances to win money as determined by a random-number drawing. New York law forbids the sale of lottery tickets and authorizes recovery of double the amount anyone delivers in exchange for a lottery ticket. Plaintiff Joseph Kent purchased ten tickets in a PoolTogether lottery on October 21, 2021, by delivering $10 worth of cryptocurrency to PoolTogether. He brings this suit, on behalf of himself and all others similarly situated, against PoolTogether and all those who conspired with it (and each other), and who aided and abetted its criminal acts.

## Parties

2.     Plaintiff Joseph ("Joe") Kent is a software engineer with an extensive background in building technology for nonprofits and political campaigns. In 2020, he led a technology team for a U.S. presidential campaign. He is gravely concerned that the cryptocurrency ecosystem—which requires the use of enormous amounts of electricity—is accelerating climate change and allowing people to evade financial regulations and scam consumers.

3.     Defendant PoolTogether, Inc., is a corporation formed under the laws of the State of Delaware that lists its principal place of business in public filings as Grand Rapids, Michigan, but whose actual principal place of business, as explained

below, is Brooklyn, New York. PoolTogether operates an illegal lottery from Brooklyn, New York, available to gamblers all over the world.

4.      Defendant Leighton Cusack is a resident of Brooklyn, New York. He is the founder of and an investor in PoolTogether.

5.      Defendant Kain Warwick is a resident of Sydney, Australia. He invested in PoolTogether with the purpose of promoting its illegal lottery.

6.      Defendant Stanislav Kulechov is a resident of Helsinki, Finland. He invested in PoolTogether with the purpose of promoting its illegal lottery.

7.      Defendant Dragonfly Digital Management, LLC ("Dragonfly"), is a limited-liability company formed under the laws of the State of Delaware and headquartered in San Francisco, California, and Beijing, China. It invested in PoolTogether with the purpose of promoting its illegal lottery.

8.      Defendant Nascent US, LLC ("Nascent"), is a limited-liability company formed under the laws of the State of Delaware and headquartered in Manhattan, New York. It invested in PoolTogether with the purpose of promoting its illegal lottery.

9.      Defendant Maven 11 Capital, BV ("Maven 11"), is a private limited company formed under the laws of the Netherlands and headquartered in Amsterdam. It invested in PoolTogether with the purpose of promoting its illegal lottery.

10.     Defendant Galaxy Digital HK Limited ("Galaxy"), is a Hong Kong private limited company. It invested in PoolTogether with the purpose of promoting its illegal lottery.

11.     Defendant ParaFi Capital, LP ("ParaFi"), is a limited partnership formed under the laws of the State of Delaware and headquartered in Greenwich, Connecticut. It invested in PoolTogether with the purpose of promoting its illegal lottery.

12.     Defendant Compound Labs, Inc., is a corporation formed under the laws of the State of Delaware, and headquartered in San Francisco, California. It promotes PoolTogether and purposefully facilitates PoolTogether's illegal lottery.

## Jurisdiction and Venue

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2) because PoolTogether gamblers have delivered at least $122,000,000 into currently operating pools and the amount in controversy therefore exceeds $5,000,000, and because Kent and many members of the proposed class are citizens of a different state than at least one of the defendants.

14.     This Court has general personal jurisdiction over PoolTogether, Nascent, and Cusack because they are domiciliaries of New York.

15.     This Court has specific personal jurisdiction over all Defendants because they purposefully conspired to operate an illegal lottery by directing money into Brooklyn, New York; because they purposefully aided and abetted the operation of an illegal lottery in Brooklyn, New York; and because they conspired with others who conducted an illegal lottery in Brooklyn, New York.

3

**PoolTogether's Plan**

16.     Cusack founded PoolTogether in 2018.

17.     In public writings, Cusack describes PoolTogether as a "no-loss lottery," tracing the history of such games to turn-of-the-(last)-century Britain. In a "no-loss lottery," otherwise known as a "prize-linked savings account," users deposit money with a counterparty and forgo the interest otherwise due on that money in exchange for a lottery ticket paying a prize valued at (roughly) the total amount of interest due to all depositors over the drawing period.

18.     PoolTogether is conspicuously marketed to the general public. According to Cusack, PoolTogether is "GOOD for you" because it "leverages the fun of speculation to increase saving money." It is, in his view, "a better alternative to both savings accounts and lotteries" because PoolTogether "offers people access to outsize returns WITHOUT needing to risk their capital." PoolTogether's "[e]ndgame," according to Cusack, "is replacing savings accounts and lotteries." "The first step," he notes, "is becoming the first viral DeFi [decentralized finance] protocol to break into the mainstream."

19.     But all of the money delivered to PoolTogether is at risk of loss while gambling. To make this clear, PoolTogether says on one of its websites that "there are risks associated with using [PoolTogether] and users assume the full responsibility for these risks. You should not deposit any money you are not comfortable losing."

20.     And nothing about PoolTogether is unique in its supposed benefits. Pursuant to a 2014 federal law (the American Savings Promotion Act, *see* Pub. L. 113-251 (2014)), states may authorize banks and credit unions to create prize-linked

savings accounts exactly like PoolTogether, except using U.S. currency and, crucially, subject to oversight by state and federal banking regulators and at effectively zero transaction costs. A New York law passed in response to that 2014 federal law specifically permits any "banking organization . . ., federal credit union, federal savings bank, federal savings and loan association, or national bank association" to offer a "savings promotion prize giveaway." N.Y. Banking L. 9-v. PoolTogether is not a licensed bank or credit union.

21.     True retail savers, then, have safer alternatives already at their disposal. Savers who put their money into prize-linked savings accounts at banks as authorized by federal and state law can rest assured that their deposits are guaranteed, that the value of their accounts must be clearly stated, and that they will always have access to their money.

22.     PoolTogether is a riskier, more expensive, and unregulated version of something already available to genuine retail investors. Its true purpose is just like that of a traditional criminal enterprise running a traditional numbers racket: to convince people to forgo their valuable money in the hopes of winning a prize, and to use that money in the interim for its own unsupervised purposes.

23.     Further, state and federal banking regulations exist to protect broader national interests like national security and preventing tax evasion. For example, anti-money-laundering regulations strengthened after the September 11th terrorist attacks require regulated financial institutions to know their customers and report transactions of a certain size or type to the government. Banks are also required to

verify that they are not working directly or indirectly with sanctioned entities and people. On information and belief—as explained below, based on Kent's experience—despite soliciting gamblers to give their money to PoolTogether, PoolTogether does not comply with any of these regulations. PoolTogether is seeking to attract money for its own benefit with a product that can be offered lawfully only by a regulated financial institution without being subject to any of the regulations applicable to those institutions. And PoolTogether is violating New York's prohibition on operating an illegal lottery.

### The Mechanics of PoolTogether's Illegal Lottery

24.   To gamble with PoolTogether, users send cryptocurrencies to PoolTogether's platforms. PoolTogether accepts various cryptocurrencies, including Dai, Compound, Celo, and some coins that are linked in value to the U.S. dollar ("stablecoins").

25.   Each dollar worth of value delivered to PoolTogether entitles the gambler to one "ticket" for a lottery that is drawn by a random-number generator either daily or weekly.

26.   Meanwhile, the money delivered to PoolTogether is immediately lent out to a "liquidity pool" of cryptocurrencies from which unrelated people and entities can borrow or exchange cryptocurrencies. The largest such pool operators are Compound and Aave (which Kulechov founded), but PoolTogether also lends deposited funds to other, smaller operations. Unlike funds obtained by the regulated financial institutions that U.S. and New York law permit to run "no-loss lotteries," there are

no restrictions on the kinds of entities to which PoolTogether can lend out the money gamblers deliver.

27.     PoolTogether gamblers forgo the "yield"—or interest—that would otherwise be due from the liquidity pools. PoolTogether then (as its name suggests) pools all the interest and divides it among a pre-specified number of winning tickets, keeping up to 50% of the yield that would otherwise be due as prizes as a "reserve" to generate more yield, supposedly for future prizes.

28.     Currently, PoolTogether operates fourteen running lotteries. The lotteries differ only in the prize distributions (how many, and how often) and the cryptocurrencies used; they are otherwise identical.

29.     PoolTogether also allows other people or organizations to use its "protocol" to create their own lotteries. PoolTogether thus hosts the operation of many more lotteries as well.

30.     As of October 26, 2021, PoolTogether gamblers have delivered $122,000,000 to PoolTogether's fourteen current lotteries.

31.     Since its founding in 2018, according to its own publicly accessible records, PoolTogether paid out approximately $4,300,000 in prizes.

32.     Because the simple act of sending cryptocurrency to PoolTogether is remarkably expensive, only large deposits in PoolTogether or deposits that are left with PoolTogether for a very long time could possibly have positive expected value. And because PoolTogether keeps up to 50% of each weekly prize as a "reserve," which may never be paid out, PoolTogether may never offer a positive expected value.

33.     For example, because every transaction in a cryptocurrency using Ethereum (a major network of cryptocurrency and other block-chain applications) requires significant computing power, transactors must pay something called a "gas" fee to compensate the network for that power.

34.     A recent attempt to deliver 25 of the cryptocurrency U.S. Dollar Coins, or USDC, to PoolTogether and receive 25 tickets for its USDC lottery would have required a gas payment of $161.27. Therefore, a gambler is effectively paying $186.27 for $25 in PoolTogether lottery tickets. According to PoolTogether, the $25 in tickets that the gambler paid $186.27 for would have given the gambler a one in 316,438 chance to win a prize of $11,670, resulting in a weekly winning expected value of a little more than three cents. Even excluding the cost of loss of access to their $25, gamblers would still be expected to lose money decades after their initial deposit.

35.     Those decades of expected losses are calculated before gamblers attempt to withdraw their money. To withdraw from PoolTogether, gamblers must pay another gas fee of similar size. Therefore, they could easily end up paying over $250 to buy $25 in tickets, gamble, and then withdraw their money.

36.     Gas fees alone make PoolTogether lottery tickets a very bad deal for anyone gambling less than tens of thousands of dollars (roughly enough to render the expected returns high enough to overcome the gas fees). To supposedly compensate for these severe limitations, PoolTogether has begun allowing users to pool their purchases of tickets in units called "pods." But participants in these gambling pods

still indirectly pay large gas fees, face the same risks as other lottery participants, and are entitled to lower potential prizes.

37.     For example, a recent attempt to deposit 25 U.S. Dollar Coins into a PoolTogether gambling pod would have required a gas fee of $36.36 before receiving the first fraction of a pod's lottery ticket.

38.     The deal is likely even worse than it appears for gamblers. Starting in early 2021, PoolTogether began keeping up to *fifty percent* of each weekly prize as a "reserve," as mentioned above, added back to the pool after each drawing. There is no guarantee that the reserve will ever be paid out to the gamblers, and if it ever is, it may be after many gamblers have already withdrawn their cryptocurrency from the pool. Even excluding gas fees, then, PoolTogether is likely a significantly worse deal than simply depositing one's money with the liquidity pools to which PoolTogether immediately lends gamblers' money.

## **Kent Buys a Ticket**

39.     On October 21, 2021, Kent navigated to app.pooltogether.com[1] and there delivered $10 worth of Gemini Dollars (GUSD) to PoolTogether and received ten tickets in PoolTogether's GUSD lottery.

---

[1] Two URLs are associated with PoolTogether: The URL that Kent visited to purchase tickets (app.pooltogether.com) and another hosting a site describing PoolTogether's operations (pooltogether.com). The former contains no terms of service or use. The latter begins with a link to the former, and describes itself in a page called "terms," whose link is at the very bottom of the home page, as "a website of PoolTogether LLC," the now-inactive New York LLC. To access either URL, a user need not indicate assent to any terms of service.

40.     With gas fees, Kent spent $275.60 in total value (including the $10 he delivered to PoolTogether) in exchange for the tickets.

41.     PoolTogether listed Kent's odds of winning as one in 2,303, and listed the prize as $778.

42.     During no part of the process was Kent asked to assent to, acknowledge, or even view any contract, terms of use, or disclosures.

43.     During no part of the process was Kent asked to provide any information about himself other than the address of the cryptocurrency wallet from which he delivered GUSD to PoolTogether.

### PoolTogether's Principal Place of Business Is in Brooklyn, New York

44.     On September 26, 2019, Cusack registered a corporation called "PoolTogether, Inc.," formed under the laws of the State of Delaware, as an "unauthorized foreign corporation" in New York. The same day, he listed the corporation in New York as inactive because it had been "merged out of existence," but PoolTogether, Inc., is currently listed in Delaware as in good standing as the survivor of a September 25, 2019, merger.

45.     On September 26, 2019, Cusack also formed PoolTogether, LLC, under the laws of the State of New York. PoolTogether, LLC, is now listed as inactive.

46.     Both entities' address was listed in New York as 215 Moore Street, Brooklyn, New York.

47.     215 Moore Street appears to be the address of the Bushwick Generator, a "community influenced innovation lab and creative hub in Brooklyn," that houses the "Bushwick Blockchain Alliance," which, according to its website, "connects local

businesses, city agencies and civic organizations with blockchain startups and subject matter experts."

48.     On October 25, 2019, PoolTogether, Inc., was registered with the California Secretary of State as a foreign corporation. On that registration form, PoolTogether listed its "business address" as an address in Grand Rapids, Michigan.

49.     The Grand Rapids address is Cusack's parents' house. According to publicly accessible records, it is a single-family home owned by a trust controlled by Cusack's mother, but to preserve Cusack's family's privacy, Kent omits the specific address and other details establishing that it is Cusack's parents' house.

50.     On September 10, 2020, PoolTogether filed a Form D with the SEC noticing an exemption from registration of securities offerings. On that form, PoolTogether lists Cusack's parents' house as its "principal place of business" and lists Cusack as its "executive officer," "director," and "promoter." His address on that form is listed in Brooklyn.

51.     Notwithstanding the Grand Rapids address, at all times relevant to this Action, Cusack operated PoolTogether with its nerve center and principal place of business in Brooklyn.

52.     In December 2019, Cusack wrote on Twitter that, because his "work [was] ramping up," he was "get[ting] an apartment in nyc" where he is "primarily based."

53.     PoolTogether is listed on Praxis, a "a creative engine for redemptive entrepreneurship," with its "headquarters" in "Brooklyn, NY." Praxis's website says that Cusack "lives and works in Brooklyn."

54.     In March and June 2020, and May of 2021, Cusack tweeted that he was in New York City.

55.     In July of 2021, Cusack mentioned on a website that he lived above his favorite restaurant in Brooklyn.

56.     In September 2021, Cusack sent a message on another social-media site saying that PoolTogether was throwing a party in New York.

57.     On a jobseekers' website, PoolTogether lists two positions as "New York (NY) – Vancouver – Remote."

58.     PoolTogether's statement that its principal place of business is Cusack's parents' house in Michigan is false. Throughout its existence, PoolTogether was controlled by Cusack from Brooklyn.

### The Investors' Conspiracy to Promote the Lottery

59.     Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, Galaxy, and ParaFi all agreed to give money to PoolTogether, with the purpose of enabling it to illegally sell lottery tickets from within the State of New York, in exchange for a financial interest in its operations.

#### *Cusack*

60.     Cusack himself founded PoolTogether and at all times has controlled its operations. He, therefore, agreed with the other investor defendants to operate

12

PoolTogether as a joint conspiracy, and he aided and abetted PoolTogether's illegal lottery operation.

61.     Although this is not an element of conspiracy or aiding-and-abetting liability, Cusack himself is in fact aware of the federal, and perhaps state, laws that he is violating. In a 2021 interview, Cusack stated that he is aware that prize-linked savings accounts were "only legalized in the United States in 2014"—an apparent reference to the American Savings Promotion Act of 2014, which specifically limits its changes to the definition of illegal gambling to exclude only prize-linked savings accounts "conducted by an insured depository institution or an insured credit union."

62.     In the same interview, Cusack marketed PoolTogether's lottery with gambling terminology, describing how by purchasing tickets through his company's pods "anyone can become a whale, which is kind of cool."

63.     Cusack is purposefully running a numbers racket through PoolTogether. The mere fact that he may subjectively believe that this is legal (or should be legal) does not change the fact that he is purposefully doing it, and it is no defense to this Action.

<u>*Warwick*</u>

64.     In or around October 2020, Warwick invested in PoolTogether alongside ParaFi, Kulechov, and others.

65.     Although the substance of Warwick's arrangement with PoolTogether is not known, on information and belief Warwick gave money to PoolTogether in exchange for an ownership share (or right to purchase an ownership share) in

PoolTogether, Inc., its related LLC, another related entity, or voting rights in its governance protocols.

66.     The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York.

### *Kulechov*

67.     In or around October 2020, Kulechov invested in PoolTogether alongside Warwick, ParaFi, and others.

68.     Although the substance of Kulechov's arrangement with PoolTogether is not known, on information and belief Kulechov gave money to PoolTogether in exchange for an ownership share (or right to purchase an ownership share) in PoolTogether, Inc., its related LLC, another related entity, or voting rights in its governance protocols.

69.     The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York.

70.     Kulechov's firm Aave and PoolTogether have also promoted a joint lottery, contending in a public Tweet that participants would earn 490% returns per year.

### *ParaFi*

71.     In or around October 2020, ParaFi invested in PoolTogether alongside Warwick, Kulechov, and others.

72.     Although the substance of ParaFi's 2020 arrangement with PoolTogether is not known, on information and belief ParaFi gave money to PoolTogether in exchange for an ownership share (or right to purchase an ownership

14

share) in PoolTogether, Inc., its related LLC, another related entity, or voting rights in its governance protocols.

73.     The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York.

### *Dragonfly, Maven 11, Nascent, ParaFi and Galaxy*

74.     In or around May of 2021, Dragonfly, ParaFi, Maven 11, Nascent, Galaxy, and others, invested in PoolTogether and have described their involvement in the design of the lottery and operations of PoolTogether.

75.     To achieve this investment, the companies transferred U.S. Dollar Coins totaling a little under $6,000,000 to the PoolTogether "treasury" and, in exchange, were issued "POOL Tokens," which allow the companies to vote on governance issues and, eventually, redeem value from the enterprise.

76.     The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York.

77.      Nascent co-founder Dan Elitzer stated that, in addition to investing, "Since first meeting the PoolTogether team . . . we have collaborated with them on prototypes and experiments testing various implementations" of PoolTogether's lottery.

78.     Maven 11 Managing Partner Balder Bomans stated that his company would be "working with . . . PoolTogether . . . as well as the founding team to make the protocol an even bigger success," an apparent reference Maven 11's involvement in designing and operating PoolTogether's lottery.

79.     In a press release announcing its investment, Maven 11 aptly described PoolTogether as a "lottery" and "chance based game" that was "ready to take over a large chunk of the no loss lottery market."

80.     Maven 11 is also an investor in Defendant Kulechov's firm Aave, which has promoted a joint lottery with PoolTogether.

81.     ParaFi Founder and Managing Partner Ben Forman promoted PoolTogether's "lotteries" as being able to "[function] more elegantly on a blockchain vs. traditional financial infrastructure."

82.     Galaxy refers to itself as "the bridge between the crypto and the institutional worlds." Cusack has stated that Galaxy "brings deep institutional ties" to PoolTogether.

83.     Dragonfly describes itself as, "a cross-border crypto venture fund" and touts its relationship with PoolTogether. Cusack has stated that Dragonfly works with PoolTogether to gain new lottery participants from Asia: "Dragonfly Capital has a strong Asia focus and will help the protocol grow there (currently China is #2 for web traffic to PoolTogether.com)."

### Compound Labs' Facilitation of the Lottery

84.     Compound Labs describes itself as "one of the most visible pioneers of decentralized finance." The company designed a protocol that allows individuals to loan their cryptocurrencies out and earn interest.

85.     PoolTogether gamblers deliver their money to PoolTogether in exchange for lottery tickets. PoolTogether then loans its gamblers' cryptocurrencies out through

Compound and earns interest. PoolTogether then pays a portion of that interest back to its users in the form of lottery prizes. Compound takes a portion of the interest PoolTogether earns as a fee, thereby directly profiting from the scheme.

86.     As Cusack publicly admitted, Compound Labs designed a PoolTogether smart contract (a form of computer program facilitating the distribution of cryptocurrencies), and Compound Labs in return thanked PoolTogether "for building on top of Compound."

87.     By building tools with which PoolTogether may operate an illegal lottery to Compound Labs' benefit, Compound Labs purposefully facilitates PoolTogether's lottery. Compound Labs touts PoolTogether on its website as "[a] no-loss *lottery* utilizing the interest earned in Compound as the prize" (emphasis added), making clear that it intends the purpose of its involvement to be facilitating a lottery.

88.     The stated, public purpose of the partnership between Compound Labs and PoolTogether is to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York.

## Class Action Allegations

89.     Plaintiff proposes to move to certify the following class: All people who delivered money to PoolTogether to participate in a lottery operated by PoolTogether.

90.     The proposed class meets Federal Rule of Civil Procedure 23's requirements, called respectively numerosity, commonality, typicality, adequacy, predominance, and superiority.

### *Numerosity*

91.     The class is so large that joinder of all parties would be impracticable.

92.     PoolTogether currently operates fourteen lotteries and, based on publicly accessible records, more than 11,900 people are currently participating—including over 5,400 people in just one lottery.

93.     PoolTogether has been operating these lotteries for at least two years.

94.     The class therefore contains at least 5,400 members (and likely many more) and satisfies the numerosity requirement.

*Commonality*

95.     There are questions of law and fact common to members of the class.

96.     The questions of fact common to the members of the classes include, without limitation, how much money in total was delivered to PoolTogether; and whether the Investor Defendants conspired with each other and PoolTogether, and whether they and Compound aided and abetted PoolTogether, in violating New York's prohibition on selling lottery tickets.

97.     The questions of law common to the members of the classes include, without limitation, whether PoolTogether operates a lottery under New York law.

*Typicality*

98.     New York General Obligations Law § 5-423 gives a cause of action to any person who "purchase[s]" a "ticket . . . in a[] lottery" to recover "double the sum of money, and double the value of goods or things in action, which he may have paid or delivered in consideration of such purchase, with double costs of suit."

99.     On October 21, 2021, Kent delivered ten dollars' worth of GUSD in consideration for ten tickets in a PoolTogether lottery.

18

100.    Kent's claim is, therefore, typical of—indeed identical to—the claims of all the class members.

### *Adequacy*

101.    Kent's claim, as explained above, is identical to the claims of other class members and he has no known conflicts of interest with any other class member. Additionally, Kent has a sophisticated understanding of software engineering, which will help him guide this litigation effectively.

102.    Kent will adequately protect the interests of absent class members.

103.    Kent proposes Gerstein Harrow, LLP, and Fairmark Partners, LLP, as class counsel.

104.    Both founding partners of Gerstein Harrow have significant experience litigating complex cases, including major class actions.

105.    Charles Gerstein has, among other things, served as lead counsel in a class action case against the City of Houston that recently settled for $1.175 million, and has served as counsel or lead counsel in several complex class actions seeking prospective relief against public entities and officers throughout the country. As a law clerk for the U.S. District Court of the Southern District of New York and the U.S. Court of Appeals for the Second Circuit, Gerstein advised the courts on several complex class-action cases.

106.    Jason Harrow has litigated complex cases on behalf of New York State and its agencies as an Assistant Solicitor General, as an associate at the national law firm Davis Wright Tremaine, LLP, and as lead counsel in the U.S. Supreme Court in

*Colorado Dep't of State v. Baca*, No. 19-518 (argued May 13, 2020; decided July 6, 2020). As a law clerk for the U.S. District Court for the Southern District of New York and the U.S. Court of Appeals for the Ninth Circuit, Harrow advised the courts on several complex class-action cases.

107.    Fairmark Partners' attorneys have significant experience litigating complex cases, including major class actions.

108.    James Crooks, a founding partner of Fairmark Partners, has significant experience litigating complex cases, including major class actions. After clerking for the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court, where he advised the courts on several complex class-action cases, Crooks joined the international law firm O'Melveny & Myers, LLP, where he was a litigation associate for several years. There, he litigated complex commercial cases, including class actions, relating to financial products, insurance, products liability, and consumer protection at the federal trial, court of appeals, and Supreme Court levels.

109.    Several of Fairmark's other attorneys have years of experience in complex commercial litigation, including class actions, at major U.S. and international law firms, including Williams & Connolly, LLP, Proskauer Rose, LLP, and O'Melveny & Myers, LLP.

110.    Class counsel will fairly and adequately represent the interests of the class.

*Predominance and Superiority*

111.   The questions of fact and law common to the class predominate in this Action over any questions affecting only individual members of the class.

112.   In fact, there will be no individual questions of law or fact for any of the members of the class: Each class member delivered money to PoolTogether in exchange for a lottery ticket, and that is the only element necessary to recover under New York law.

113.   The classes in this case will be easily managed and ascertained. PoolTogether keeps a publicly accessible record of every transaction any gambler has ever executed with it, and each gambler's account is assigned a unique identification code. Thus, although PoolTogether does not know the legal identities of its gamblers, it can communicate with (and therefore ensure the provision of notice to) all its gamblers; it can determine the amount of money it owes them without any complex individual calculations; and it can pay the money it owes them easily by crediting the accounts associated with each identification number.

## Claim for Relief

### *Count One*: Violation of N.Y. Gen. Oblig. Law. § 5-423

114.   Kent incorporates all prior paragraphs by reference here.

115.   Kent and all members of the putative class delivered things of value to PoolTogether in exchange for lottery tickets.

116.   Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, ParaFi, Galaxy, and Compound agreed with each other and with PoolTogether to forward PoolTogether's stated purpose of selling lottery tickets in the State of New York.

117. Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, ParaFi, and Galaxy all took the concrete action of giving PoolTogether money for the purpose of aiding its operation of an illegal lottery in the State of New York.

118. Compound designed the tools that PoolTogether uses to operate some of its lotteries, directly handled the proceeds delivered to PoolTogether as part of the illegal lotteries, and profited from doing so.

119. Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, ParaFi, Galaxy, and Compound all took the concrete steps of, among other things, assisting PoolTogether with the design and operation of its illegal lottery in the State of New York with the purpose of aiding its operation of an illegal lottery in the State of New York.

120. Defendants are, therefore, jointly and severally liable to Kent and the members of the putative class in the amount of double the value that Kent and the putative classmembers delivered to PoolTogether in exchange for lottery tickets.

## **Prayer for Relief**

Plaintiff Joseph Kent respectfully requests:

- An award of compensatory damages against all Defendants jointly and severally in the amount of double the value of cryptocurrency that the classmembers delivered to PoolTogether; and
- An award of double the amount of reasonable attorneys' fees and costs of this Action against all Defendants jointly and severally.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
611 Pennsylvania Ave. SE, No. 317

Washington, DC 20003
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
(*pro hac vice* application forthcoming)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

*/s/ James Crooks*
James Crooks
(*pro hac vice* application forthcoming)
FAIRMARK PARTNERS, LLP
1499 Massachusetts Ave. NW, #113A
Washington, DC 20005
jamie@fairmarklaw.com
(619) 507-4182

*Attorneys for Plaintiffs*