# GERSTEIN HARROW LLP

Hon. Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

*Via ECF*

Re: Consolidated Response to Defendants' Pre-Motion Letters in Kent v.
PoolTogether, et al., No. 21-CV-6025-FB-CLP

Dear Judge Block,

My colleagues and I represent Plaintiff Joseph Kent and a putative class of all purchasers of illegal lottery tickets sold by Defendant PoolTogether, Inc. I write to respond to the six pre-motion letters filed by Defendants. They have consented to our filing a consolidated response and to combining the page limit for each responsive letter into one.

PoolTogether sells lottery tickets. Users purchase those tickets by sending cryptocurrency to PoolTogether's "protocol" (a supposedly decentralized network of computers), which routes the cryptocurrency to a "liquidity pool," keeps the interest earned from the pool, and then gives users products that PoolTogether itself calls "tickets" to "win" "prizes" in a "lottery." Those prizes are valued at the total interest that would have accrued on all users' cryptocurrency minus up to fifty percent that PoolTogether's protocol governors keep for themselves. This violates New York law.

All Defendants plan to argue that PoolTogether's product isn't a lottery, even though that is how PoolTogether and its founder repeatedly and consistently describe its product. Defendants argue that, despite these statements, PoolTogether is not actually a lottery because users don't necessarily gamble *all* the money that they send. They argue that PoolTogether is not a ticket seller because of its supposedly decentralized nature. And Investor Defendants would also have this Court hold that New York's prohibition on selling lottery tickets does not encompass liability for aiding and abetting a sale or conspiracy to sell. I explain in some detail below why these arguments are without merit.

Defendants, though, make two additional arguments that may require somewhat different handling at this stage. First, Defendant PoolTogether seeks to move to compel arbitration based on a particularly weak theory premised on a factual basis that has continued to shift in recent correspondence, likely because it is inaccurate. I explain those shifts below, why they should be of concern to the Court, and why a motion to compel would fail no matter what. Second, several Defendants argue that Plaintiff lacks Article III standing. They claim that Plaintiff has not been harmed



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

because he supposedly could withdraw the face amount of cryptocurrency that he sent PoolTogether, and that he could have chosen not to play at all. This argument is obviously frivolous and would be a waste of time even to brief. Defendants ignore that PoolTogether kept the *interest* that would have been paid but for the lottery. That is obviously concrete harm. And Defendants ignore decades of law showing that a plaintiff's mere voluntary participation in conduct causing harm does not negate standing.

## I.    Facts

According to PoolTogether, its users send cryptocurrency to PoolTogether's protocol, which "automatically routes those funds into 'a "liquidity pool" of cryptocurrencies from which unrelated people and entities can borrow or exchange [those same] cryptocurrencies,' generating 'interest' on the amounts contributed." (Doc. 31 at 1 (quoting Complaint ¶ 26) (alterations in letter)). Next, according to PoolTogether, "[t]he interest in each pool is aggregated and distributed automatically to a randomly selected subset of contributors to that pool." (*Id.*)

Users may request a withdrawal of the face amount that they send to PoolTogether at any time. (*Id.* at 2.) Although PoolTogether also claims that "[n]othing is risked or wagered" through this process, and that gamblers "deposit[] cryptocurrency to a common pool . . . such that the deposits *may generate a return* to the contributor" (*id.* at 1, 2 (emphasis added)), statements on its own website contradict this. Its website says that "'[y]ou should not deposit any money you are not comfortable *losing*.'" (Amended Complaint ¶ 19 (emphasis added).) That must be true: PoolTogether is unregulated by any state or federal entity, as far as Plaintiff can tell, and so deposits to it are uninsured, unprotected, and could in fact be lost at any time. Further, PoolTogether gamblers get a "return" only if they *win* the lottery. Users who are not randomly selected to receive the prize lose the interest that they would otherwise have earned.

The expected value of this product is quite bad relative to simply sending money to liquidity pools directly. Although PoolTogether is right that users could leave their cryptocurrencies in a wallet—the digital equivalent of keeping savings under a mattress—and earn no return (Doc. 31 at 2 n.2), the comparison is disingenuous: If users sent their money to *Compound* or other liquidity pools (as PoolTogether does with its users' money), they would get Compound's rate of return, whereas with PoolTogether they forfeit up to fifty percent of the interest as a "reserve." At least once, PoolTogether's "protocol" decided to pay the reserve *to itself*. *See, e.g.*, PoolTogether, *POOL incentive adjustments and buy back*, https://gov.pooltogether.com/t/ptip-27-pool-incentive-adjustments-and-buy-back/1369 (June 25, 2021) (approving proposal to "[b]egin[] using 75% of weekly reserves intake to buy back POOL [governance tokens] (~$2,500 - $3,500 daily)"). So



**Charlie Gerstein,** *Partner*   611 Pennsylvania Ave. SE, No. 317
charlie@gerstein-harrow.com   Washington, DC 20003
202-670-4809   gerstein-harrow.com

much, then, for Cusack's contention that PoolTogether is "GOOD for you" because it "offers people access to *outsize* returns." (Amend. Compl. ¶ 18 (emphasis added).)

Contrary to the language used here by its lawyers, PoolTogether markets itself as a gambling product. It calls its "distrubut[ion]" a "game" and a "lottery." It calls those payments "prizes" and the people who win them "winners." Purchasers are issued "smart contracts" (*i.e.*, self-executing electronic contracts) that PoolTogether, Cusack, and other PoolTogether representatives call "tickets." The conspirator defendants also call PoolTogether a lottery, saying, for example, that PoolTogether is a "no-loss lottery" and that "no-loss lotteries are chance based games where the prize consists of the yield on the deposited assets." After all, PoolTogether's stated *raison d'etre* is to convince more people to avail themselves of the purportedly stupendous gains on offer in the world of "decentralized finance" by "leverag[ing] the fun of speculation." (*Id.* ¶ 18.) Cusack touted the "social element" of PoolTogether as similar to when "people in the office will all pool their money together to buy lottery tickets." *PoolTogether: Save Money, With a Chance to Win*, Unconfirmed Podcast, Ep. 108 at 22:30 (Jan. 17, 2020), *available at* https://bit.ly/3mtZj2Y.

In a tweet announcing PoolTogether's launch, Cusack called it "a no loss lottery" and encouraged his followers to "buy a ticket for a chance to win." @lay2000lbs, TWITTER, https://perma.cc/FX2L-GWFL (Jun. 24, 2019, at 8:30 AM). And as recently as December 20, four days after filing its pre-motion letter, PoolTogether re-tweeted someone's message describing PoolTogether this way: "Gambling, all rotten? . . . [I]n this case a less predatory and more fun lottery: PoolTogether." *See* @PoolTogether_, TWITTER, https://perma.cc/9JBT-D8K4 (Dec. 20, 2021, at 9:13 AM) (discussing "draw[ings]" and "jackpots" for PoolTogether's "lottery"). Cusack himself described PoolTogether succinctly: "The idea is, it's really simple, you buy a ticket for a chance to win a prize." Unconfirmed Podcast Ep. 108, *supra*, at 02:10 (Jan. 17, 2020).

## II. DEFENDANTS' CONTENTION THAT PLAINTIFF AGREED TO ARBITRATE HAS NO BASIS IN FACT OR LAW

Defendants (principally PoolTogether, but the others too) contend that this case should be compelled to arbitration because Plaintiff agreed to terms of service that require arbitration of all disputes. He never did, and the factual basis for PoolTogether's contention to the contrary appears wrong, and has certainly changed quite a bit since PoolTogether's letter of last week.

PoolTogether said in its initial letter that "[w]hen Plaintiff connected his cryptocurrency 'wallet' to the protocol through [PoolTogether's] interface [on app.pooltogether.com] and deposited $10 in cryptocurrency into the protocol, he agreed to be bound by Defendant's terms, which conspicuously provided: 'By connecting a wallet, you agree to PoolTogether's Terms of Service.'" This was incorrect as an initial matter. Today, app.pooltogether.com, the website that Plaintiff used to



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

connect his wallet, indeed displays the quoted sentence when a user initially connects a wallet. But on October 19, 2021, when Plaintiff first connected his wallet, the website did not display that sentence. In correspondence since PoolTogether's letter, PoolTogether now admits that it changed its website at the earliest on October 20, 2021, at 4:42 PM Eastern Time—one day after Plaintiff initially connected his wallet on October 19, 2021, at 6:26 PM Eastern Time. It is thus now undisputed that Plaintiff could not have been, and in fact was not, presented with language suggesting that wallet connection possibly could lead to agreement to arbitrate when Plaintiff first connected his wallet.

Plaintiff then delivered money to PoolTogether on October 21, 2021, which, by sheer coincidence, may have been one day after PoolTogether made a change to the website to present some notice language to users when they *connect a wallet* (which, again, Plaintiff had already done before that change). As Plaintiff pleaded, when Plaintiff delivered money to PoolTogether on October 21, 2021, nothing he did on the website resulted in his seeing such a message or agreeing to any terms.

Following this initial exchange where the parties determined the date of initial wallet connection and the earliest date of a website change, PoolTogether has now shifted its position on the factual predicate for arbitration at least twice. In an email on December 20, PoolTogether's counsel claimed that, although Plaintiff was not presented with terms upon initial wallet connection, "terms are presented at various stages of a user's interaction with the interface, **including** at the time of deposit or transfer." (Emphasis in original.) Plaintiff then quickly shared substantial evidence that no terms were presented to Plaintiff at "the time of deposit or transfer," including a video of Plaintiff transferring money, and PoolTogether has now apparently disavowed this theory too.

Instead, in its most recent letter, PoolTogether's latest basis for such a motion will apparently be its claim that Plaintiff must have manually *re*connected a wallet on October 21, before making a deposit, and upon that reconnect was presented with a message citing terms of service that included an arbitration provision. PoolTogether writes that "generally if a user visits the website, connects a wallet, . . . ends the website session, and returns to the website to make a deposit, the user will have to reconnect the wallet before making the deposit." Evidence that Plaintiff has collected (today, after hearing from PoolTogether's counsel last night) appears to contradict this assertion: an investigator working with our team visited the website, connected a wallet, ended his "session," and returned to find his wallet *still* connected. PoolTogether offers purported evidence that Plaintiff's wallet *failed* to connect at some point during the process—thus supposedly giving rise to a circumstantial inference that he needed to reconnect it during that process—but PoolTogether apparently has no affirmative evidence that, indeed, Plaintiff was forced to reconnect. Moreover, under PoolTogether's own theory, any express reference to terms and conditions would have said nothing about *reconnecting* a wallet, but instead would



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

have referred generically to "connecting a wallet"—which Plaintiff had already done two days earlier, when all agree there were no terms of use presented.

Although we acknowledge that there may be some disputed facts and that evidence cannot be considered complete at this early stage, we welcome the Court's intervention in dissuading PoolTogether from making a motion to compel arbitration. Its shifting factual basis is quite weak, and, as explained below, Plaintiff would not be compelled to arbitrate anyway under PoolTogether's current theory. Instead, such a motion would lead only to a waste of time and money as PoolTogether attempts to play "gotcha" based on a website change that all agree occurred after Plaintiff's initial interactions with the website and the protocol.

The Federal Arbitration Act "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 66 (2010). "Thus, a court can order a dispute to arbitration only if, under the principles of contract law, 'the court is satisfied that the parties agreed to arbitrate that dispute.'" *Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 159 (E.D.N.Y. 2019) (Block, J.) (quoting *Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis omitted)). That question is answered by state law. *Id.* Although "new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.'" *Id.* (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). And "'[i]n the context of web-based contracts, [courts] look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms.'" *Id.* at 159–60 (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)).

Here, Defendants cannot succeed under that standard. The website that purchasers use to buy lottery tickets, app.pooltogether.com, contained no indication that linking a wallet or buying a ticket would bind a user to any contract when Plaintiff first encountered it (on PoolTogether's version of the facts) or ever (on Plaintiff's). A different website, pooltogether.com, contained a tiny link to a contract, buried at the very bottom of the page—while the website's actionable portion is at the very top—unaccompanied by any indication that doing anything would assent to the terms in the link. (Amend. Compl. n.1.) The Second Circuit, as this Court explained in *Sultan*, has *rejected* forced arbitration even where the page from which users purchase products *does* say that "'[b]y placing your order, you agree to . . . conditions of use'" where "[n]othing about the 'Place your order' button alone suggest[ed] that additional terms apply, and the presentation of terms is not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as acceptance" and where "the message itself . . . is not bold, capitalized, or conspicuous in light of the whole webpage." *Sultan*, 354 F. Supp. 3d at 159 (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016)); *see also Specht v. Netscape*, 306 F.3d 17, 23 (2d Cir.



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen").

It gets worse. If users happen to dig through the wrong website and find PoolTogether's supposed contract, they discover a contract between *no* parties to this dispute and one that does not even purport to bind users of app.pooltogether.com to anything. PoolTogether.com's boilerplate reads:

> Welcome to *PoolTogether.com*, a website of PoolTogether LLC ("PoolTogether", "we", "our", or "us"). This page explains the terms by which you may use our website (*the "Site"*). By accessing or using the Site, you signify that you have read, understood, and agree to be bound by this Terms of Service Agreement ("Agreement"), whether or not you are a registered user of our Site. . . . This Agreement applies to all visitors, users, and others *who access the Site* ("Users").

Two clear problems arise. First, PoolTogether LLC is not a party to this case. It is defunct. (Amend. Compl. ¶ 45.) PoolTogether *Incorporated*, the entity that Cusack falsely registered with the SEC to his mother's house, is a party to this case. (Amend. Compl. ¶ 49–49.) The agreement does not purport to run to successors or assigns. By its own terms, then, the agreement would not compel arbitration here between Plaintiff and PoolTogether, Inc., let alone with PoolTogether's conspirators and aiders and abettors. *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) (Block, J.) (holding that even where arbitration clause *did* list all potential parties "no reasonable person would think that checking a box accepting the 'terms and conditions' . . . would obligate them to arbitrate [with] . . . all of the affiliates under [defendant]'s corporate umbrella").

And PoolTogether purports to bind only users who access the "Site," which it defines as PoolTogether.com. Plaintiff did not purchase his tickets through that site. He went to app.pooltogether.com, as any user can. Therefore, according to the boilerplate language that *PoolTogether* relies on, Plaintiff did not assent to any contract with anyone.

Finally, PoolTogether's latest claim that Plaintiff ever manifested assent to these ineffective terms is meritless. Even taking PoolTogether's "reconnection" theory as true (which it is not, and this Court need not assume so for purposes of any motion), it would not be sufficient to form a contract to arbitrate. That is because PoolTogether cannot change two key facts: *first*, Plaintiff indisputably first connected his wallet before doing so possibly could manifest any assent to anything; and *second*, even assuming he was presented with some message on a reconnect before the October 21 deposit, that brief notice did not include any express acknowledgment there was a change, did not differentiate between initial connection and reconnection, and did not include a place for Plaintiff to indicate he was agreeing to any terms, changed or not.



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

*See, e.g., Sultan,* 354 F. Supp. 3d at 159 (rejecting arbitration where nothing about the action of purchasing "suggest[ed] that additional terms apply"). PoolTogether cannot force Plaintiff to arbitrate this matter.

### III. Defendants' Standing Arguments Misread the Complaint and Misunderstand the Law

Defendants also argue that this case should be dismissed because Plaintiff has not alleged facts sufficient to give rise to Article III standing. This is a frivolous argument that would serve only to waste the Court's and parties' time.

Article III standing requires "(1) that the plaintiff have suffered an 'injury in fact,' i.e., an injury that is 'concrete and particularized' . . . ; (2) that there be a 'causal connection between the injury and the conduct complained of,' i.e. that the injury be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court'; and (3) that it be likely that the injury complained of would be 'redressed by a favorable decision.'" *St. Pierre v. Dyer,* 208 F.3d 394, 401 (2d Cir. 2000) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). Defendants' core misunderstanding here is on the first and second prongs.

Defendants contend that "Plaintiff voluntarily deposited $10 in cryptocurrency that can be withdrawn any time," such that he suffered no harm, and that whatever harm he could have suffered was "self-inflicted." (Doc. 31 at 2.) But Plaintiff did, in fact, lose money. He forewent the "yield" otherwise due on $10 worth of Gemini US Dollars every week for which he purchased a lottery ticket. That's not a lot of money, but small losses count. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing."). And, just to be clear, that does not mean that the measure of *damages* is a "trifle" here: Legislatures may take any concrete harms and "elevate" them to legally actionable wrongs compensable by statutory damages and penalties. *See, e.g., TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2205 (2021). Additionally, the transaction fee for a user attempting to withdraw from PoolTogether is significant and in some cases exceeds the total amount of a deposit.

On the second prong, Defendants appear to argue that the mere fact that Plaintiff chose to subject himself to the chance of losing money—in other words, that he could simply have chosen not to play—defeats this case. This is wrong, and quite obviously so. According to the leading treatise on federal civil procedure, "[t]he voluntary choice to suffer the injury that conferred standing [i]s sufficient" to confer standing. Charles Alan Wright, et al., *Causation,* in 13A Federal Practice and Procedure Jurisdiction § 3531.5 (3d ed. 2021). There is nothing unusual, let alone improper, about plaintiffs attempting to "create standing to sue" (Doc. 31 at 1) by engaging in transactions with defendants. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S.



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

363, 374 (1982) ("That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury.").

Gambling-recovery laws are built on the premise that "voluntary" participants in gambling may recover: in all such cases, plaintiffs could have avoided harm by not playing. Yet federal courts routinely entertain state-law-based cases for recovery of gambling losses (including small ones), and at least one has rejected a nearly identical attempt to kick a meritorious case out of court for lack of standing. *See Wilson v. PTT, LLC*, No. C18-5275RSL, 2021 WL 211532, at *2 (W.D. Wash. Jan. 21, 2021) ("Plaintiff lost $1.99 on an allegedly illegal gambling application developed and maintained by defendant. The alleged injury is fairly traceable to defendant's conduct and can be redressed by pursuing this [gambling-recovery] claim. . . . [P]laintiff has standing.").

Defendants' cases can't do the work that Defendants expect of them. In *Taylor v. Bernanke*, another judge of this court said, in a footnote, in self-described dicta, that plaintiff-depositors at Treasury Department–regulated banks lacked standing to seek an injunction requiring implementation of the Volker Rule (prohibiting certain speculative trading by depository banks) *where the plaintiffs had not yet lost any money*. No. 13-CV-1013, 2013 WL 4811222, *10 n.5 (E.D.N.Y. Sept. 9, 2013). The court observed that plaintiffs could have taken their business to banks that "have better records when it comes to speculative trading activities," *id.*, but specifically noted that "[t]his court *need not determine* whether the alleged risk to plaintiffs' deposits is 'so completely due to the plaintiff's own fault as to break the causal chain' alleged to connect that risk to defendant's conduct *since causation is found lacking on other grounds*." *Id.* (quoting *Natural Res. Def. Council, Inc.*, 710 F.3d at 85 (quoting *Pierre v. Dyer*, 208 F.3d 394, 403 (2d Cir.2000))). And in *Katz v. Donna Karan International, Inc.*, No. 14-CV-740, 2017 WL 2191605 (S.D.N.Y. May 17, 2017), the plaintiffs alleged that they had Article III standing merely because a statute authorized statutory damages, an argument that has since been rejected by the Supreme Court, *TransUnion*, 141 S. Ct. at 2204, and that Plaintiff does not rely on. Plaintiff lost money. Defendants' standing arguments are meritless and this Court should discourage them from filing a motion to dismiss on those grounds.

## IV.   Defendants' Remaining Arguments Are Without Merit

Defendants argue that so-called "no-loss lotteries," as PoolTogether advertises its product, are not "lotteries" under New York law; that New York law does not impose secondary liability for those who aid and abet lottery-ticket sales or conspire to sell lottery tickets; that people who knowingly invest in New York–based lottery schemes may not be haled into New York courts; and that no Defendant here may be liable because PoolTogether is, in fact, a decentralized "protocol." Plaintiff does not contend that these arguments are frivolous, but this Court should deny motions filed on these



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

bases. Defendants are, under clear law, liable for either operating an illegal lottery or knowingly conspiring to do so.

### a. So-called "No-Loss Lotteries" are Lotteries

The parties all appear to agree on the basic mechanics of PoolTogether's protocol: Users send cryptocurrency to the protocol. The protocol sends that cryptocurrency to a liquidity pool. The liquidity pool generates yield, or interest, on that deposited cryptocurrency. PoolTogether takes that interest, pools it together (hence "PoolTogether"), and issues tickets that give each ticketholder a chance at winning a portion of all the interest in the pool. PoolTogether and Cusack did not invent this financial concept, called a "prize-linked savings account" or "no-loss lottery." As its name would suggest, a "no-loss lottery" is, indeed, a lottery under New York law.

Under New York law,

> Any person who shall purchase any share, interest, ticket, certificate of any share or interest, or part of a ticket, or any paper or instrument purporting to be a ticket or share or interest in any ticket, or purporting to be a certificate of any share or interest in any ticket, or in any portion of any lottery, may sue for and recover double the sum of money, and double the value of goods or things in action, which he may have paid or delivered in consideration of such purchase, with double costs of suit.

N.Y. Gen. Oblig. Law. § 5-423. "That section," New York courts have explained,

> [D]efines lottery as an unlawful gambling scheme in which players pay or agree to pay something of value for chances, represented and differentiated by numbers or combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and the holders of the winning chances are to receive something of value.

*Harris v. Economic Opportunity Commission of Nassau County Inc.*, 142 Misc. 2d 980, 981–82 (N.Y. Sup. Ct. 1989).

Defendants argue that "where the alleged consideration claimed to form the lottery is not itself lost or at risk of loss due to the element of chance, there can be no lottery, even if prizes are also distributed by chance." (Doc. 31 at 3.) This argument is factually wrong because PoolTogether users indeed "risk" the "loss" of their interest due to "the element of chance." Indeed, the prize pool exists only because users do not receive interest payments to which they would otherwise be entitled; instead, they



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

risk that interest in exchange for a chance at a prize determined by a drawing. PoolTogether is thus a paradigmatic lottery.

Moreover, New York law does not require that the "thing of value" constituting consideration be paid to the Defendant in exchange for *only* a lottery ticket; schemes where purchasers of *other products* are entitled to lottery tickets *also* violate New York law. *See, e.g., People ex Rel. Ellison v. Lavin*, 179 N.Y. 164, 168 (1904) (holding scheme is a lottery where "the persons among whom the distribution is to be made pay a valuable consideration for the chance *when they purchase the cigars*, the bands on which entitle them to compete for the prizes is settled by authority" even though there is no risk of loss because they get the cigars anyway (emphasis added)).

New York's specific law on no-loss lotteries confirms this. Licensed banking institutions may lawfully operate a "savings-promotion prize giveaway" for their depositors but only if they do not require "consideration" to do so. The law explains that

> [P]articipants shall not be deemed to have provided consideration *due to the requirement that they deposit money in a qualifying account to obtain entries to win*, so long as: (i) the interest rate associated with any such qualifying account *is not reduced* when compared with other comparable non-qualifying accounts offered by any banking organization, federal credit union, federal savings bank, federal savings and loan association or national bank association, to account for the possibility of depositors winning specified prizes.

N.Y. Banking Law § 9-v (McKinney) (emphasis added). The law exempts programs meeting this requirement from the otherwise-applicable definition of "lottery." *Id.* PoolTogether, then, requires consideration *a fortiori* for its chances to win: It failed to comply with the licensure requirements of New York law, thereby putting itself back into the general definition of "lottery," which Banking Law § 9-v confirms *includes* schemes with a "requirement that [users] deposit money . . . to obtain entries to win." *Id.* PoolTogether is operating a lottery under New York law.

Defendants' primary authority only proves Plaintiff's point. In *Kohn v. Koehler*, 96 N.Y. 362 (N.Y. 1884), the Court of Appeals held that certain bonds issued by the Austrian government did not constitute a "lottery" *where users were paid their interest even if they lost. Id.* at 366. Here, unlike in *Kohn*, users at the very least forgo their interest. And regardless that case was decided 140 years before the New York legislature carved out exactly such a product from the definition of lottery for regulated entities only, strongly suggesting that, in the intervening 140 years, courts—as described above—had come to interpret New York's lottery statute as covering such products. *Kohn*, to the extent it holds that a no-loss lottery as defined in Banking Law 9-v is not a "lottery," is no longer good law.



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

### b. New York Law Provides for Secondary Liability for Selling Lottery Tickets

The Amended Complaint explains how several Defendants are liable to Plaintiff because they invested in PoolTogether with the purpose of funding an illegal lottery and how Compound is liable because it helped create the PoolTogether protocol with the purpose of running an illegal lottery. Some investors, by their own admission, even participate in the governance of the lottery. (Doc. 44 at 1 (noting that two defendants "participate in crowdsourced decisionmaking about the workings the protocol" and that one has an "equity investment in PoolTogether, Inc.") As Plaintiff has pleaded, these investor Defendants are straightforwardly liable to Plaintiff under well-established theories of conspiracy or aiding and abetting. *Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 273 (E.D.N.Y. 2012) (listing elements for imposing liability for participating in civil conspiracy).

No Defendant disputes that it purposefully funded what Plaintiff has characterized as an illegal lottery, that it participated in its governance, or that it did both. Instead, the Defendants attempt to avoid conspiracy liability on the grounds that secondary liability is categorically unavailable here. Not so.

*First*, Compound and Galaxy both claim that they cannot be liable because they did not directly pay any money to Plaintiff. This argument denies the premise of conspiracy liability, but "[t]he function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *In re WorldCom, Inc.*, 368 B.R. 308, 328 (Bankr. S.D.N.Y. 2007), *aff'd by* 424 F. App'x 32 (2d Cir. 2011) (quotation marks omitted). Thus, so long as conspiracy liability is available—and it is, as explained further below—the supposed fact these Defendants did not directly pay money to, or take money from, Plaintiff is no bar to their liability.

*Second*, various Defendants claim that secondary liability is unavailable because GOL § 5-423 does not expressly provide for it. But that's no bar to liability either. It's apparently undisputed that New York law generally allows for secondary liability based on a tort, so the only question is whether statutory causes of action are somehow excluded from this general rule. At least one district court to have examined the same question has held that the nature of the underlying cause of action makes no difference, *Varela v. Flintlock Const., Inc.*, No. 01-cv-2736, 2002 WL 342657, at *3 (S.D.N.Y. Mar. 5, 2002), and this Court should reach that result here too.

Indeed, several Defendants' arguments to the contrary rely primarily on an obvious misreading of the statute giving rise to this suit. They claim that the statute "unambiguously" provides that a plaintiff may sue only "the person to whom such payment or delivery was made" under GOL § 5-423. But that limiting language is



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

only in the second paragraph of the statute, which Plaintiff does not invoke. The *first* paragraph of § 5-423 provides broader rights, and it does not contain this limitation. Rather, it provides broadly that any person "may sue for and recover double the sum of money [and additional remedies]" without limitation. The case on which Defendants primarily rely actually confirms that the statute does not limit recovery to just a direct seller. *Grover v. Morris*, 73 N.Y. 473, 477 (1878) ("The section does not in terms declare against whom the action shall be brought."). Where courts have encountered similarly broad language, they have concluded secondary liability is appropriate. *City of New York v. Milhelm Attea & Bros.*, No. 06-CV-3620 (CBA), 2009 WL 701005, at *3 (E.D.N.Y. Mar. 11, 2009) ("When the text of a particular statute is ambiguous, courts have found aiding and abetting liability to exist based upon broad statutory language.").

Moreover, New York broadly criminalizes illegal operation and promotion of lotteries, and aiding-and-abetting and conspiracy liability are available for all criminal laws. *See* N.Y. Penal Law art. 225 (gambling offenses); *id.* art. 105 (conspiracies). Because it would be odd if somehow defendants were subject to criminal exposure but not civil exposure, courts often attempt to harmonize civil and criminal conspiracy liability. *See, e.g., Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 583 (E.D.N.Y. 2005) ("I further find that civil conspiracy liability . . . is also available. The statute expressly includes conspiracy to engage in terrorist acts under its criminal provisions, and there is no reason to treat the civil provisions as excluding this type of liability."). That would result in liability here.

### c. The Complaint Adequately Alleges Personal Jurisdiction Over Out-of-State Defendants

Three defendants—Galaxy Digital Trading HK, ParaFi Capital LP, and Nascent US LLC—argue that the Complaint fails to allege facts that would subject them to this Court's personal jurisdiction. (Doc. 42 at 1-2 (Nascent); Doc. 44 at 1-2 (Galaxy and ParaFi).) Each purposefully invested in PoolTogether, whose only business is running its illegal lottery from its headquarters in Brooklyn. Because the investment relates directly to Plaintiff's only claim in this lawsuit, this Court has specific personal jurisdiction over these companies.

The Complaint alleges that these three defendants and others "agreed to give money to PoolTogether, with the purpose of enabling it to sell illegal lottery tickets from within the State of New York." (Amended Complaint ¶ 59.) Galaxy, ParaFi, Nascent, and other investors transferred nearly $6,000,000 worth of cryptocurrency to PoolTogether in exchange for "POOL Tokens," which give these investors a say in the lottery's governance and the right to an eventual return. *Id.* ¶¶ 74–83. In their letters, Galaxy, ParaFi, and Nascent concede that they exchanged their capital for these "governance tokens." (Doc. 42 at 2; Doc. 44 at 1 (noting also ParaFi has a "small equity investment in PoolTogether" the corporation))



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

This satisfies New York's long-arm statute, C.P.L.R. § 302(a)(1), because these entities transacted business in New York and Plaintiff's claim "arises from that business activity," *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006). "[A] single act in New York may satisfy § 302(a)(1), if it was sufficiently purposeful and substantially related to plaintiff's cause of action arising from the transaction." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020). Galaxy, ParaFi, and Nascent—all well-established investors in cryptocurrency—publicly stated that the purpose of their investments was to further PoolTogether's operation of lotteries, *id.* ¶¶ 76, 81, 82, which is sufficient to hale them to New York, *see Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 72 (2006) ("sophisticated institutional" investor subject to personal jurisdiction when it conducted investment transaction with New Yorker that formed suit's basis); *Wilson v. Dantas*, 9 N.Y.S.3d 187, 196 (App. Div. 2015) ("Defendants had sufficient minimum contacts with New York by purposefully entering the state to negotiate and execute contracts with Citibank, a New York entity," where those contracts formed the basis of plaintiff's claim.).

Galaxy and ParaFi argue that the Complaint's jurisdictional allegations as to them are too "conclusory." (Doc. 44 at 2.) That is because they are conclusive. Investing in an unlawful lottery renders one secondarily liable under GOL § 5-423, and so these defendants' investment in PoolTogether was a "business transaction" in New York from which Plaintiff's claim "arises." Nothing more needs to be said. And the Court can safely ignore Galaxy's and ParaFi's argument that the Complaint's allegations regarding their investment "do not mention New York." (Doc. 44 at 2.) The Court must read the complaint as a whole and make all reasonable inferences in Plaintiff's favor. *Berdeaux v. OneCoin Ltd.*, No. 19-CV-4074, 2021 WL 4267693, at *5 (S.D.N.Y. Sept. 20, 2021). The Complaint couldn't be clearer that "PoolTogether's [p]rincipal [p]lace of [b]usiness [i]s in Brooklyn, New York." (Amended Complaint ¶¶ 44-58) Defendants point to no authority requiring Plaintiff to repeat that allegation.

### d. Defendants Are Liable for an Old-Fashioned Conspiracy and May Also Be Liable as Participants in a Decentralized Enterprise

Finally, Defendants argue that they may not be held liable as "sellers" of lottery tickets—or, in the case of Compound, for any legal violations at all—because they do not do anything legally relevant; the violations Plaintiff alleges, according to one of Defendants' theories, are committed by a decentralized network of individuals operating through a "protocol" on the Ethereum blockchain. Compound says that "Plaintiff conflates defendant Compound Labs (which is a company) with the Compound Protocol (which is no more than software on the internet) . . . . Plaintiff cannot hold Compound *Labs* liable . . . for anyone else's actions on the decentralized, autonomous software that is the Compound Protocol." And PoolTogether says that it merely "operates a website . . . that provides information relating to the PoolTogether



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

protocol and also provides an interface through which a person can connect a cryptocurrency 'wallet' to the protocol to make transfers of cryptocurrency directly into the protocol." PoolTogether and Compound may be right that their products are, in some sense, decentralized, but they are wrong that this observation excuses their own conduct or that such a defense may properly be resolved on a motion to dismiss.

Start with Compound's argument that it "cannot be held liable for anyone else's actions on the decentralized, autonomous software that is the Compound Protocol" and Cusack's claim that he cannot be held liable for *creating* a protocol that allows others to violate the law. The implications are as obvious as they are startling: According to Defendants, they could create a "protocol" for "decentralized" peer-to-peer sharing of child pornography on the blockchain and escape liability under 18 U.S.C. § 2255(a), which authorizes liquidated damages for victims of child-pornography offenses. Defendants could create a "protocol" that encourages and facilitates the creation of a computer virus by its "decentralized" participants and escape tort liability for the harms that result. They could distribute computer code for 3D-printed firearms to sanctioned terrorists. And on and on.

Defendants offer no limiting principle to suggest that the above hypotheticals are fanciful. Their stated argument is that they may not be held liable for the acts of third parties using *Defendants' protocols* to violate the law. Thankfully the legal system has existing doctrines to handle people who attempt crimes exactly like these. In the early 2000's, services were created that allowed users to share (among other things) copyrighted files with each other. The Supreme Court had no trouble interpreting the Copyright Act to forbid providing such a "peer-to-peer" service. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005). So too here: when PoolTogether set up an "interface" through which users "can . . . make transfers into the protocol" and thereby purchase lottery tickets using computer code, PoolTogether became someone "who violates" the relevant law. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) (interpreting Copyright Act to allow for contributory infringement based on that language but holding that defendants were not contributory infringers).

This case is even more straightforward. Here, PoolTogether's website appears to all outsiders to be selling lottery tickets and Cusack created whatever "protocol" underlies it. PoolTogether anticipates filing a motion to dismiss, and this Court will thus take Plaintiff's well-pleaded facts as true. PoolTogether and Cusack cannot, accordingly, rely on their mere say so that they have no legally cognizable role in their own "protocol." Instead, they will eventually have to introduce evidence sufficient to convince a reasonable jury that a website offering lottery tickets for sale and appearing to any member of the public to be selling lottery tickets is not, in fact, a website offering lottery tickets for sale, but rather a portal into a (law-free?) world where lottery tickets simply materialize from the ether. And it will have to convince this Court that Cusack may create a protocol to generate lottery tickets and loose it



**Charlie Gerstein,** *Partner*
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com

on the world without consequence. PoolTogether and Cusack will likely have a tough time doing those things, but regardless they cannot do them now. As this case stands, Plaintiff—relying entirely on PoolTogether's *own descriptions* of its products—has adequately alleged that it is selling lottery tickets and that Cusack and Compound (Compound *Labs*) at least aided and abetted that sale.

In any event, using the word "decentralized" does not magically transform the word "illegal" into "legal," and it does not absolve responsible individuals and entities of liability. To the extent that their decentralization theory is correct, then all these Defendants have done is described a general partnership to sell lottery tickets in violation of New York law. *See, e.g.*, Usha R. Rodrigues, *Law and the Blockchain*, 104 Iowa L. Rev. 679, 684 (2019) (explaining that an early decentralized autonomous organization "was an association of two or more individuals carrying on as co-owners of a business for profit[,] [and because] [i]t did not formally organize under any state's jurisdiction[,] . . . it was a partnership, and its tokenholders . . . faced unlimited liability"). Here, Galaxy, for example, admits that it holds POOL tokens and uses those tokens to participate in the governance of PoolTogether's illegal lottery protocol. On *Defendants'* version of the facts, then, Galaxy and the other defendants who own POOL tokens, including Cusack, Nascent, ParaFi, and Dragonfly, are general partners in an enterprise violating New York law. This would also defeat their personal-jurisdiction objections. *Afloat in Fr., Inc. v. Bancroft Cruises Ltd.*, No. 03 Civ. 917(SAS), 2003 WL 22400213, at *5, 2003 U.S. Dist. LEXIS 18703, at *14 (S.D.N.Y. Oct. 20, 2003) ("Where a court has personal jurisdiction over a partnership, either because of the partnership's activities as a whole *or the actions of a single partner* acting on behalf of the partnership, the court has personal jurisdiction over all of the general partners.") (emphasis added)).

\* \* \*

We hope this detailed letter can assist the Court in setting an efficient briefing schedule for the issues worth briefing.

Sincerely,

Charlie Gerstein
December 23, 2021



**Charlie Gerstein, *Partner***
charlie@gerstein-harrow.com
202-670-4809

611 Pennsylvania Ave. SE, No. 317
Washington, DC 20003
gerstein-harrow.com