# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH KENT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| POOLTOGETHER, INC.; DHARMA ) | Case No. 21-CV-6025 |
| LABS, INC.; OZONE NETWORKS, ) | CLASS ACTION |
| INC.; LEIGHTON CUSACK; KAIN ) | JURY TRIAL DEMANDED |
| WARWICK; STANISLAV KULECHOV; ) | |
| DRAGONFLY DIGITAL ) | |
| MANAGEMENT, LLC; NASCENT US, ) | |
| LLC; NASCENT LIMITED ) | |
| PARTNERSHIP; STICHTING MAVEN ) | |
| 11 FUNDS; GALAXY DIGITAL ) | |
| TRADING HK LIMITED, LP; PARAFI ) | |
| CAPITAL, LP; and COMPOUND ) | |
| LABS, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## SECOND AMENDED COMPLAINT

1.      Defendant PoolTogether, Inc. (PoolTogether), advertises for sale what it has described on its website as "tickets" to win "prizes" in a "lotter[y]" to gamblers all over the world. In his First Amended Complaint in this Action, Kent alleged that PoolTogether, its creator, and its investors conspired to violate New York law by selling lottery tickets; and that those Defendants and Defendant Compound Labs, Inc., aided and abetted PoolTogether's sale of lottery tickets. Kent and the purported class of plaintiffs maintain those allegations.

2.      In its initial response to this Action, PoolTogether wrote that, even if it created an illegal online lottery called "PoolTogether," the company is not legally a "seller" of any illegal tickets because it merely "operates a website . . . that provides information relating to the PoolTogether protocol and also provides an interface through which a person can connect a cryptocurrency 'wallet' to the protocol to make transfers of cryptocurrency directly into the protocol." And the Investor Defendants contended that they "participate in . . . decisionmaking about the workings of the *protocol*" but that they did not thereby incur *secondary* liability under New York's civil-recovery statute for illegal-lottery sales.

3.      After the First Amended Complaint was filed, Kent purchased two tickets in the PoolTogether USDC lottery *without* using or interacting with PoolTogether, Inc.'s "interface" at all. Kent used Dharma, an application, produced by Defendant Dharma Labs, Inc., that (until its impending acquisition by Defendant Ozone Networks, Inc., was announced) linked traditional bank accounts to blockchain-based products and which specifically promoted PoolTogether. On behalf

of himself and all others similarly situated, Kent alleges (in addition to the original allegations) that Cusack and the Investor Defendants operate a general partnership that, using the PoolTogether protocol—"decentralized software on the internet," according to Defendants—sells lottery tickets and that they are jointly and severally liable for that conduct; and that Dharma or its successors are also liable for selling tickets or, in the alternative, for aiding and abetting the sale of those tickets.

## Parties

4.     Plaintiff Joseph ("Joe") Kent is a software engineer with an extensive background in building technology for nonprofits and political campaigns. In 2020, he led a technology team for a U.S. presidential campaign. He is gravely concerned that the cryptocurrency ecosystem—which requires the use of enormous amounts of electricity—is accelerating climate change and allowing people to evade financial regulations and scam consumers.

5.     Defendant PoolTogether, Inc., is a corporation formed under the laws of the State of Delaware that lists its principal place of business in public filings as Grand Rapids, Michigan, but whose actual principal place of business, as explained below, is Brooklyn, New York. PoolTogether operates an illegal lottery from Brooklyn, New York, available to gamblers all over the world.

6.     Defendant Leighton Cusack is a resident of Brooklyn, New York. He is the founder of and an investor in PoolTogether.

7.     Defendant Kain Warwick is a resident of Sydney, Australia. He invested in PoolTogether with the purpose of promoting its illegal lottery.

2

8.     Defendant Stanislav Kulechov is a resident of Helsinki, Finland. He invested in PoolTogether with the purpose of promoting its illegal lottery.

9.     Defendant Dragonfly Digital Management, LLC ("Dragonfly"), is a limited-liability company formed under the laws of the State of Delaware and headquartered in San Francisco, California, and Beijing, China. It invested in PoolTogether with the purpose of promoting its illegal lottery.

10.     Defendant Nascent US, LLC (together with the entity below, "Nascent"), is a limited-liability company formed under the laws of the State of Delaware and headquartered in Canada. It invested in PoolTogether with the purpose of promoting its illegal lottery, and it employs Dan Elitzer, who (while acting within the scope of his employment) actively participated in the creation and governance of PoolTogether's illegal lottery.

11.     Defendant Nascent Limited Partnership (together with the entity above, "Nascent"), is a limited partnership formed as a Canadian entity in December 2020, redomiciled as a Cayman Islands entity in November 2021, and headquartered in Canada. It invested in PoolTogether with the purpose of promoting its illegal lottery.

12.     Defendant Stichting Maven 11 Funds ("Maven 11"), is a private foundation formed under the laws of the Netherlands and headquartered in Amsterdam. It invested in PoolTogether with the purpose of promoting its illegal lottery.

13.     Defendant Galaxy Digital HK Limited ("Galaxy"), is a Hong Kong private limited company. It invested in PoolTogether with the purpose of promoting its illegal lottery.

14.     Defendant ParaFi Capital, LP ("ParaFi"), is a limited partnership formed under the laws of the State of Delaware and headquartered in Greenwich, Connecticut. It invested in PoolTogether with the purpose of promoting its illegal lottery.

15.     Defendant Compound Labs, Inc., is a corporation formed under the laws of the State of Delaware, and headquartered in San Francisco, California. It promotes PoolTogether and purposefully facilitates PoolTogether's illegal lottery.

16.     Defendant Dharma Labs, Inc. is, is a corporation formed under the laws of the State of Delaware, and headquartered in San Francisco, California.

17.     Defendant Ozone Networks, Inc. is a corporation formed under the laws of the State of Delaware, and headquartered in New York, New York.

## Jurisdiction and Venue

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2) because PoolTogether gamblers have delivered at least $122,000,000 into currently operating pools and the amount in controversy therefore exceeds $5,000,000, and because Kent and many members of the proposed class are citizens of a different state than at least one of the defendants.

19.     This Court has general personal jurisdiction over PoolTogether, Nascent, and Cusack because they are domiciliaries of New York.

4

20. This Court has specific personal jurisdiction over all Defendants because they purposefully conspired to operate an illegal lottery by directing money into Brooklyn, New York; because they purposefully aided and abetted the operation of an illegal lottery in Brooklyn, New York; because they conspired with others who conducted an illegal lottery in Brooklyn, New York; and because they are partners in a general partnership with at least one member that has conducted partnership business in New York and is therefore subject to personal jurisdiction in New York.

## PoolTogether's Basic Operations

21. Cusack founded PoolTogether in 2018.

22. In public writings, Cusack describes PoolTogether as a "no-loss lottery," tracing the history of such games to turn-of-the-(last)-century Britain. In a "no-loss lottery," otherwise known as a "prize-linked savings account," users deposit money with a counterparty and forgo the interest otherwise due on that money in exchange for a lottery ticket paying a prize valued at (roughly) the total amount of interest due to all depositors over the drawing period.

23. PoolTogether is conspicuously marketed to the general public. According to Cusack, PoolTogether is "GOOD for you" because it "leverages the fun of speculation to increase saving money." It is, in his view, "a better alternative to both savings accounts and lotteries" because PoolTogether "offers people access to outsize returns WITHOUT needing to risk their capital." PoolTogether's "[e]ndgame," according to Cusack, "is replacing savings accounts and lotteries." "The first step," he notes, "is becoming the first viral DeFi [decentralized finance] protocol to break into the mainstream."

24.     But all of the money delivered to PoolTogether is at risk of loss while gambling. To make this clear, PoolTogether has said on one of its websites that "there are risks associated with using [PoolTogether] and users assume the full responsibility for these risks. You should not deposit any money you are not comfortable losing."

25.     And nothing about PoolTogether is unique in its supposed benefits. Pursuant to a 2014 federal law (the American Savings Promotion Act, *see* Pub. L. 113-251 (2014)), states may authorize banks and credit unions to create prize-linked savings accounts exactly like PoolTogether, except using U.S. currency and, crucially, subject to oversight by state and federal banking regulators and at effectively zero transaction costs. A New York law passed in response to that 2014 federal law specifically permits any "banking organization . . ., federal credit union, federal savings bank, federal savings and loan association, or national bank association" to offer a "savings promotion prize giveaway." N.Y. Banking L. 9-v. PoolTogether is not a licensed bank or credit union.

26.     True retail savers, then, have safer alternatives already at their disposal. Savers who put their money into prize-linked savings accounts at banks as authorized by federal and state law can rest assured that their deposits are guaranteed, that the value of their accounts must be clearly stated, and that they will always have access to their money.

27.     PoolTogether is a riskier, more expensive, and unregulated version of something already available to genuine retail investors. Its true purpose is just like

that of a traditional criminal enterprise running a traditional numbers racket: to convince people to forgo their valuable money in the hopes of winning a prize, and to use that money in the interim for its own unsupervised purposes.

28.     Further, state and federal banking regulations exist to protect broader national interests like national security and preventing tax evasion. For example, anti-money-laundering regulations strengthened after the September 11th terrorist attacks require regulated financial institutions to know their customers and report transactions of a certain size or type to the government. Banks are also required to verify that they are not working directly or indirectly with sanctioned entities and people. On information and belief—as explained below, based on Kent's experience— despite soliciting gamblers to give their money to PoolTogether, PoolTogether does not comply with any of these regulations. PoolTogether is seeking to attract money for its own benefit with a product that can be offered lawfully only by a regulated financial institution without being subject to any of the regulations applicable to those institutions. And PoolTogether is violating New York's prohibition on operating an illegal lottery.

### The Mechanics of PoolTogether's Illegal Lottery

29.     To gamble with PoolTogether, users send cryptocurrencies to PoolTogether's platforms. PoolTogether accepts various cryptocurrencies, including Dai, Compound, Celo, and some coins that are linked in value to the U.S. dollar ("stablecoins").

30.     Each dollar worth of value delivered to PoolTogether entitles the gambler to one "ticket" for a lottery that is drawn by a random-number generator either daily or weekly.

31.     Meanwhile, the money delivered to PoolTogether is immediately lent out to a "liquidity pool" of cryptocurrencies from which unrelated people and entities can borrow or exchange cryptocurrencies. The largest such pool operators are Compound and Aave (which Kulechov founded), but PoolTogether also lends deposited funds to other, smaller operations. Unlike funds obtained by the regulated financial institutions that U.S. and New York law permit to run "no-loss lotteries," there are no restrictions on the kinds of entities to which PoolTogether can lend out the money gamblers deliver.

32.     PoolTogether gamblers forgo the "yield"—or interest—that would otherwise be due from the liquidity pools. PoolTogether then (as its name suggests) pools all the interest and divides it among a pre-specified number of winning tickets, keeping up to 50% of the yield that would otherwise be due as prizes as a "reserve" to generate more yield, supposedly for future prizes.

33.     Currently, PoolTogether operates fourteen running lotteries. The lotteries differ only in the prize distributions (how many, and how often) and the cryptocurrencies used; they are otherwise identical.

34.     PoolTogether also allows other people or organizations to use its "protocol" to create their own lotteries. PoolTogether thus hosts the operation of many more lotteries as well.

35.    As of October 26, 2021, PoolTogether gamblers had delivered about $122,000,000 to PoolTogether's fourteen current lotteries.

36.    Since its founding in 2018, according to its own publicly accessible records, PoolTogether paid out approximately $4,300,000 in prizes.

37.    Because the simple act of sending cryptocurrency to PoolTogether is remarkably expensive, only large deposits in PoolTogether or deposits that are left with PoolTogether for a very long time could possibly have positive expected value. And because PoolTogether keeps up to 50% of each weekly prize as a "reserve," which may never be paid out, PoolTogether may never offer a positive expected value.

38.    For example, because every transaction in a cryptocurrency using Ethereum (a major network of cryptocurrency and other block-chain applications) requires significant computing power, transactors must pay something called a "gas" fee to compensate the network for that power.

39.    A recent attempt to deliver 25 of the cryptocurrency U.S. Dollar Coins, or USDC, to PoolTogether and receive 25 tickets for its USDC lottery would have required a gas payment of $161.27. Therefore, a gambler is effectively paying $186.27 for $25 in PoolTogether lottery tickets. According to PoolTogether, the $25 in tickets that the gambler paid $186.27 for would have given the gambler a one in 316,438 chance to win a prize of $11,670, resulting in a weekly winning expected value of a little more than three cents. Even excluding the cost of loss of access to their $25, gamblers would still be expected to lose money decades after their initial deposit.

40.     Those decades of expected losses are calculated before gamblers attempt to withdraw their money. To withdraw from PoolTogether, gamblers must pay another gas fee of similar size. Therefore, they could easily end up paying over $250 to buy $25 in tickets, gamble, and then withdraw their money.

41.     Gas fees alone make PoolTogether lottery tickets a very bad deal for anyone gambling less than tens of thousands of dollars (roughly enough to render the expected returns high enough to overcome the gas fees). To supposedly compensate for these severe limitations, PoolTogether has begun allowing users to pool their purchases of tickets in units called "pods." But participants in these gambling pods still indirectly pay large gas fees, face the same risks as other lottery participants, and are entitled to lower potential prizes.

42.     For example, a recent attempt to deposit 25 U.S. Dollar Coins into a PoolTogether gambling pod would have required a gas fee of $36.36 before receiving the first fraction of a pod's lottery ticket.

43.     The deal is likely even worse than it appears for gamblers. Starting in early 2021, PoolTogether began keeping up to *fifty percent* of each weekly prize as a "reserve," as mentioned above, added back to the pool after each drawing. There is no guarantee that the reserve will ever be paid out to the gamblers, and if it ever is, it may be after many gamblers have already withdrawn their cryptocurrency from the pool. Even excluding gas fees, then, PoolTogether is likely a significantly worse deal than simply depositing one's money with the liquidity pools to which PoolTogether immediately lends gamblers' money.

## The Nature of the PoolTogether Protocol

44.     In 2019, Cusack and several of his friends and collaborators wrote a piece of software, called a "protocol," operating on the Ethereum blockchain—a decentralized network of computers that, among other things, allows users to trade cryptocurrencies and create decentralized applications—to sell lottery tickets. They called this software "PoolTogether."

45.     As explained, PoolTogether gamblers send cryptocurrency to the protocol and receive lottery tickets in exchange. The protocol routes the gamblers' cryptocurrency to liquidity pools, then takes the interest, pools it together, keeps up to 50% as a "reserve," and distributes the rest to the holder of each lottery's winning tickets.

46.     From its creation in 2019 until in or around February of 2021, the protocol was controlled by Cusack and his collaborators.

47.     But in February 2021, Cusack and his initial collaborators sought to transform PoolTogether into a supposedly Decentralized Autonomous Organization ("DAO.")

48.     To do this, Cusack and his collaborators distributed approximately 5,000,000 POOL tokens—ownership interests in the PoolTogether protocol that give their holders a say in the governance and operation of the protocol—and Cusack and his collaborates pre-programmed the protocol to allow the issuance of only 10,000,000 (with some future potential exceptions not relevant here).

49.     According to a PoolTogether public statement, the initial distribution sent 15% of POOL tokens to previous gamblers and users who voted in initial straw

11

polls on PoolTogether's operations; 12.44% to the PoolTogether "team" (Cusack and his initial collaborators); 7.52% to investors in PoolTogether, Inc.; 7.5% to be used for some initial projects not relevant here; and the remaining 57.54% to the "POOL Token Treasury," which was available for further distribution as determined by a vote of the holders of the other 42.46% of the tokens.

50.     Each POOL token entitles its holder to one vote in the PoolTogether governance protocol. Users may delegate their votes to others, but only users with 10,000 or more votes may put proposals up for a vote. Tokenholders must "activate" their tokens in order to vote, and activation generally incurs network charges or "gas fees," as described in the First Amended Complaint.

51.     According to a public statement by Cusack, as of February 27, 2021, one "PoolTogether Inc. investor" (likely a Defendant here, although its identity is unknown) held 57% of the voteable tokens, perhaps because others had forgone activating their tokens.

52.     After the initial distribution, POOL tokens became available for purchase on the secondary market. According to publicly available data, in February 2021, they changed hands for $15.77. Today, they change hands for about $2.99 per token.

53.     In May of 2021, when POOL was trading between $19 and $23 per token, Cusack put a proposal up for a vote by which the "treasury" would transfer 411,479 POOL tokens to ParaFi, Galaxy, Dragonfly, Nascent, and Maven 11, in exchange for which those companies would transfer $5,950,000 worth of U.S. Dollar

Coins (whose value is pegged to the U.S. Dollar) to the treasury. Under this proposal, the POOL tokens transferred to these companies would be blocked from sale for one year, with the tokens gradually becoming tradeable on a weekly basis thereafter.

54.   After some debate on an initial version of the proposal, the May 2021 proposal passed on May 26, 2021, 103,780 votes to zero, and the tokens were transferred as described.

55.   Cusack acknowledged that the result of this transaction was that, at least "for a short amount of time," "investors" became "on lead" in the protocol—meaning that they would together control more than 50% of the voteable tokens. It is unclear whether the investors ever ceased to be "on lead."

56.   Holders of POOL tokens are empowered, according to Cusack and PoolTogether, Inc., to do with the protocol whatever a holder of a majority of tokens wish to do.

57.   For example, according to Cusack, "the prize pool reserves . . . can be used by governance for whatever purposes POOL holders believe will help grow the protocol," and, on at least one occasion, the POOL holders believed that the best thing to do with the reserve money is effectively to pay it to themselves by buying back POOL tokens from the POOL Token Treasury.

## The PoolTogether General Partnership

58.   POOL tokens entitle their holders to a share in the control of the PoolTogether business and to an ownership share of that business.

59.   Together, the Investor Defendants are likely the largest holders of POOL tokens, and they use those tokens to work together with each other, Cusack,

and other people or entities, to operate the PoolTogether protocol as a business for profit.

60.     Galaxy, ParaFi, and Maven 11 admit that they participate, through their own efforts, in the operation of the protocol using their tokens: According to those Defendants, they "participate in . . . decisionmaking about the workings of the protocol."

61.     Nascent similarly participates in the operation of the protocol using its tokens. Cusack stated that "Dan [Elitzer] from Nascent" has been among the "most active" in governance proposals for the protocol and has "commented and voted."

62.     Dan Elitzer co-founded both Nascent entities, and Nascent US LLC is Dan Elitzer's employer.

63.     At least one Nascent entity, likely Nascent Limited Partnership, holds a substantial amount of POOL tokens and has entered into a so-called SAFE agreement (that is, a "simple agreement for future equity") to purchase additional tokens; take additional equity in PoolTogether, Inc., or a related company; or take another related action that would maintain or increase its financial interest in the protocol and corporation.

64.     Dragonfly participates in the operation of the protocol. Cusack stated that Dragonfly was providing "value" to PoolTogether with "connections and knowledge" and that he was hoping to "work with Dragonfly" on a "China strategy" for PoolTogether.

65.     Cusack stated that ParaFi and Nascent have delivered "proven value to the protocol over the last 2 years. And even today, they are LP'ing [providing liquidity] for the protocol, they hold deposits in the protocol, they are participating in governance, they are connecting us with people (That Gemini deal I mentioned was from ParaFi's connection, etc.). It's really too numerous to list."

66.     Although Cusack has publicly claimed that he generally does not vote on governance proposals, he has acknowledged that he votes at least sometimes, saying "I *try* not to [vote] though so that the others in the community can have a bigger voice."

67.     And Cusack obviously participates in the affairs of the partnership: He discusses proposals with his partners, he puts proposals up for a vote using his tokens, and he holds a large share of POOL tokens, perhaps the largest individual share. He is PoolTogether's founder, and the center of its partnership.

68.     The partners carry on PoolTogether as a for-profit business, and they publicly say so.

69.     Ben Forman, of ParaFi capital, said that "[o]wners of the governance tokens from . . . DAOs [including PoolTogether] not only have a right to the cash flow on these networks, they also have claim to some of the assets in the DAO," implying that the purpose of purchasing governance tokens—and thereby participating in the enterprise they govern—is at least in part profit.

70.     Maven 11 described its purchase of POOL tokens as justified because "PoolTogether has product market fit and is ready to take over a large chunk of the

no loss lottery market," implying that the purpose of purchasing governance tokens—and thereby participating in the enterprise they govern—is at least in part profit.

71.     In February 2021, Dan Elitzer of Nascent explained to the holders of POOL tokens that the proposal to sell him and the other Investor Defendants POOL Tokens was a good proposal. To explain why his own motivations were aligned with the existing POOL holders, Elitzer said that "getting a slightly better deal on buying tokens from the treasury to the detriment of the project/community would not be a positive [expected value] play for me . . . . Again, as one of the potential buyers here, I'm obviously biased, but as a long-standing member of the PoolTogether community, I do honestly believe supporting this proposal is the right thing to do." This implies that Elitzer was at least in part interested in profit, for if he were not, he would have no economic bias in his statement.

72.     Elitzer separately said on Twitter that "I'm strongly in favor of adding $POOL incentives to the Sponsorship pools, then directing a meaningful portion (50%?) of that yield to the Reserve. The Reserve will be a key long-term moat." By "moat" he likely meant a business mechanism that allows a company to maintain a competitive advantage over others, which would matter only if PoolTogether were operating for a profit.

73.     Cusack justified the sale of tokens by explaining that it would "ha[ve] the added benefit of bringing in long term *value* aligned *investors*."

74.     Similarly, when explaining why it was a good idea to initiate a buyback of POOL tokens using the reserve money from the lottery, Cusack said that the

purpose was "improving overall tokenomics," and "improving incentives for POOL holders." "Tokenomics" is (unsurprisingly) a portmanteau of "token" and "economics," and it generally refers to analyzing the prospective value of a token. Cusack was attempting (successfully) to justify using the reserve money to pay POOL tokenholders by explaining that doing so would be in the long-term economic interest of the business as a whole.

75.     The Chief Technology Officer of PoolTogether, Inc., wrote, in support of the sale of tokens to the Investor Defendants, that "I think it helps to view PT [the PoolTogether DAO] through the startup lens. VCs [venture capitalists] invest in a startup that they believe in. In one that they have conviction in. They are willing to wait years until that startup *turns a profit*. Money is spent on growth until the company has a strong foothold in the market."

76.     Another major contributor to the PoolTogether protocol (who may also have a role at PoolTogether, Inc.) put the matter succinctly: "[T]he protocol makes profit by taking part of the interest generated by the pools[.] Those profits are controlled by POOL token holders."

77.     In September of 2021, Cusack was forthright about the reason he "tries not to" vote: to avoid regulation. He wrote that "The important thing from a regulatory side is decentralization of control. That's why we were so aggressive on the initial token distribution, low voting thresholds, etc. That's also why I have never voted! If there are things being suggested, implemented, and voted on by token holders un-affiliated with the founding team[,] I'm really not concerned about

regulation. That actually proves the case that PoolTogether is truly decentralized. I think teams that will have issues are the ones that aren't really decentralized (i.e. they kept tokens with the company, they vote on everything, etc.)."

78.     But events after the filing of the First Amended Complaint in this action suggest that the relationship between PoolTogether, Inc., and the protocol is not as distant as PoolTogether, Inc., claims.

79.     On January 21, 2022, more than a month after PoolTogether, Inc., filed a letter in this Court saying that "[t]he protocol is not owned, operated, or controlled by Defendant," a key participant in the PoolTogether protocol (whose relationship to PoolTogether, Inc., is unknown) publicly responded to a "[s]ensitive question" from another PoolTogether participant. "Is [the] current token price [which, as described above, has fallen significantly in the last year] causing pressure on PT *Inc*'s ability to retain/compensate team members or payouts to dao contributors?" The key participant responded: "We have around $7 million in the treasury. We're good for a while." The key participant was referring to the protocol treasury, which at the time had approximately $7 million of accessible value in it.

80.     It is, therefore, at least possible for PoolTogether, Inc., to tap into reserves kept in the PoolTogether protocol's treasury to pay the corporation's expenses.

81.     Similarly, as recently as December 2021, Cusack stated that PoolTogether, Inc., would be paying for the services of someone working on behalf of the protocol, "[b]ecause the full direct to DAO hiring process has not been ironed out."

82.     In January 2022, a PoolTogether, Inc. employee suggested that someone wanting to transfer an asset to the DAO "could probably make it out to pooltogether Inc" and then "pooltogether Inc holds it for the dao."

83.     Cusack has directed users of the protocol to report security issues with the protocol to email addresses for PoolTogether, Inc. Cusack and employees of PoolTogether, Inc., provide ongoing, daily customer support for users of the protocol, including those who did not deposit through PoolTogether, Inc. And Cusack stated in June 2021 that recent governance changes for the protocol had been *exclusively* proposed by PoolTogether, Inc., employees: "The last 4 proposals have all been submitted by PoolTogether Inc employees. I'd love to see more proposals coming from the community."

## Dharma's Interface and Ozone's Liability

84.     Until January 18, 2022, Dharma operated a platform by which users could transfer money from traditional bank accounts to decentralized-finance applications.

85.     The Dharma interface offered users a discount on gas fees, which Dharma said could be achieved by periodically pooling transactions and executing them together. (Gas fees do not necessarily change based on the volume of the transaction, so pooling transactions could reduce the cost per user.)

86.     Dharma separately charged users fees for executing transactions.

87.     Dharma prominently advertised PoolTogether as one of four specific applications to which Dharma users could send cryptocurrency via their U.S. bank accounts.

88.     Cusack promoted the use of Dharma as a way to access PoolTogether, writing, "Dharma I think is easiest way to get onboarded for people who have no exchange account" and saying that by using Dharma, "you don't need to connect to the PoolTogether website at al[l]." Cusack also offered to "pay" an individual who would develop "a tutorial for joining PoolTogether using Dharma" and indicated that Cusack was directly in communication with Dharma.

89.     Dharma specifically earned money from purchases of PoolTogether tokens because when users purchased tokens Dharma charged them fees that they would not otherwise have paid.

90.     On January 18, 2022, Ozone (which operates a business called OpenSea, which serves as a marketplace for digital collectibles called NFTs) announced that it was purchasing Dharma.

### Kent Buys a Ticket Via App.PoolTogether.com

91.     On October 21, 2021, Kent navigated to app.pooltogether.com[1] and there delivered $10 worth of Gemini Dollars (GUSD) to PoolTogether and received ten tickets in PoolTogether's GUSD lottery.

---

[1] Two URLs are associated with PoolTogether: The URL that Kent visited to purchase tickets (app.pooltogether.com) and another hosting a site describing PoolTogether's operations (pooltogether.com). At the time of the transaction (and today), the former contains no explicit terms of service or use. The latter begins with a link to the former, and describes itself in a page called "terms," whose link is at the very bottom of the home page, as "a website of PoolTogether LLC," the now-inactive New York LLC. To access either URL, a user need not indicate assent to any terms of service.

92.     With gas fees, Kent spent $275.60 in total value (including the $10 he delivered to PoolTogether) in exchange for the tickets.

93.     PoolTogether listed Kent's odds of winning as one in 2,303 and listed the prize as $778.

94.     During no part of the process was Kent asked to assent to, acknowledge, or even view any contract, terms of use, or disclosures.

95.     During no part of the process was Kent asked to provide any information about himself other than the address of the cryptocurrency wallet from which he delivered GUSD to PoolTogether.

### Kent Buys a Second Ticket Via Dharma

96.     On January 17, 2022, Kent downloaded the Dharma application for his cellphone.

97.     The same day, he connected a bank account to Dharma. The application prompted Kent to provide identifying information and a copy of his photo ID, and the application then compared the ID to a photo of his face taken with his cellphone camera.

98.     After the bank account was connected, Kent clicked a button labeled "protocols." The first (and most colorful) icon that popped up had PoolTogether's logo on it and read "Deposit to PoolTogether to win up to $80,000."

99.     Kent clicked "deposit."

100.    He was directed to a screen asking him how much he would like to deposit, and he entered $2 worth of U.S. Dollar Coins.

101.   On the following page, Kent was asked whether he wanted to "confirm and execute" the transaction, which listed a purchase of 2 USDC tickets from PoolTogether, $99.87 of "gas lite" (which Dharma said was 62.64% less than Kent would have spent executing the transaction through another service or the Ethereum blockchain directly), and $2.70 fee to be paid directly to Dharma.

102.   At no point during this process was Kent shown any type of notice that any terms and conditions would govern his interactions with Dharma.

103.   Kent has never seen any terms and conditions that Dharma purports to apply to those who use its service.

104.   No agent of Kent knew of or had seen any terms and conditions that Dharma purports to apply to those who use its service at the time Kent connected his wallet and delivered money to Dharma.

105.   The same day that Kent purchased PoolTogether tickets through Dharma, Kent, through counsel, attempted to find terms and conditions on Dharma's cellphone application and found none.

## PoolTogether's Principal Place of Business Is in Brooklyn, New York

106.   On September 26, 2019, Cusack registered a corporation called "PoolTogether, Inc.," formed under the laws of the State of Delaware, as an "unauthorized foreign corporation" in New York. The same day, he listed the corporation in New York as inactive because it had been "merged out of existence," but PoolTogether, Inc., is currently listed in Delaware as in good standing as the survivor of a September 25, 2019, merger.

107. On September 26, 2019, Cusack also formed PoolTogether, LLC, under the laws of the State of New York. PoolTogether, LLC, is now listed as inactive.

108. Both entities' address was listed in New York as 215 Moore Street, Brooklyn, New York.

109. 215 Moore Street appears to be the address of the Bushwick Generator, a "community influenced innovation lab and creative hub in Brooklyn," that houses the "Bushwick Blockchain Alliance," which, according to its website, "connects local businesses, city agencies and civic organizations with blockchain startups and subject matter experts."

110. On October 25, 2019, PoolTogether, Inc., was registered with the California Secretary of State as a foreign corporation. On that registration form, PoolTogether listed its "business address" as an address in Grand Rapids, Michigan.

111. The Grand Rapids address is Cusack's parents' house. According to publicly accessible records, it is a single-family home owned by a trust controlled by Cusack's mother, but to preserve Cusack's family's privacy, Kent omits the specific address and other details establishing that it is Cusack's parents' house.

112. On September 10, 2020, PoolTogether filed a Form D with the SEC noticing an exemption from registration of securities offerings. On that form, PoolTogether lists Cusack's parents' house as its "principal place of business" and lists Cusack as its "executive officer," "director," and "promoter." His address on that form is listed in Brooklyn.

113.    Notwithstanding the Grand Rapids address, at all times relevant to this Action, Cusack operated PoolTogether with its nerve center and principal place of business in Brooklyn.

114.    In December 2019, Cusack wrote on Twitter that, because his "work [was] ramping up," he was "get[ting] an apartment in nyc" where he is "primarily based."

115.    PoolTogether is listed on Praxis, a "a creative engine for redemptive entrepreneurship," with its "headquarters" in "Brooklyn, NY." Praxis's website says that Cusack "lives and works in Brooklyn."

116.    In March and June 2020, and May of 2021, Cusack tweeted that he was in New York City.

117.    In July of 2021, Cusack mentioned on a website that he lived above his favorite restaurant in Brooklyn.

118.    In September 2021, Cusack sent a message on another social-media site saying that PoolTogether was throwing a party in New York.

119.    On a jobseekers' website, PoolTogether lists two positions as "New York (NY) – Vancouver – Remote."

120.    PoolTogether's statement that its principal place of business is Cusack's parents' house in Michigan is false. Throughout its existence, PoolTogether was controlled by Cusack from Brooklyn.

## The Investors' Conspiracy to Promote the Lottery

121.    Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, Galaxy, and ParaFi all agreed to give money to PoolTogether, with the purpose of enabling it

to illegally sell lottery tickets from within the State of New York, in exchange for a financial interest in its operations.

*Cusack*

122.  Cusack himself founded PoolTogether, Inc., and at all times has controlled its operations, and created the PoolTogether protocol and continuously participates in its governance. He, therefore, agreed with the other investor defendants to operate the PoolTogether lottery as a conspiracy or a general partnership, and he aided and abetted PoolTogether's illegal lottery operation.

123.  Although this is not an element of conspiracy or aiding-and-abetting liability, Cusack himself is in fact aware of the federal, and perhaps state, laws that he is violating. In a 2021 interview, Cusack stated that he is aware that prize-linked savings accounts were "only legalized in the United States in 2014"—an apparent reference to the American Savings Promotion Act of 2014, which specifically limits its changes to the definition of illegal gambling to exclude only prize-linked savings accounts "conducted by an insured depository institution or an insured credit union."

124.  In the same interview, Cusack marketed PoolTogether's lottery with gambling terminology, describing how by purchasing tickets through his company's pods "anyone can become a whale, which is kind of cool."

125.  Cusack is purposefully running a numbers racket through PoolTogether. The mere fact that he may subjectively believe that this is legal (or should be legal) does not change the fact that he is purposefully doing it, and it is no defense to this Action.

<u>*Warwick*</u>

126.   In or around October 2020, Warwick invested in PoolTogether alongside ParaFi, Kulechov, and others.

127.   Although the substance of Warwick's arrangement with PoolTogether is not known, on information and belief Warwick gave money to PoolTogether in exchange for an ownership share (or right to purchase an ownership share) in PoolTogether, Inc., its related LLC, another related entity, or voting rights in its governance protocols.

128.   The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York or participate in the general partnership that controls the protocol.

<u>*Kulechov*</u>

129.   In or around October 2020, Kulechov invested in PoolTogether alongside Warwick, ParaFi, and others.

130.   Although the substance of Kulechov's arrangement with PoolTogether is not known, on information and belief Kulechov gave money to PoolTogether in exchange for an ownership share (or right to purchase an ownership share) in PoolTogether, Inc., its related LLC, another related entity, or voting rights in its governance protocols.

131.   The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York or participate in the general partnership that controls the protocol.

132.   Kulechov's firm Aave and PoolTogether have also promoted a joint lottery, contending in a public Tweet that participants would earn 490% returns per year.

<em>ParaFi</em>

133.   In or around October 2020, ParaFi invested in PoolTogether alongside Warwick, Kulechov, and others.

134.   Although the substance of ParaFi's 2020 arrangement with PoolTogether is not known, on information and belief ParaFi gave money to PoolTogether in exchange for an ownership share (or right to purchase an ownership share) in PoolTogether, Inc., its related LLC, another related entity, or voting rights in its governance protocols.

135.   The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York or participate in the general partnership that controls the protocol.

<em>Dragonfly, Maven 11, Nascent, ParaFi and Galaxy</em>

136.   In or around May of 2021, Dragonfly, ParaFi, Maven 11, Nascent, Galaxy, and others, invested in PoolTogether and have described their involvement in the design of the lottery and operations of PoolTogether.

137.   To achieve this investment, the companies transferred U.S. Dollar Coins totaling a little under $6,000,000 to the PoolTogether "treasury" and, in exchange, were issued "POOL Tokens," which allow the companies to vote on governance issues and, eventually, redeem value from the enterprise.

138.    The stated, public purpose of this investment was to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York or participate in the general partnership that controls the protocol.

139.    Nascent co-founder Dan Elitzer stated (before founding Nascent) that, in addition to investing, "Since first meeting the PoolTogether team . . . we have collaborated with them on prototypes and experiments testing various implementations" of PoolTogether's lottery.

140.    Maven 11 Managing Partner Balder Bomans stated that his company would be "working with . . . PoolTogether . . . as well as the founding team to make the protocol an even bigger success," an apparent reference Maven 11's involvement in designing and operating PoolTogether's lottery.

141.    In a press release announcing its investment, Maven 11 aptly described PoolTogether as a "lottery" and "chance based game" that was "ready to take over a large chunk of the no loss lottery market."

142.    Maven 11 is also an investor in Defendant Kulechov's firm Aave, which has promoted a joint lottery with PoolTogether.

143.    ParaFi Founder and Managing Partner Ben Forman promoted PoolTogether's "lotteries" as being able to "[function] more elegantly on a blockchain vs. traditional financial infrastructure."

144.    Galaxy refers to itself as "the bridge between the crypto and the institutional worlds." Cusack has stated that Galaxy "brings deep institutional ties" to PoolTogether.

145.   Dragonfly describes itself as, "a cross-border crypto venture fund" and touts its relationship with PoolTogether. Cusack has stated that Dragonfly works with PoolTogether to gain new lottery participants from Asia: "Dragonfly Capital has a strong Asia focus and will help the protocol grow there (currently China is #2 for web traffic to PoolTogether.com)."

## **Compound Labs' Facilitation of the Lottery**

146.   Compound Labs describes itself as "one of the most visible pioneers of decentralized finance." The company designed a protocol that allows individuals to loan their cryptocurrencies out and earn interest.

147.   PoolTogether gamblers deliver their money to PoolTogether in exchange for lottery tickets. PoolTogether then loans its gamblers' cryptocurrencies out through Compound and earns interest. PoolTogether then pays a portion of that interest back to its users in the form of lottery prizes. Compound takes a portion of the interest PoolTogether earns as a fee, thereby directly profiting from the scheme.

148.   As Cusack publicly admitted, Compound Labs designed a PoolTogether smart contract (a form of computer program facilitating the distribution of cryptocurrencies), and Compound Labs in return thanked PoolTogether "for building on top of Compound."

149.   By building tools with which PoolTogether may operate an illegal lottery to Compound Labs' benefit, Compound Labs purposefully facilitates PoolTogether's lottery. Compound Labs touts PoolTogether on its website as "[a] no-loss *lottery*

utilizing the interest earned in Compound as the prize" (emphasis added), making clear that it intends the purpose of its involvement to be facilitating a lottery.

150.    The stated, public purpose of the partnership between Compound Labs and PoolTogether is to facilitate PoolTogether's operation of a lottery based in Brooklyn, New York.

## Class Action Allegations

151.    Plaintiff proposes to move to certify the following class: All people who delivered money to PoolTogether to participate in a lottery operated by PoolTogether.

152.    The proposed class meets Federal Rule of Civil Procedure 23's requirements, called respectively numerosity, commonality, typicality, adequacy, predominance, and superiority.

### *Numerosity*

153.    The class is so large that joinder of all parties would be impracticable.

154.    PoolTogether currently operates fourteen lotteries and, based on publicly accessible records, more than 11,900 people are currently participating—including over 5,400 people in just one lottery.

155.    PoolTogether has been operating these lotteries for at least two years.

156.    The class therefore contains at least 5,400 members (and likely many more) and satisfies the numerosity requirement.

### *Commonality*

157.    There are questions of law and fact common to members of the class.

158.    The questions of fact common to the members of the classes include, without limitation, how much money in total was delivered to PoolTogether; and

whether the Investor Defendants conspired with each other and PoolTogether, and whether they and Compound aided and abetted PoolTogether, in violating New York's prohibition on selling lottery tickets, or whether defendants are engaged in a general partnership to operate an illegal lottery.

159.   The questions of law common to the members of the classes include, without limitation, whether PoolTogether operates a lottery under New York law.

<em>Typicality</em>

160.   New York General Obligations Law § 5-423 gives a cause of action to any person who "purchase[s]" a "ticket . . . in a[] lottery" to recover "double the sum of money, and double the value of goods or things in action, which he may have paid or delivered in consideration of such purchase, with double costs of suit."

161.   On October 21, 2021, Kent delivered ten dollars' worth of GUSD in consideration for ten tickets in a PoolTogether lottery.

162.   Kent's claim is, therefore, typical of—indeed identical to—the claims of all the class members.

<em>Adequacy</em>

163.   Kent's claim, as explained above, is identical to the claims of other class members and he has no known conflicts of interest with any other class member. Additionally, Kent has a sophisticated understanding of software engineering, which will help him guide this litigation effectively.

164.   Kent will adequately protect the interests of absent class members.

165.    Kent proposes Gerstein Harrow, LLP, and Fairmark Partners, LLP, as class counsel.

166.    Both founding partners of Gerstein Harrow have significant experience litigating complex cases, including major class actions.

167.    Charles Gerstein has, among other things, served as lead counsel in a class action case against the City of Houston that recently settled for $1.175 million, and has served as counsel or lead counsel in several complex class actions seeking prospective relief against public entities and officers throughout the country. As a law clerk for the U.S. District Court of the Southern District of New York and the U.S. Court of Appeals for the Second Circuit, Gerstein advised the courts on several complex class-action cases.

168.    Jason Harrow has litigated complex cases on behalf of New York State and its agencies as an Assistant Solicitor General, as an associate at the national law firm Davis Wright Tremaine, LLP, and as lead counsel in the U.S. Supreme Court in *Colorado Dep't of State v. Baca*, No. 19-518 (argued May 13, 2020; decided July 6, 2020). As a law clerk for the U.S. District Court for the Southern District of New York and the U.S. Court of Appeals for the Ninth Circuit, Harrow advised the courts on several complex class-action cases.

169.    Fairmark Partners' attorneys have significant experience litigating complex cases, including major class actions.

170.    James Crooks, a founding partner of Fairmark Partners, has significant experience litigating complex cases, including major class actions.  After clerking for

the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court, where he advised the courts on several complex class-action cases, Crooks joined the international law firm O'Melveny & Myers, LLP, where he was a litigation associate for several years.   There, he litigated complex commercial cases, including class actions, relating to financial products, insurance, products liability, and consumer protection at the federal trial, court of appeals, and Supreme Court levels.

171.   Several of Fairmark's other attorneys have years of experience in complex commercial litigation, including class actions, at major U.S. and international law firms, including Williams & Connolly, LLP, Proskauer Rose, LLP, and O'Melveny & Myers, LLP.

172.   Class counsel will fairly and adequately represent the interests of the class.

### Predominance and Superiority

173.   The questions of fact and law common to the class predominate in this Action over any questions affecting only individual members of the class.

174.   In fact, there will be no individual questions of law or fact for any of the members of the class: Each class member delivered money to PoolTogether in exchange for a lottery ticket, and that is the only element necessary to recover under New York law.

175.   The classes in this case will be easily managed and ascertained. PoolTogether keeps a publicly accessible record of every transaction any gambler has ever executed with it, and each gambler's account is assigned a unique identification

code. Thus, although PoolTogether does not know the legal identities of its gamblers, it can communicate with (and therefore ensure the provision of notice to) all its gamblers; it can determine the amount of money it owes them without any complex individual calculations; and it can pay the money it owes them easily by crediting the accounts associated with each identification number.

## Claims for Relief

***Count One*: Violation of N.Y. Gen. Oblig. Law. § 5-423 (Against PoolTogether, Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, Parafi, Galaxy, and Compound)**

176.   Kent incorporates all prior paragraphs and all paragraphs of the Complaint by reference here.

177.   Kent and all members of the putative class delivered things of value to PoolTogether in exchange for lottery tickets.

178.   Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, Parafi, Galaxy, and Compound agreed with each other and with PoolTogether to forward PoolTogether's stated purpose of selling lottery tickets in the State of New York.

179.   Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, Parafi, and Galaxy all took the concrete action of giving PoolTogether money for the purpose of aiding its operation of an illegal lottery in the State of New York.

180.   Compound designed the tools that PoolTogether uses to operate some of its lotteries, directly handled the proceeds delivered to PoolTogether as part of the illegal lotteries, and profited from doing so.

181.   Cusack, Warwick, Kulechov, Dragonfly, Nascent, Maven 11, Parafi, Galaxy, and Compound all took the concrete steps of, among other things, assisting

PoolTogether with the design and operation of its illegal lottery in the State of New York with the purpose of aiding its operation of an illegal lottery in the State of New York.

182.   Defendants are, therefore, jointly and severally liable to Kent and the members of the putative class in the amount of double the value that Kent and the putative classmembers delivered to PoolTogether in exchange for lottery tickets.

### *Count Two*: Violation of N.Y. Gen. Oblig. Law. § 5-423 (Against Cusack, Dragonfly, Nascent, Galaxy, ParaFi, Maven 11, Dharma, and Ozone)

183.   Kent incorporates all prior paragraphs (and all paragraphs of the First Amendment Complaint in this Action) by reference here.

184.   Cusack, Dragonfly, Nascent, Galaxy, ParaFi, Maven 11, and others carry on as co-owners the business of operating the PoolTogether protocol for profit. Through their mutual ownership of POOL tokens, they have agreed to share profits and losses of the business of the PoolTogether protocol; jointly control and manage the protocol, through the governance rights of POOL tokenholders; make contributions to the protocol's success, including through their respective contributions of capital, knowledge, connections, and other resources described in this Supplemental Complaint; and intended to be partners in the protocol with the other parties and, by definition, with other POOL tokenholders.

185.   Kent and all members of the putative class delivered things of value to the PoolTogether protocol in exchange for lottery tickets.

186.    Defendants are, therefore, general partners, and they are jointly and severally liable to Kent and the members of the putative class in the amount of double the value that Kent and the putative classmembers delivered to PoolTogether in exchange for lottery tickets.

187.    Dharma provided an interface through which users could give Dharma money in exchange for PoolTogether lottery tickets. It, therefore, sold lottery tickets to Kent and all members of the putative class

188.    In the alternative, Dharma aided and abetted the sale of lottery tickets to Kent and all members of the putative class.

189.    Ozone merged with Dharma and is its successor in interest.

## **Prayer for Relief**

Plaintiff Joseph Kent respectfully requests:

- An award of compensatory damages against all Defendants jointly and severally in the amount of double the value of cryptocurrency that the classmembers delivered to PoolTogether or the PoolTogether protocol; and
- An award of double the amount of reasonable attorneys' fees and costs of this Action against all Defendants jointly and severally.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
(*pro hac vice*)
GERSTEIN HARROW LLP

3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

*/s/ James Crooks*
James Crooks
(*pro hac vice* application forthcoming)
FAIRMARK PARTNERS, LLP
1499 Massachusetts Ave. NW, #113A
Washington, DC 20005
jamie@fairmarklaw.com
(619) 507-4182

*Attorneys for Plaintiffs*