**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH KENT,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>POOLTOGETHER, INC.; DHARMA LABS, INC.; OZONE NETWORKS, INC.; LEIGHTON CUSACK; KAIN WARWICK; STANISLAV KULECHOV; DRAGONFLY DIGITAL MANAGEMENT, LLC; NASCENT US, LLC; NASCENT LIMITED PARTNERSHIP; STICHTING MAVEN 11 FUNDS; GALAXY DIGITAL TRADING HK LIMITED, LP; PARAFI CAPITAL, LP; and COMPOUND LABS, INC.,<br><br>　　　　Defendants. | Case No. 21-cv-6025-FB-CLP |

**DECLARATION OF LEIGHTON CUSACK IN SUPPORT OF DEFENDANT POOLTOGETHER INC.'S MOTION (1) TO COMPEL ARBITRATION, OR ALTERNATIVELY, (2) TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT, OR ALTERNATIVELY, (3) TO STRIKE PLAINTIFF'S CLASS ALLEGATIONS**

## DECLARATION OF LEIGHTON CUSACK

I, Leighton Cusack, hereby declare as follows:

1. I am over 18 years of age and competent to make this declaration. I have either personal knowledge of the matters set forth in this declaration or I have learned them through reasonable investigation, and if called upon as a witness, I could and would testify competently to them.

2. I am the President and Chief Executive Officer of PoolTogether Inc., which is a role I assumed on September 20, 2019, when PoolTogether Inc. filed its articles of incorporation with the Delaware Secretary of State. PoolTogether Inc. is an open source software development company, and it operates the website pooltogether.com.

3. Through my role, I am familiar with PoolTogether Inc.'s corporate activities and corporate records, including its merger with its predecessor company, PoolTogether LLC. Through my role, I am also familiar with PoolTogether, Inc.'s activities relating to the PoolTogether website (pooltogether.com); the ways in which users can interact with the PoolTogether website; the nature, operations, and governance of the PoolTogether savings protocol; the technical means through which PoolTogether Inc. notifies users of, and requires them to consent to, the Terms of Service that governs their access and use of the website; and the internal systems PoolTogether Inc. utilizes to retain documented activities regarding certain user interactions with the website.

### General Background on PoolTogether LLC and PoolTogether Inc.

4. The PoolTogether savings protocol concept began at PoolTogether LLC, which was a New York limited liability company that filed its articles of incorporation with the New York Secretary of State on May 2, 2019. PoolTogether LLC was an open-source software development company with the mission of "building products that create financial health." *See*

-1-

v3.docs.pooltogether.com/governance/overview.  ("Open source" means that the software source code created is freely available to the public for anyone to use, modify or redistribute subject only to limited specified license restrictions.  Open source software companies create free software and make money by building services on top of the free open source software.)

5.      PoolTogether LLC developed the PoolTogether website (pooltogether.com) and the PoolTogether savings protocol, both of which were launched in or around June 2019.  PoolTogether LLC thereafter decided to transition into a Delaware corporation, and it did so by: (1) the incorporation of PoolTogether Inc. on September 20, 2019, and (2) a merger between the two companies made effective on September 26, 2019, with PoolTogether LLC merging out of existence, leaving PoolTogether Inc. as the surviving company.

6.      As part of the merger, PoolTogether Inc. assumed all rights, interests, property, assets, liabilities, and obligations of PoolTogether LLC.  To that end, PoolTogether Inc. took over operation and maintenance of the PoolTogether website.  PoolTogether Inc., like its predecessor, is an open-source software development company.

**General Operation of the PoolTogether Savings Protocol**

7.      PoolTogether LLC created the first version of the PoolTogether savings protocol to give cryptocurrency holders a cryptocurrency-based alternative to traditional savings accounts that are available for fiat currencies (such as the dollar).  The savings protocol incentivizes people to save their cryptocurrency assets by providing cryptocurrency distributions to randomly selected depositors who save their cryptocurrency assets using the savings protocol, among other benefits.

8.      The savings protocol was initially created only on the Ethereum network and it was created such that only one type of cryptocurrency could be deposited: DAI.  DAI is a "stablecoin."  A stablecoin is a cryptocurrency that is pegged to the value of a stable asset.  For example, DAI is

pegged to the U.S. dollar. One DAI equals one U.S. dollar. USDC and GUSD also are dollar-pegged stablecoins. The savings protocol has since been expanded to several other cryptocurrency networks and it has been expanded to accept deposits of a variety of cryptocurrencies, including USDC, GUSD, CUSD, CEUR, UNI, and COMP, to name a few.

9. The savings protocol generally operates as follows: Users deposit a cryptocurrency asset into a particular "pool" of the savings protocol designated for that type of cryptocurrency (*e.g.*, users deposit USDC in the USDC pool on the Ethereum network). The savings protocol automatically pools those assets together from all depositors and programmatically routes them to other protocols that generate yield on the same cryptocurrency network (*e.g.*, to the Compound protocol on the Ethereum network). The deposited assets accrue interest at a rate set by the particular yield protocol (*e.g.*, at 1.97% APY for USDC deposits in the Compound protocol). Then, at periodic intervals depending on the particular pool (*e.g.*, once a week), the savings protocol recalls either all or a portion of the interest accrued on the pooled deposits from the lending protocol and distributes it to randomly selected depositors in that pool.

10. Throughout this process users may withdraw their cryptocurrency assets from the savings protocol. If a user withdraws his cryptocurrency assets from the protocol, he is no longer eligible to receive the randomly selected distribution—thus providing an incentive to save his funds rather than withdraw and spend them.

### Governance of the PoolTogether Savings Protocol and the POOL Token

11. The PoolTogether savings protocol is a non-custodial, autonomous, decentralized protocol. The savings protocol is "non-custodial," meaning that user deposits are not under the control of any third party. Deposits cannot be accessed, withdrawn or influenced by anyone other than the user. The savings protocol is "autonomous," meaning that it can operate without any

specific third party required to facilitate the transactions.  And the savings protocol is "decentralized," meaning that its governance is not controlled by any particular person or company.

12. The primary functionality of the protocol is thus immutable and predefined by its coding; however, a small subset of parameters related to the protocol can be modified by majority vote of those holding the PoolTogether governance token: the "POOL" token.

13. PoolTogether Inc. created the POOL token through a "smart contract" on the Ethereum network on February 17, 2021.  The total supply of POOL tokens is 10 million, and each POOL token entitles its holder to one vote in governance operations of the savings protocol.

14. Of the total supply of minted POOL tokens, 42.46% were initially distributed or allocated, among others, to investors, employees and advisors of PoolTogether, Inc., and to users of the protocol.  Specifically, approximately 15% of the total supply of POOL tokens were freely distributed to all individuals who had previously deposited into the PoolTogether savings protocol at any time prior to midnight on January 14, 2021.  *See* [medium.com/pooltogether/introducing-pool-23b09f36db48](https://medium.com/pooltogether/introducing-pool-23b09f36db48) (PoolTogether Inc. press release delineating the initial distributions and allocations).  The remaining 57.54% were placed into the "treasury" in the PoolTogether savings protocol to be distributed as the POOL token holders (the other 42.46%) sees fit.

15. Since the initial distribution described above, the POOL token holders have governed the PoolTogether savings protocol.  Among other things, POOL token holders approved new measures to freely distribute POOL tokens to users of the protocol in certain designated pools.  The GUSD pool into which Plaintiff deposited did not receive POOL token distributions.

16. POOL token governance is limited to a narrow set of parameters relating to the PoolTogether savings protocol.  For example, POOL token holders can propose and vote to create

new pools and introduce new cryptocurrencies eligible for deposit; limit or expand the criteria or number of depositors who receive distributions from the savings protocol; or distribute POOL tokens from the treasury to depositors based on designated conditions (*e.g.*, depositors during a certain period of time or depositors of a certain pool). Importantly, however, POOL token holders cannot vote to access, remove, or transfer any user's cryptocurrency deposit from the savings protocol. This aspect of the code is immutable.

17. PoolTogether Inc. has not received any distribution of POOL tokens and does not hold any POOL tokens, and therefore it has not participated in token-based governance of the PoolTogether savings protocol. I personally did receive POOL tokens, but I have never used them to vote on any proposed changes to the protocol.

**The Wallet Connection Interface on the PoolTogether Website**

18. PoolTogether Inc. maintains the PoolTogether website (pooltogether.com), which has two primary functions. First, the website provides information relating the PoolTogether savings protocol, such as information relating to the different pools and overall operations of the protocol, as well as information for developers to utilize the open-source nature of PoolTogether Inc.'s software to integrate with the protocol.

19. Second, the website provides an interface for users to connect their cryptocurrency wallet to the savings protocol. For example, [v3.pooltogether.com](v3.pooltogether.com) (version three) and [app.pooltogether.com](app.pooltogether.com) (version four) are the subdomains for the two most recent versions of the wallet connection interface. A user can access the wallet connection interface page by visiting either of these URLs, or the user can visit the main domain (pooltogether.com) and click the "App" link at the top right corner, which will take the user to version four (app.pooltogether.com).

20. If a user visits the version three URL (the version into which Plaintiff decided to

deposit), the user will see the landing page, which provides a list of different pools and a link to "Connect Wallet" in the upper right corner:



21. If a user wants to make a deposit into a pool on the savings protocol, the user must engage in three primary steps: (1) connect wallet, (2) approval transaction, and (3) deposit transaction. Below I describe these steps.

22. **Connect wallet.** This occurs in one of two ways: either the user clicks the "Connect Wallet" link (shown in the upper right corner of the screenshot above), in which case the wallet connection interface is presented to the user (the popup shown below); or the user can attempt to proceed with a "deposit" transaction without first connecting a wallet (*e.g.*, by clicking "Deposit USDC" in the screenshot above), in which case the user is still directed to the same wallet connection interface (the popup shown below). In either event, the user cannot proceed to make

any transaction with the savings protocol without first connecting a cryptocurrency wallet.

23.     Below is the screenshot of the popup window that presents when a user initiates the wallet connection step, which states: "By connecting a wallet, you agree to PoolTogether's Terms of Service," and the user can access the Terms of Service by clicking the Terms of Service hyperlink (which directs a user to this URL: pooltogether.com/terms/).  A true and correct copy of the Terms of Service is attached hereto as **Exhibit A**.



24.     A wallet connection is not perpetual—meaning that a user will need to connect a wallet multiple times, for example, if a user connects a wallet and ends the website session or reboots the device.  How often a wallet needs to be connected depends on a variety of user-specific

circumstances, such as the type of device and device settings, type of wallet, or type of browser and browser settings.

25.   **Approval transaction.**  After a user has successfully connected a wallet to the interface, before making a deposit into any particular pool, the user must first engage in what is called an "approval transaction" with that particular "pool," which is an approval transaction required for all "smart contracts" on the Ethereum network.  The approval transaction is something that generally must be done only once for that pool.  Below is an example of the approval transaction step for the GUSD pool, which is initiated when a user attempts to make a deposit into the GUSD pool.



26.   **Deposit transaction.**  When a user has a wallet connected and has completed the approval transaction for a particular pool, the user then can proceed to make a deposit transaction into that pool.  Below is an example of the deposit transaction step for the GUSD pool, which is

presented after a user completes the approval transaction for the GUSD pool.



27.     After the user clicks the "Deposit GUSD" link at the bottom, the user is then directed through the wallet provider's mobile app to approve the transaction. In the case of the Coinbase Wallet mobile app, the user is first given a warning as to the "high" gas fees (if applicable), and, after acknowledging that message, the user is then asked to confirm the transaction. These steps are exemplified below (flowing from left to right).



28.     After the user presses "OK" to acknowledge the high gas fees (if applicable) and then presses "Confirm" to approve the deposit transaction, the PoolTogether website then shows that the deposit transaction has completed, as exemplified in the screenshot below.



**Plaintiff's Interactions with the PoolTogether Website and Savings Protocol**

29.     Before October 20, 2021, the popup screen at the wallet connection step did not contain the language described above relating to users' consent to the Terms of Service; rather, before October 20, 2021, the Terms were accessible on a different location of the website. PoolTogether Inc. implemented the above-described popup language at the wallet connection step on October 20, 2021, at 4:42 pm ET.  Since that time, the popup language described above at the wallet connection step has been live on the website, with the limited exception of a 21-minute period between 12:06 pm ET and 12:27 pm ET on October 21, 2021, when the Terms were not displayed due to a maintenance-related issue.

30.     I understand that Plaintiff alleges in his complaint that he made his 10 GUSD deposit into the GUSD pool of the savings protocol on October 21, 2021.   Subsequently, a video

was provided by Plaintiff's counsel showing the exact time of the deposit to be 11:43 pm ET on October 21, 2021. Based on the information alleged in the complaint regarding the date and amount of Plaintiff's transaction, and the limited amount of transaction traffic in the GUSD pool (as compared to other pools), I have been able to determine Plaintiff's cryptocurrency wallet address and locate his transactions on the Etherscan website (https://etherscan.io/), which is a publicly available source that tracks and publishes transactions on the Ethereum blockchain network. The Etherscan website allows anyone to filter content to a specific cryptocurrency wallet address.

31. A true and correct copy of the transactions displayed on the Etherscan page for Plaintiff's wallet address is attached hereto as **Exhibit B**. Below is a screenshot from that webpage, showing the transactions to and from Plaintiff's cryptocurrency wallet (with relevant transactions highlighted by a red circle, as described further below). This webpage is accessible at this URL: etherscan.io/address/0x907017f30caf5fc62c46def92efc49251300b552.



32. Plaintiff made his deposit transaction on October 21, 2021, at 11:43 pm ET (October 22, 2021 at 3:43 am UTC), which can be seen on the Etherscan screenshot above (the most recent, top-listed transaction). This was over 24 hours after the Terms popup screen at the

wallet connection step went live on the website (which, as explained above, was implemented on October 20, 2021, at 4:42 pm ET). This means Plaintiff was presented with the Terms when he connected his wallet to make his deposit.

33. I understand that Plaintiff maintains he was able to avoid connecting his wallet and assenting to the Terms because he had previously connected his wallet to the website interface on October 19, 2021, before the Terms were live at the wallet connection step. I understand Plaintiff alleges he was not required to connect his wallet again between the time of the approval transaction on October 19, 2021, and the time of his deposit on October 21, 2021.

34. It is true that, per the Etherscan screenshot above (the middle, third-listed transaction), Plaintiff engaged in an "approval" transaction for the GUSD pool on October 19, 2021 at 7:26 pm ET (October 19, 2021 at 11:26 pm UTC). This means his wallet must have been connected at this time.

35. As explained above, however, the fact that Plaintiff connected his wallet on October 19, 2021, and engaged in an approval transaction that day (before the Terms were live on the wallet connection step) does not mean that his wallet would remain connected to the interface when he returned to the website two days later to make his deposit transaction on October 21, 2021 (after the Terms were live on the wallet connection step). To the contrary, Plaintiff was required to connect his wallet again, as reflected by Plaintiff's own information and PoolTogether Inc.'s documented activity logs associated with Plaintiff's IP address.

36. PoolTogether Inc. retains a vendor, Sentry (sentry.io/welcome/), to keep track of certain activities and errors encountered on the PoolTogether website. The activity and error data are retained and made accessible by PoolTogether Inc. through an online dashboard provided by Sentry. Based on the timing of Plaintiff's transactions and interactions with the website and the

limited traffic on the GUSD pool, I was able to locate error logs in the Sentry dashboard associated with a New York IP address matching Plaintiff's activities on the website. Further, I understand, based on my review of videos provided by counsel for Plaintiff purporting to record Plaintiff's transactions on the PoolTogether website that Plaintiff used a Coinbase Wallet, an Apple device and a Google Chrome browser, which corroborated that these error logs were generated by Plaintiff's activities on the website.

   37. A true and correct copy of a screenshot of the Sentry dashboard of a "failed to fetch" error log dated October 21, 2021, associated with Plaintiff's IP address is attached hereto as **Exhibit C**. A screenshot of the relevant portions of the error log is shown below (with relevant portions highlighted by a red circle).



-14-



38.     A "failed to fetch" error is, generally speaking, a connectivity error between the user's browser and the website.  In this context, it means that the wallet previously connected using the wallet interface failed to connect when a user returned to the website—for example, after closing the browser or shutting off the device.  It means that, based on the user's configuration setup—*e.g.*, the browser or browser settings, cryptocurrency wallet, and device or device settings—the user's wallet was unable to connect automatically upon returning to the website.

39.     This error log shows that on October 21, 2021, at 12:35 pm ET, Plaintiff visited the PoolTogether website and his Coinbase wallet was unable to connect automatically despite his prior wallet connection on October 19, 2021.  In order for Plaintiff to proceed with his deposit transaction later that day (on October 21, 2021 at 11:43 pm ET), he was required to connect his wallet again through the wallet connection process described above.  Absent a manual connection of the Coinbase wallet following the failed-to-fetch error, which would have included Plaintiff agreeing to PoolTogether's Terms of Service as described in paragraph 23 above, Plaintiff could not have proceeded with his deposit transaction as he did later that day.

40.     Additionally, even without the specific log evidence, we know Plaintiff would have been required to connect his wallet multiple times due to a publicly known "bug" with the Coinbase Wallet app that Plaintiff used.  The bug resulted in an error message (shown below) that displays, "Failed to complete. Reason: Unknown Ethereum address."  This bug occurred when a user returned to the website after previously having a connected wallet.  (The existence of this bug is corroborated by evidence the Plaintiff provided and Coinbase users posting about it in online fora at the time of Plaintiff's deposit.  See github.com/coinbase/coinbase-wallet-sdk/issues/149.)  The

only remedy for the bug is to manually disconnect and connect the Coinbase Wallet again.



41.     This exact bug is documented and confirmed in a video Plaintiff's counsel sent to my counsel. The video titled "Screen Recording 2021-12-23 at 1:37:53 PM" (submitted as Exhibit 6 to the Declaration of Andy LeGolvan) shows an alleged "investigator" encountering the exact same bug under similar circumstances of Plaintiff's deposit. In the video, the investigator visits the PoolTogether website, connects a Coinbase Wallet (at 00:21), and then proceeds to end the website session and visit other websites (*e.g.*, Wikipedia). The investigator then returns to the PoolTogether website (at 07:32) in which it appears the wallet automatically connects to the interface based on the prior website session. However, as captured in the video, the Coinbase bug (the same error depicted above) prevents the investigator from completing the deposit (at 08:18). The only remedy is for the investigator to disconnect and reconnect the Coinbase wallet, again assenting to the Terms of Service.

42.     Therefore, even assuming Plaintiff was able to get to the "deposit" screen without

having to run through the wallet connection step when he returned to the website on October 21, 2021, he would not have been able to make a deposit due to this Coinbase bug. To fix this and to complete the deposit (as he allegedly did that day), he would have been required to manually disconnect and connect his Coinbase wallet again, at which time he would have been required to consent to the Terms as described in paragraph 23 above.

### Specific Issues Raised by Plaintiff's Allegations Regarding the Savings Protocol

43. I understand that Plaintiff has made allegations in his complaint and other pleadings relating to the nature and operation of the PoolTogether savings protocol and the scope of the Terms of Service. I address them below.

44. **The reserve.** I understand that Plaintiff alleges that PoolTogether Inc. keeps a portion of the interest accrued on deposits as a "reserve." This is incorrect for several reasons. First, none of the interest accrued on deposits into the savings protocol is retained by PoolTogether Inc. PoolTogether Inc. does not receive any money, interest or yield by reason of the transactions made with the savings protocol. Even when a user makes a deposit into the savings protocol by using the wallet connection interface on PoolTogether Inc.'s website, the funds flow directly from the user's cryptocurrency wallet into the savings protocol. PoolTogether Inc. does not take possession or custody of the funds during this process; PoolTogether Inc. does not have access to or control of funds in the savings protocol; and PoolTogether Inc. makes no revenue from the transactions or deposits.

45. The "reserve" is one of the parameters of the protocol that is under the control of the POOL token holders. The amount at which the "reserve" is set represents a percent of the interest accrued on deposits that are kept in the pool and placed under the control of POOL token holders—not PoolTogether Inc.

46. The reserve does not under any circumstances go to PoolTogether Inc. It remains in the savings protocol and is subject to governance of POOL token holders. Some pools have a reserve, while others do not. The GUSD pool on the Ethereum network—the pool into which Plaintiff deposited his 10 GUSD—does not have a reserve at all.

47. **Pooltogether.com and app.pooltogether.com.** I understand that Plaintiff has attempted to draw a distinction between pooltogether.com and app.pooltogether.com to argue that the Terms of Service only relate to the former, but not the latter. Pooltogether.com is the "main" domain, and app.pooltogether.com is a "subdomain" of pooltogether.com. They are part of the same website, just as [docs.pooltogether.com](docs.pooltogether.com) and [dev.pooltogether.com](dev.pooltogether.com) are merely subdomains of the main domain, pooltogether.com. They are not different websites.

### Basis for PoolTogether Inc.'s Business Activities

48. I understand that the Court raised questions regarding whether PoolTogether Inc. makes any revenue from the savings protocol, and if not, why it developed and maintains the interface on the pooltogether.com website. PoolTogether Inc. follows the standard open source software business model—that is, it develops and contributes to free open source software and monetizes those efforts by providing services to companies that want to integrate or use the free software. As part of this goal, developing and maintaining an open source interface at [pooltogether.com](pooltogether.com) helps showcase how the protocol can be used. PoolTogether Inc. does not make any revenue from user deposits or otherwise when individuals interact with the savings protocol, whether through the pooltogether.com website or any other website providing an interface.

49. As the protocol increases in popularity and use, PoolTogether Inc. will continue to work with other companies seeking to connect their financial products to the savings protocol, through the development of software applications or interfaces, or related products. PoolTogether

Inc. receives fees from those clients for that development work. In addition to the business case, I am personally motivated by a desire to help people become financially healthy. The cryptocurrency world is often dominated by speculation and gambling. The PoolTogether savings protocol is unique in its focus on savings and financial well-being. As usage of cryptocurrencies and protocols continue to grow, it will be more and more important to have companies focused on financial health.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 19, 2022, in New York City, New York.

By: _____
Leighton Cusack