## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH KENT, )<br><br>Plaintiff, )<br><br>v. )<br><br>POOLTOGETHER, INC.; DHARMA LABS, INC.; OZONE NETWORKS, INC.; LEIGHTON CUSACK; KAIN WARWICK; STANISLAV KULECHOV; DRAGONFLY DIGITAL MANAGEMENT, LLC; NASCENT US, LLC; NASCENT LIMITED PARTNERSHIP; STICHTING MAVEN 11 FUNDS; GALAXY DIGITAL TRADING HK LIMITED, LP; PARAFI CAPITAL, LP; and COMPOUND LABS, INC., )<br><br>Defendants. ) | Case No. 1:21-CV-6025-FB-CLP<br>CLASS ACTION |

## COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE

# TABLE OF CONTENTS

I.    FACTS AND PROCEDURAL HISTORY ........................................................... 3

    A.    The Mechanics of The Illegal Lottery ............................................... 3

    B.    The PoolTogether DAO ...................................................................... 6

II.   ARGUMENT ........................................................................................... 11

    A.    Summary ............................................................................................ 11

    B.    PoolTogether Is an Illegal Lottery ................................................... 13

         1.    The Definition of "Lottery" Under New York Law Includes
             Schemes Where the Consideration Is Forgone Interest or
             Lost Time-Value of Assets ............................................................ 13

         2.    Gamblers Forgo Interest in Consideration For Lottery
             Tickets ........................................................................................... 19

         3.    Alternatively, Gamblers Forgo The Use of Their Assets,
             Which Has Value ........................................................................... 21

    C.    The PoolTogether General Partnership Is Liable For Selling
        Lottery Tickets .................................................................................. 24

    D.    Dharma And PoolTogether, Inc., Are Liable For Selling Lottery
        Tickets or, in The Alternative, For Aiding And Abetting Sales ........... 31

         1.    New York Law Creates a Cause of Action Against Both
             Direct Sellers and Those Who Operate or Profit From
             Illegal Lotteries. ........................................................................... 32

         2.    PoolTogether, Inc., and Dharma Sold Lottery Tickets ............... 35

         3.    If It's Not a Direct Seller, Dharma Aided and Abetted the
             Sale of Lottery Tickets. ................................................................. 43

    E.    Investor Defendants Conspired to Sell Lottery Tickets ....................... 49

         1.    Conspiracy Claims are Available Under Section 5-423 ............... 49

         2.    Kent Has Properly Pleaded a Conspiracy Claim Against
             the Investor Defendants ................................................................. 52

F.    PoolTogether, Inc., and Compound Aided and Abetted The Sale of Lottery Tickets by Making Tools With No Purpose Other Than to Sell Lottery Tickets ................................................... 55

G.    Kent Has Standing to Bring This Action Because He Lost Assets ...... 58

    1.    Kent's Deposits Generated Interest That Defendants Kept For Themselves or Paid to The Lottery's Winner ...................... 59

    2.    Voluntary Participation in Illegal Gambling Confers Standing ................................................................................ 61

    3.    Kent Has Standing to Pursue the Investor Defendants ............ 64

H.    This Court Has Personal Jurisdiction Over Out-of-State Defendants ................................................................................ 66

    1.    Jurisdiction Over the Partnership .............................................. 66

    2.    Jurisdiction Over the Conspiracy ................................................ 67

    3.    "Transacting Business" Jurisdiction Exists and Comports with Due Process ........................................................ 68

I.    The Motion to Strike Class Action Allegations Is Premature And Without Merit ................................................................ 70

    1.    New York Law Governs This Case .............................................. 71

    2.    Not All Tokenholders Are General Partners And Regardless Kent Pleads a Valid Class Action at This Stage ........................................................................................ 74

III.    CONCLUSION ................................................................ 76

# TABLE OF AUTHORITIES

## Cases

*Ackers v. U.N.*, No. 5-cv-1200-FB, 2005 U.S. Dist. LEXIS 5940 (E.D.N.Y. Apr. 8, 2005) ................................................................................................ 64

*Alt. Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322 (E.D.N.Y. 2009) ................ 52

*American Preferred Prescription, Inc. v. Health Mgmt., Inc.*, 252 A.D.2d 414 (1st Dept. 1998) .................................................................................. 49

*Babcock v. Jackson*, 191 N.E.2d 279 (N.Y. 1963) ........................................ 72

*Benson v. Double Down Interactive, LLC*, 527 F. Supp. 3d 1267 (W.D. Wash. 2021) ............................................................................................ 73

*Berkshire Bank v. Lloyds Banking Grp. PLC*, No. 20-1987-cv, 2022 U.S. App. LEXIS 5095 (2d Cir. 2022) .............................................................. 67, 68

*Billboard Co. v. City of Cincinnati*, 675 F.3d 974 (6th Cir. 2012) ........................ 65

*Brady v. Basic Rsch., L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015) ...................... 75

*Brodsky v. Stadlen*, 138 A.D.2d 662 (2d Dep't 1988) ...................................... 27

*Carl Company v. Lennon*, 148 N.Y.S. 375 (S. Ct., Albany County 1914) ............ 17, 22

*Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533 (5th Cir. 2019) ............... 63

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ........................................................................................ 45

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) ............ 54, 67

*Chun v. State of New York*, 807 F. Supp. 288 (S.D.N.Y. 1992) ..................... 42, 72, 74

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................... 63

*Clemmons v. Hodes*, 2017 U.S. Dist. LEXIS 158550 (S.D.N.Y. 2017) .................... 67

*Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284 (S.D.N.Y. 2019) ................ 68, 69

*Dalton v. Pataki*, 5 N.Y.3d 243 (N.Y. 2005) ................................................ 15

*Davito v. AmTrust Bank*, 743 F. Supp. 2d 114 (E.D.N.Y. 2010) ......................... 71

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65 (2006) ................... 69

*Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418 (E.D.N.Y. 2012) ............... 68

*Evans v. Linden Research., Inc.*, 2012 U.S. Dist. LEXIS 166006 (N.D. Cal. Nov. 20, 2012) ........................................................................................................... 65

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*, 2018 N.Y. Slip Op. 32530 (N.Y. Sup. Ct. 2018), *aff'd in relevant part* 173 A.D.3d 551 (1st Dep't 2019 .................................................................................................................... 52

*Falbaum v. Pomerantz*, 891 F. Supp. 986 (S.D.N.Y. 1995) ........................................ 44

*Federal Election Commission v. Ted Cruz*, 596 U. S. ___, (May 16, 2022) .............. 61

*Filler v. Hanvit Bank*, 156 Fed. App'x 413 (2d Cir. 2005) .......................................... 45

*Ford v. Henry*, 155 Misc. 2d 192 (App. Term 1993) .................................................... 50

*Giffuni v. Towler*, 119 N.Y.S.3d 703 (S. Ct., Suffolk County 2019) ............................ 27

*Grover v. Morris*, 73 N.Y. 473 (1878) ................................................................. passim

*Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677 (Bankr. S.D.N.Y. 2008) .................................................................................................................... 55

*Harris v. Economic Opportunity Commission of Nassau County Inc.*, 142 Misc. 2d 980 (N.Y. Sup. Ct. 1989), *aff'd* 171 A.D. 2d 223 (1991) ........................ 14, 15, 16

*Harty v. W. Point Realty, Inc.*, 28 F.4th 435 (2d Cir. 2022) ....................................... 62

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .............................................. 62

*Horner v. United States*, 147 U.S. 449 (1893) ............................................................. 18

*Illinois DOT v. Hinson*, 122 F.3d 370 (7th Cir. 1997) ................................................. 64

*In re Estate of Franks*, 277 N.Y.S. 573 (Sur. Ct. 1935) .............................................. 43

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013) ......................................................................................................... 59

*John's Insulation, Inc. v. Siska Const. Co., Inc.*, 774 F. Supp. 156 (S.D.N.Y. 1991) .................................................................................................................... 51

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ................... 55

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ........................................ 72

*Kohn v. Koehler*, 96 N.Y. (51 Sickels) 362 (1884) ...................................................... 18

*Laundry v. Hencken*, 203 A.D. 140 (1st Dep't 1922) .................................................... 27

*Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454 (2d Cir. 2013) ..................................... 45

*MacDonald v. United States*, 63 F. 426 (7th Cir. 1894) ............................................... 17

*Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2012) ....................................................... 64

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 2010 NY Slip Op 33909(U) (Sup. Ct.) ............................................................................................. 66

*Matter of Steinbeck v. Gerosa*, 4 N.Y.2d 302 (N.Y. 1958) ............................................ 31

*McKeage v. Bass Pro Outdoor World, LLC,* 943 F.3d 1148 (8th Cir. 2019) .............. 63

*MGM v. Grokster*, 545 U.S. 913 (2005) ............................................................. 56, 57, 58

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71 (2d Cir. 2013) ...................................................................................................................... 60

*Ortiz v. Ledbetter*, No. 19-CV-2493 (CS), 2020 U.S. Dist. LEXIS 90354 (S.D.N.Y. May 22, 2020), ........................................................................................ 55

*Oster v. Kirschner*, 77 A.D.3d 51 (1st Dep't 2010) ...................................................... 47

*People ex Rel. Ellison v. Lavin*, 179 N.Y. 164 (1904) ................................................... 15

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. S. Ct., N.Y. County 1999) ......................................................................................... 72

*People v. Hines*, 284 N.Y. 93 (N.Y. 1940 ...................................................................... 14

*People v. Kim*, 585 N.Y.S.2d 310 (Crim. Ct., Bronx County 1992) ............................. 42

*People v. Marrero*, 69 N.Y.2d 382 (1987) .................................................................... 47

*People v. Miller*, 2 N.E.2d 38 (N.Y. 1936) .................................................. 15, 18, 21, 64

*People v. Schneider*, 37 N.Y.3d 187 (2021) .................................................................. 49

*People v. Wassmus*, 182 N.W. 66 (Mich. 1921) .......................................................... 16

*Picard v. Sage Realty*, No. 20 CIV. 10057 (JFK), 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) ....................................................................................................... 31

*Pittman by Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998) .................................... 43

*Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418 (S.D.N.Y. 2019) ......................................... 60

v

*Proctor v. Whitlark & Whitlark, Inc.*, 414 S.C. 318 (2015) ........................................ 13

*Richter v. Empire Trust Co.*, 20 F. Supp. 289 (S.D.N.Y. 1937) ................................... 74

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F. Supp. 2d 292 (S.D.N.Y. 2002) ........................................................................................................................ 47

*Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679 (N.Y. 1985) ................................ 72

*Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428 (S.D.N.Y. 2017 ............... 43

*Slabakis v. Schik*, 164 A.D.3d 454 (1st Dep't 2018) .................................................... 29

*Solovay v. Greater N.Y. Sav. Bank*, 198 A.D.2d 27 (1st Dep't 1993) .......................... 51

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ............. 57

*SRW Assocs. v. Bellport Beach Prop. Owners*, 129 A.D.2d 328 (2d Dep't 1987) ........ 51

*State v. Lipkin*, 84 S.E. 340 (N.C. 1915) ...................................................................... 16

*Tarazi v. Quintessential Biosciences, LLC*, 2015 U.S. Dist. LEXIS 199144 (S.D.N.Y. Aug. 21, 2015) ........................................................................................ 47

*Taylor v. Bernanke*, No. 13-CV-1013, 2013 U.S. Dist. LEXIS 128533 (E.D.N.Y. Sep. 9, 2013) ............................................................................................................. 63

*Tedesco v. Ecobank Transnat'l Inc.*, 102 A.D.3d 607 (1st Dep't 2013) ...................... 29

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ................................................. 60

*Tyszka v. Make & Take Holding, LLC*, 72 A.D. 3d 1620 (4th Dep't 2010) ................. 44

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62 (E.D.N.Y. 2006) ............................................................................................... 64

*United States Bank Nat'l Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605 (S.D.N.Y. 2008) .......................................................................................................... 66

*Valentin v. El Diario La Prensa*, 427 N.Y.S.2d 185 (Civ. Ct. Bronx County 1980) ........................................................................................................................... 16

*Van v. LLR, Inc.*, 962 F.3d 1160 (9th Cir. 2020) ........................................................ 60

*Varela v. Flintlock Const., Inc.*, No. 01-cv-2736, 2002 WL 342657 (S.D.N.Y. Mar. 5, 2002) ...................................................................................................... 44, 49

*Vasquez v. H.K. & Shanghai Banking Corp.,* 477 F. Supp. 3d 241 (S.D.N.Y. 2020)................................................................................................69

*Wexler v. AT & T Corp.*, 323 F.R.D. 128 (E.D.N.Y. 2018)...........................................71

*White v. Cuomo*, ___ N.Y.3d ___, No. 2022-01954, 2022 WL 837573 (Mar. 22, 2022)................................................................................................39

*Wilson v. PTT, LLC*, No. C18-5275RSL, 2021 U.S. Dist. LEXIS 11618 (W.D. Wash. Jan. 21, 2021) ......................................................................60, 63

### Statutes

18 U.S.C. § 2333.............................................................................................................55

C.P.L.R § 302(a)(1).........................................................................................................68

N.Y. Banking Law § 96(15)(b) .......................................................................................19

N.Y. Banking Law § 9-v............................................................................................19, 20

N.Y. Gen. Oblig. Law § 5-241 ........................................................................................14

N.Y. Gen. Oblig. Law § 5-419 ........................................................................................50

N.Y. Gen. Oblig. Law § 5-423 .................................................................................passim

N.Y. P'ship L. § 26...........................................................................................................30

N.Y. P'ship Law § 10 .......................................................................................................27

N.Y. Tax Law § 1612.........................................................................................................6

### Other Authorities

ANDREESEN HOROWITZ, *About*, a16z.com/about............................................................26

Carla L. Reyes, *If Rockefeller Were a Coder*, 87 GEO. WASH. L. REV. 373 (2019).......25

Charles Alan Wright, et al., Causation, in 13A FEDERAL PRACTICE AND PROCEDURE JURISDICTION (3d ed. 2021)................................................................62

David Kerr & Miles Jennings, ANDREESEN HOROWITZ, *A Legal Framework for Decentralized Autonomous Organizations*, https://a16z.com/wp-content/uploads/2021/10/DAO-Legal-Framework-Jennings-Kerr10.19.21-Final.pdf (Oct. 19, 2021) .........................................................................................26

Ephrat Livni & Eric Lipton, *How Venture Capitalists Think Crypto Will Reshape Commerce*, N.Y. TIMES, Oct. 29, 2021, at B1 ................................................. 4

Julia Kagan, INVESTOPEDIA, *3-6-3 Rule*, Jan. 2, 2021, https://www.investopedia.com/terms/1/3_6_3_rule.asp ........................................... 21

NEW YORK LOTTERY, *Information For Retailers*, https://nylottery.ny.gov/page/information-retailers ................................................ 41

Paul Guzzo, *Bolita, Tampa's Illegal Lottery, Was Deadly And Lucrative*, TAMPA BAY TIMES, Sept. 28, 2021 ........................................................................................ 6

PoolTogether Frequently Asked Questions, https://docs.pooltogether.com/welcome/ faq (accessed May 18, 2022) ...................................................................................... 5

POOLTOGETHER, *Treasury*, info.pooltogether.com ..................................................... 10

Stats. of Queen Anne, Ninth Year, Chap. 1, 7 (1711) ................................................ 14

Unconfirmed Podcast Ep. 108 (Jan. 17, 2020) ....................................................... 5, 15

Wyoming Secretary of State, DAO: Frequently Asked Questions, https://sos.wyo.gov/Business/Docs/DAOs_FAQs.pdf ............................................... 26

## PRELIMINARY STATEMENT

PoolTogether is a protocol that sells lottery tickets. Its founder describes the protocol's sole offering as a "lottery" (SAC ¶ 22, referring to a "no-loss lottery"), and that is how its investors describe it too (SAC ¶ 141 (Maven 11 describing PoolTogether as a "lottery")). The problem for these Defendants is that the protocol is run from New York, where lotteries are illegal and where lottery operators are subject to civil suits like this one. All Defendants nevertheless move to dismiss. Roughly speaking, their argument is that what PoolTogether promotes as a "lottery" is not, in fact, a lottery; and, even if it were, there is no identifiable person or entity that can be held liable. The motions should be denied because Plaintiff Joseph Kent has plausibly alleged that the PoolTogether protocol sells illegal lottery tickets, and these Defendants must answer for the illegal sales.

On October 21, 2021, and January 17, 2022, Plaintiff Joseph Kent purchased smart contracts issued by the PoolTogether decentralized autonomous organization (DAO) with the following terms: Kent's U.S. Dollar Coins and Gemini U.S. Dollar Coins (USDC, and GUSD, respectively) were sent to the Compound protocol, where they generated interest; the PoolTogether DAO kept that interest and pooled it together with the interest generated on other users' money; then the PoolTogether DAO randomly paid the pooled interest (less 50% for itself in the January 17 lottery) each week to some of the users as a prize.

Defendants argue that this is somehow not a lottery by asserting that Kent forewent no interest and paid nothing of value in these transactions, since if he had held onto his money in a wallet it would not have generated interest. This is

straightforwardly wrong. The easiest way to understand why is to ask: Where does the prize money come from? The answer, of course, is the interest generated on users' deposits with the Compound protocol and others like it. Had PoolTogether not operated an illegal lottery, Kent would have earned the interest that his money in fact generated. But, because the lottery exists and Kent participated, he paid the interest he earned to the PoolTogether DAO, and he therefore paid valuable consideration for a chance to win a prize at a random drawing (known to New York law and Defendants' own frequent descriptions as a "lottery ticket"). He also lost money sufficient to easily confer Article III standing.

Defendants also argue that even assuming the PoolTogether smart contracts are lottery tickets, none of these Defendants is liable for selling them. But lottery tickets do not sell themselves. The Defendants here either built the protocol, operate the protocol, collect the money, distribute the tickets, or are general partners in this shared enterprise. If none of them are liable, who would be? Defendants' only answer is: no one. That cannot be right.

Thus, while this case is admittedly the first case to seek private, civil damages from a DAO operating illegally, the straightforward operation of well-settled principles of liability makes clear that these Defendants are jointly and severally liable to Plaintiff and the proposed class. After all, for Defendants to succeed on their motions, they must convince this Court that operating a business through a DAO shields the business, the people who created it, and the people who sell access to it from liability in *all* cases. That argument fails. New York law forbids the unlicensed

operation of lotteries and authorizes recovery for people who gamble against the people who operate the lotteries. This Court should deny all of the motions.[1]

## I.    FACTS AND PROCEDURAL HISTORY

Although Defendants use novel technology to achieve their business goals, those goals are simple and timeless. They use the promise of a random chance at riches—the "fun of speculation," or the chance of a "jackpot," as Cusack puts it—to convince gamblers to part with their money on terms that are good for Defendants and bad for the gamblers.

### A.    The Mechanics of The Illegal Lottery

Kent and Defendants appear to agree on this much: According to Cusack (and Kent agrees)

> [PoolTogether's protocol] generally operates as follows: Users deposit a cryptocurrency asset into a particular "pool" of the . . . protocol designated for that type of cryptocurrency (e.g., users deposit USDC in the USDC pool on the Ethereum network). The . . . protocol automatically . . . routes [those assets] to other protocols that generate yield on the same cryptocurrency network (e.g., to the Compound protocol on the Ethereum network). The deposited assets accrue interest at a rate set by the particular yield protocol (e.g., at 1.97% APY [annual percentage yield] for USDC deposits in the Compound protocol). Then, at periodic intervals depending on the particular pool (e.g., once a week), the . . . protocol recalls either all or a portion of the interest accrued on the pooled deposits from the lending protocol and distributes it to randomly selected depositors in that pool.

---

[1] Defendants consented to Kent filing this combined response. Together, the Defendants' memoranda of law contain 134 pages. This memorandum and Kent's memorandum in opposition to the motions to compel arbitration together contain 100 pages.

(Cusack Decl. ¶ 9.) Thus, a "contributor" gets a "return" only by winning the lottery. Losers part with the "interest [that their] deposited assets accrue" from the yield protocols to which they are "programmatically routed." (Cusack Decl. ¶ 9.)

Defendants contend that users may withdraw the "deposited" assets at any time. (*Id.* ¶ 10.) But this is only partially true, and the reason it is partially false is important: Assets sent to "protocols that generate yield" (*id.*) *are at risk of loss.* As PoolTogether, Inc., puts it "there are risks associated with using [PoolTogether] and users assume the full responsibility for these risks. You should not deposit any money you are not comfortable losing." (Second Amended Complaint [SAC] ¶ 24.) Yield protocols like Compound often lose user funds, and this risk of loss is part of why they compensate users with interest on their deposits. *See, e.g.*, Ephrat Livni & Eric Lipton, *How Venture Capitalists Think Crypto Will Reshape Commerce*, N.Y. TIMES, Oct. 29, 2021, at B1 ("On the DeFi protocol Compound, a recent programming snafu revealed vulnerabilities in systems deliberately designed to eliminate the middlemen regulators traditionally rely on to oversee financial transactions and guarantee consumer protection. After a bug was introduced during a software upgrade, $160 million worth of cryptocurrency was put at risk of improper distribution, and about $90 million of that was actually wrongly paid out, the company said.").

Contrary to the language used here by its lawyers, PoolTogether—the corporation and the DAO—conspicuously markets its tickets as a gambling product. PoolTogether, Inc., calls its "distribut[ion]" and "savings protocol" a "lottery." (SAC ¶ 22.) It calls those payments "prizes" and the people who win them "winners."

PoolTogether Frequently Asked Questions, https://docs.pooltogether.com/welcome/faq (accessed May 18, 2022). Purchasers are issued "smart contracts" (*i.e.*, self-executing electronic contracts) that PoolTogether, Cusack, and other PoolTogether representatives call "tickets." Unconfirmed[2] Podcast Ep. 108, *supra*, at 02:10 (Jan. 17, 2020). Cusack himself described PoolTogether succinctly: "The idea is, it's really simple, you buy a ticket for a chance to win a prize." *Id*. Dharma enticed users with the prospect that they might "win up to $80,000" (SAC ¶ 98), and the Investor Defendants have variously described PoolTogether as a "no-loss lottery" and a "chance-based game." Defendants now dub their tickets a "savings protocol" (Cusack Decl. ¶ 7-9) but ignore the countless times they marketed it as a lottery.

It makes sense to market PoolTogether's tickets this way because the stated purpose of the enterprise is to "leverage the fun of speculation" to convince people to deposit their money. (SAC ¶ 23.) And PoolTogether "leverage[s]" that "fun" to convince people to choose PoolTogether's lottery tickets over the interest that would otherwise be generated on their money by the yield protocols to which the PoolTogether DAO sends their money. Those tickets are a terrible deal on an expected-value basis, even excluding so-called gas fees required for all Ethereum transactions. (*See* SAC ¶¶ 37–41.) If users sent their money directly to the Compound protocol or other liquidity pools (as PoolTogether does with its users' money), they would get Compound's rate of return (1.97% APR for USDC deposits at the time of Cusack's declaration); with PoolTogether, they get that rate of return on an expected-

---

[2] The podcast's title is "Unconfirmed."

value basis *minus fifty percent* that the protocol keeps as a "reserve" in almost all of its lotteries. (SAC ¶ 43.) This is a business model that would have been familiar to numbers racketeers almost a hundred and fifty years ago. *See, e.g.*, Paul Guzzo, *Bolita, Tampa's Illegal Lottery, Was Deadly And Lucrative*, TAMPA BAY TIMES, Sept. 28, 2021 ("With an 80-1 payoff, the numbers game . . . could be lucrative. But due to long odds, it was more lucrative to operate."). And PoolTogether is a worse deal on a percentage basis than most of the games offered by the State lottery. N.Y. Tax Law § 1612 (authorizing payouts of between 50% and 60% of ticket sales for some games).

PoolTogether's tickets thus present exactly the evil that lottery bans were meant to prevent: They convince people with a poor concept of risk-adjusted expected value to forfeit money by appealing to the addictive, destructive impulse to gamble and by promising life-changing riches on a low-percentage basis.

## B.    The PoolTogether DAO

In 2019, Cusack and several of his friends and collaborators wrote a piece of software, called a "protocol," operating on the Ethereum blockchain—a decentralized network of computers that, among other things, allows users to trade cryptocurrencies and create decentralized applications—to sell lottery tickets. They called this software "PoolTogether." (SAC ¶ 44.) Kent initially believed that Cusack did this as an individual, but Cusack now contends that "PoolTogether LLC [now Inc.] developed the . . . the PoolTogether savings protocol." (Cusack Decl. ¶ 5.) PoolTogether, Inc., employing Cusack and his collaborators, ran the protocol itself from 2019 until February 2021, when they decided to transition to a DAO. (SAC ¶ 47.)

At least one purpose of transitioning to a DAO, Cusack admitted, was to avoid regulation. (SAC ¶ 77.)

To do this, Cusack and his collaborators distributed approximately 5,000,000 POOL tokens—ownership interests in the PoolTogether protocol that give tokenholders the option of a say in the governance and operation of the protocol—and Cusack and his collaborators pre-programmed the protocol to allow the issuance of only 10,000,000 total tokens (with some future potential exceptions not relevant here). (SAC ¶ 48.) According to a PoolTogether public statement, the initial distribution sent 15% of POOL tokens to previous gamblers and users who voted in initial straw polls on PoolTogether's operations; 12.44% to the PoolTogether "team" (Cusack and his initial collaborators); 7.52% to investors in PoolTogether, Inc.; 7.5% to be used for some initial projects not relevant here; and the remaining 57.54% to the "POOL Token Treasury," which was available for further distribution as determined by a vote of the holders of the other 42.46% of the tokens.

Tokenholders do not automatically become eligible to vote. Their tokens must be "activat[ed]." (SAC ¶ 50.) According to a public statement by Cusack, as of February 27, 2021, one "PoolTogether Inc. investor" (likely a Defendant here) held 57% of the voteable tokens, perhaps because others had forgone activating their tokens. In February 2021, then, that Defendant controlled the PoolTogether protocol all by itself, and chose to continue its illegal operation. Meanwhile, because the 7.5% for other projects were not immediately voteable, Cusack, the Investors, and Cusack's

close collaborators together controlled 57.6% of the voteable tokens and could alone control the protocol.

After the initial distribution, POOL tokens were tradeable on the open market, and began trading in February 2021 for around $15 per token. In May of 2021, when POOL was trading between $19 and $23 per token, Cusack put a proposal up for a vote by which the "treasury" would transfer 411,479 POOL tokens to Defendants ParaFi, Galaxy, Dragonfly, Nascent, and Maven 11 (the Investor Defendants), in exchange for which those companies would transfer $5,950,000 in USDC. Under the proposal, all the companies were required to hold their tokens for a year, which means that they held them when Kent purchased his tickets. The proposal passed unanimously, 103,780 votes to zero. (SAC ¶ 54.)

In May of 2021, the Investor Defendants together controlled more than 50% of the voteable POOL tokens. (SAC ¶ 55.) Investor Defendants now contend that "Kent does not allege the Investor Defendants have actually exercised any control over the operation of the PoolTogether protocol" because "the Investor Defendants received approximately 8% of 5,000,000 distributed POOL tokens" (Galaxy Mot. to Dismiss at 20). This is funny math in two ways. First, it ignores Cusack, who is alleged to be a general partner in the PoolTogether DAO, and his collaborators, who likely are partners as well. Second, it ignores the allegations in the Complaint: In May of 2021 the Investor Defendants—excluding other partners—held a *controlling* share of the protocol because they were "on lead" (SAC ¶ 55) in possession of voteable tokens.

8

At that moment, they could have opened their copies of the General Obligations Law, realized that they were selling illegal lottery tickets, and stopped. Instead, they continued. And, according to publicly available blockchain data, at every moment since the POOL token came into existence, fewer than ten unique wallet addresses—and, therefore, likely even fewer than ten people or entities—controlled more than 50% of issued POOL tokens, voteable or otherwise. At least as a matter of plausible inferences to which Kent is entitled, Defendants here are surely among those ten, and almost certainly could—at least as a practical matter, recalling that the overwhelming majority of POOL holders have small shares and don't vote, and probably as a formal matter too—control the protocol alone.

Cusack and the Investor Defendants used their control of the protocol to run a business through the smart contracts underlying the PoolTogether DAO. First, they agreed with each other to collaborate on the protocol's operations. Galaxy, ParaFi, and Maven 11 admitted it: According to their pre-motion letters to this Court, they "participate in . . . decisionmaking about the workings of the protocol." (SAC ¶ 60.) Cusack described Dan Elitzer, Nascent's[3] co-founder and CEO, as among the "most active" participants in governance (SAC ¶ 61), and Cusack said that he "work[ed] with Dragonfly" to develop a "China strategy" for PoolTogether (SAC ¶ 64). Investor Defendants now evidently regret these admissions, brushing them off by describing

---

[3] Two Nascent entities are sued here. The first, Nascent US LLC, "employs Dan Elitzer," who does PoolTogether partnership business within the scope of his employment. (SAC ¶ 10.) The second, Nascent Limited Partnership, is a Cayman Islands entity that, according to Nascent's counsel, holds legal title to the POOL tokens controlled by Nascent. (SAC ¶ 11.)

them as "alleg[ations] that the Investor Defendants contributed financially to the PoolTogether protocol . . . , [and] that ParaFi and Maven 11 said positive things about the protocol." (Galaxy at 21.) But Investor Defendants cannot and do not deny that they actively participated in protocol governance and worked together to do so. (*E.g.*, SAC ¶ 60.)

Second, they ran the business for profit, and publicly said so. A large and active tokenholder explained that "the protocol makes profit by taking part of the interest generated by the pools[.] Those profits are controlled by POOL token holders." (SAC ¶ 76.) Elitzer described the reserve as a source of profit for POOL token holders. (SAC ¶ 72.) Maven 11 admitted that it invested in PoolTogether because of its capacity to "take over a large chunk of the no loss lottery market." (SAC ¶ 70.) Cusack sought to improve the "[e]conomics" of the business for POOL holders. (SAC ¶ 74.) The Investors Defendants now brush this off by contending that they never "*agreed* to share profits" (Galaxy at 19 (emphasis added)) because they never "paid out" the profits (*id.*). But the Investor Defendants cannot and do not deny that as POOL token holders they *already own* the profits in the PoolTogether treasury (SAC ¶¶ 56, 58), which, as of April 29, held a little more than $13 million worth of cryptocurrency. *See* POOLTOGETHER, *Treasury*, info.pooltogether.com (as of April 29, 12:27 EST).[4] And consider the obvious: These investment companies aren't running a charity. They bought the POOL tokens as assets, hoping to generate a return from running the business and to eventually sell their tokens for more than they bought them for.

---

[4] The value of the cryptocurrency in the PoolTogether treasury tends to change frequently, as the prices of cryptocurrencies are volatile.

PoolTogether, Inc.'s role in all this is unclear at best. Although the corporation now contends that "[a]ll funds deposited into the [PoolTogether] savings protocol . . . are not . . . controlled by [PoolTogether, Inc.]" (PoolTogether Mot. to Dismiss at 3), major DAO participants have treated the corporation's bank account and the DAO treasury as interchangeable. (SAC ¶ 79 (the protocol treasury was available to "compensate . . . PT Inc.'s team members"); ¶ 81 (explaining—after Kent purchased his first ticket and filed this case—that PoolTogether, Inc., would pay someone working for the protocol because "the full direct to DAO hiring process has not been ironed out"); ¶ 82 (explaining that in January 2022—after PoolTogether, Inc., claimed in a letter to this Court that it did not hold the protocol's assets—people could transfer assets to the DAO by "mak[ing] [a check or wire] out to pooltogether Inc. . . . [which then] holds it for the DAO"). It is thus at least reasonable to infer that the allegations with respect to PoolTogether, Inc. are plausibly pleaded, despite its protestations that it has nothing relevant to do with the business bearing its name, that it created, and that its founder and major investors control.

## II.   ARGUMENT

### A.   Summary

The core, non-procedural legal points in this case are these three. First, illegal lottery tickets are available for sale under the name "PoolTogether" and are generating a handy profit for someone. Second, lottery tickets must be sold by someone because they can't sell themselves. Third, between them, the Defendants in this case are the only ones who could be selling them. Thus, one or more of them must answer for this violation of New York law. Because of the number of defendants and

theories of liability in this case, a brief summary of who is being sued for what in this case may be helpful to the Court and Defendants.

1. *Seller allegations.* Kent alleges that PoolTogether, Inc., and Dharma, by operating websites on which users can exchange money for lottery tickets, sold lottery tickets themselves. (SAC ¶¶ 84–95.)

2. *General partnership allegations.* Kent alleges that Cusack and the Investor Defendants formed a general partnership to sell lottery tickets to him and the putative class. (SAC ¶¶ 58–83.)

3. *Secondary liability allegations.* There are three distinct types of secondary liability claims in the Complaint. Because New York does not treat theories of secondary liability as independent claims, everyone is sued under General Obligations Law § 5-423, but the reasons that they are liable vary.

First, Kent alleges that PoolTogether, Inc., and Compound are secondarily liable because they manufactured software tools that have no reasonable purpose other than use in an illegal lottery. (SAC ¶¶ 146–153). Second, Kent alleges that, to the extent Dharma is not a direct seller, it at least aided and abetted the sale of lottery tickets by knowingly providing an interface for their sale. (SAC ¶ 188). Third, Kent alleges that Cusack and the Investor Defendants conspired with each other. (SAC ¶¶ 121–135).

Kent alleges several theories of liability because, owing to the novel structure Defendants use to sell illegal lottery tickets, they potentially violate the law in many configurations. And Kent in fact bought two tickets through two websites: one using

PoolTogether, Inc., and one using Dharma. Regardless, because these allegations plausibly state claims for relief, all of Defendants' motions to dismiss should be denied.

### B.    PoolTogether Is an Illegal Lottery

We begin with the question that underlies all the others: is this a lottery? It is. Those who purchase PoolTogether tickets agree to send their money to a "yield protocol," which, in turn, generates interest on the money. That interest is pooled together—hence the name—and a cut of up to 50% is taken for the house. Finally, on a regular basis, the remaining pooled interest, less the house cut, is paid out as a prize to a randomly selected winner. That's a lottery.

> 1.    *The Definition of "Lottery" Under New York Law Includes Schemes Where the Consideration Is Forgone Interest or Lost Time-Value of Assets.*

When one gambles, one forms a contract with a counterparty authorizing the winner of a game of chance to recover money from the loser, usually with a cut taken by the house facilitating the transaction. Because games of chance were, until comparably recently, illegal and viewed as a moral vice, the law barred losers from recovering against winners (even in rigged games) under the *in pari delicto* doctrine, pursuant to which recovery is barred for those who base their causes of action in activities that are themselves illegal. *See, e.g.*, *Proctor v. Whitlark & Whitlark, Inc.*, 414 S.C. 318, 326 (2015). As early as the 1700's, though, English statutes made an exception for gambling, authorizing losers to recover their losses in Court. *See, e.g.*, Stats. of Queen Anne, Ninth Year, Chap. 1, 7 (1711).

New York followed suit. New York generally forbids gambling and allows losers of $25 or more in gambling transactions to recover against winners within three calendar months of losing. *E.g.*, N.Y. Gen. Oblig. Law § 5-241. But it specifically treats lotteries more harshly. Purchasers of lottery tickets, whether they win or lose, are entitled to "recover double the sum of money, and double the value of goods or things in action, which [they] may have paid or delivered in consideration of such purchase." N.Y. Gen. Oblig. L. § 5-423. Unlike the general gambling-recovery statute, recovery for illegal lottery-ticket purchases is not explicitly limited to recovery by losers; instead, the statute authorizes *anyone* who "pa[ys] or deliver[s] . . . money" to recover double that money.

"The word 'lottery,'" New York courts have said, "has no technical legal meaning. It must be construed in the popular sense, and with a view of remedying the mischief intended to be prevented." *People v. Hines*, 284 N.Y. 93, 103 (N.Y. 1940). New York courts have nonetheless explained that Section 5-423

> defines lottery as an unlawful gambling scheme in which players pay or agree to pay something of value for chances, represented and differentiated by numbers or combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and the holders of the winning chances are to receive something of value.

*Harris v. Economic Opportunity Commission of Nassau County Inc.*, 142 Misc. 2d 980, 981 (N.Y. Sup. Ct. 1989), *aff'd* 171 A.D. 2d 223 (1991). To be a lottery, then, a scheme must require (a) valuable consideration in exchange for (b) a chance to win (c) a prize determined by (d) random numbers or some other media. *Id.*; *see also Dalton v.*

*Pataki*, 5 N.Y.3d 243, 264 (N.Y. 2005) (distinguishing lotteries from other gambling, which requires only chance, prize, and consideration, by the requirement of "the use of tickets and multiple participation, as opposed to a single player competing against a single machine").

Defendants contest only the element of consideration paid by the ticketholder, conceding, as they must, that a PoolTogether ticket is—as Cusack himself put it—"a ticket for a chance to win a prize." Unconfirmed Podcast Ep. 108, *supra*, at 02:10 (Jan. 17, 2020). But over the years, courts have time and again found consideration to be present where there is any "pay[ment] of a thing of value," *Harris*, 142 Misc. 2d at 980, broadly construed. Thus, while businesses have come up with a dizzying array of schemes to try to avoid a finding of consideration when operating chance-based prize distributions, nearly all of them are found to be lotteries, because there is no such thing as a free lunch: To make giving away prize money feasible, lottery sellers must somehow raise money. So it goes in this scheme too.

For example, the requirement of consideration is satisfied when value is paid for a legal product and a lottery ticket is thrown in as enticement to buy the product. *People v. Miller*, 2 N.E.2d 38, 46 (N.Y. 1936) ("[A] payment which entitles one to a ticket of admission to the theater plus a chance to win a prize constitutes payment of a valuable consideration for the chance."); *People ex Rel. Ellison v. Lavin*, 179 N.Y. 164, 168 (1904) (holding scheme is a lottery where "the persons among whom the distribution is to be made pay a valuable consideration for the chance when they purchase [] cigars, the bands on which entitle them to compete for the prizes . . .");

15

*People v. Wassmus*, 182 N.W. 66, 67 (Mich. 1921) (holding scheme where purchasers bought suits for $48 paid in $1 monthly installments and each month one purchaser had the balance forgiven was a lottery); *State v. Lipkin*, 84 S.E. 340, 341 (N.C. 1915) (holding that scheme is a lottery where "[e]ach customer agrees to pay 25 cents per week until the sum of $17.50 has been paid, or until their name is selected by the company . . . and will then be entitled to receive their furniture at once, providing their payments have been made regularly,"  even though "[n]o money can be lost by lapsing, as the amount paid in can be applied at any time to the purchase of any $17.50 article"); *see also Valentin v. El Diario La Prensa*, 427 N.Y.S.2d 185, 187 (Civ. Ct. Bronx County 1980) (holding element of consideration met in contest to determine "[El] Rey Infantíl" where customers could purchase newspaper containing coupons authorizing them to vote on the cutest baby in New York).[5]

New York and federal courts have specifically addressed schemes where loans of money were required as consideration for lottery tickets, and they have held that the mere time-value of merchandise was sufficient to constitute a thing of value. In *Carl Company v. Lennon*, the court considered a scheme where defendant sold 500 small toy banks for 25 cents each, numbered consecutively from 500 to 999, and each day chose a number between 500 and 999 entitling that day's winner to $1 worth of merchandise at defendant's store. 148 N.Y.S. 375, 376 (S. Ct., Albany County 1914).

---

[5] This is why most modern giveaway contests state in the fine print that there is "no purchase necessary" to enter and provide ways of entering the drawing without any requirement of consideration. *See Harris v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 171 A.D.2d 223, 228 (1991) (contrasting illegal lottery with giveaway where "no purchase was necessary to enter"). But a purchase *is* necessary to enter the PoolTogether lottery. No one can send PoolTogether a postcard and request a free entry ticket.

The court held this scheme to be an illegal lottery even though each "bank is worth the money paid for it" and *every* purchaser would *eventually* get the $1 prize. *Id.*

> It is idle to say that a sum or an obligation for a sum due and payable to-day, or at an early day, is of no more value than an obligation for an equal amount, without interest, payable at a remote and indefinite time. . . . But, as 'a bird in the hand is worth two in the bush,' so a dollar to-day is worth more than a dollar payable a year hence, and the inequality in the value of the dollar's worth of merchandise, dependent upon the chance of present or future selection, is enough to characterize plaintiff's scheme as illegal.

*Id.* at 377; *see also MacDonald v. United States*, 63 F. 426, 431 (7th Cir. 1894) ("It was insisted at the hearing that since every bondholder who shall continue to pay his dues will ultimately receive the promised sum, the prizes are equal, and therefore there is no lottery. But it is idle to say that a sum or an obligation for a sum due and payable today or at an early day is of no more value than an obligation for an equal amount, without interest, payable at a remote and indefinite time."). The mere time value of goods, then, can serve as a thing of value under New York (and analogous federal) law.

Courts—and, later, the Legislature—have also found that the key characteristic of a prize giveaway *not* being a lottery is that participants be entitled to the return of the full value of the money staked *plus interest*, and then they receive the prize ticket purely as a bonus. Over a century ago, in *Kohn v. Koehler*, the Court of Appeals held that an Austrian bond paying all holders full interest and *in addition* offering lottery tickets was not an illegal lottery. 96 N.Y. (51 Sickels) 362 (1884). The U.S. Supreme Court later explained that this was so (as the Court of Appeals also explained) because the prize "did not constitute the main feature and the substance

17

of the transaction . . . and that . . . the privilege of obtaining by . . . chance a larger sum than the principal, interest, and premium, *which the holder was sure to get in any event*, [did not] impart[] to the loan the character . . . a mere lottery scheme." *Horner v. United States*, 147 U.S. 449, 465–66 (1893) (emphasis added).[6]

Far more recently, New York passed a statute specifically addressing when a "savings promotion prize giveaway" constitutes an illegal lottery, and that statute confirms the U.S. Supreme Court's reading of *Kohn* as requiring that winners and losers receive full interest alike for a product like this to be legal. Under the Banking Law, licensed banking institutions may offer savings-promotion lotteries so long as they do not reduce the interest otherwise due. Specifically,

> [P]articipants shall not be deemed to have provided consideration [for lottery tickets] due to the requirement that they deposit money in a[n] . . . account through which depositors may obtain chances to win prizes in a savings promotion to obtain entries to win, so long as . . . the interest rate associated with any such qualifying account *is not reduced* when compared with other comparable [non-prize-generating] . . . accounts offered by any banking organization [or other regulated entity] . . . to account for the possibility of depositors winning specified prizes.

---

[6] It is possible that *Kohn* is an interpretation of Austrian law and not New York law and thus does not limit the definition of lotteries under New York law. As the U.S. Supreme Court later explained of *Kohn*, "it may be that the court of appeals gave force to the view that the Austrian loan was a legal lottery . . . issued by the Austrian government, in accordance with its laws," and therefore "[i]t by no means follows that the court of appeals would have made a like decision" were the lottery legal (or not required to be illegal for recovery). *Horner*, 147 U.S. at 466. Indeed, under New York cases like *Miller* and *Lavin*, a lottery ticket issued for free alongside a bond likely have constituted an illegal lottery, so *Kohn* probably depended on the lawfulness of that lottery under the law of the issuing country. This Court need not address that issue, because *Kohn* addressed a circumstance, unlike here, where purchasers of the bonds received full compensation whether they won or lost.

N.Y. Banking Law § 9-v, b (McKinney) (emphasis added, cleaned up to incorporate definition of "qualifying account" in subsection b); *see also* N.Y. Banking Law § 96(15)(b) ("[R]egulations shall ensure that . . . no participant in a savings promotion foregoes . . . any interest").

Three points are important about this law, and each dooms Defendants' arguments on its own. *First*, where, as here, a lottery operator *does* reduce the interest otherwise due on deposits "when compared with other comparable . . . accounts," the seller *is* deemed to require consideration, confirming this part of *Kohn*'s holding as essential. *Second*, the Legislature felt it necessary to say that "the requirement that participants deposit money in an account" *id.* (reorganized) is not consideration where regulated banks *do not* reduce the interest otherwise due on deposits. This would be unnecessary if *Kohn* really stood for what Defendants contend it does, for such a scheme would not involve actionable consideration regardless. *Finally*, savings-promotion lotteries are lawful only for *regulated banks*. If they were not lotteries to begin with, the Legislature never would have needed to exempt them.

## 2.    *Gamblers Forgo Interest in Consideration For Lottery Tickets*

It is unclear how much of the forgoing law Defendants really dispute. In the meager three and a half pages (of 134 in total across seven briefs) that they spend attempting to argue that PoolTogether tickets are not lottery tickets, Defendants appear to concede that if a "purchase" is required for a chance to win a prize in a drawing, a lottery exists, and that, where depositors are otherwise entitled to interest, they purchase a ticket if they forgo that interest. (PoolTogether MTD at 20–21 & n.9.) Instead, Defendants' primary argument is that Kent did not "forgo" any

19

interest because "he had no interest to 'pay' and had no entitlement to interest from . . . the savings protocol[;] [h]e only had 10 GUSD with which he could, in theory, accrue interest based on some hypothetical transaction with a third party or protocol" (*id.* at 21). This argument is plainly contradicted by the plausible allegation in the Complaint that the "protocol routes the gamblers' cryptocurrency to liquidity pools, then takes the interest, pools it together, keeps up to 50% as a 'reserve,' and distributes the rest to the holder of each lottery's winning tickets." (SAC ¶ 45.)

It's also contradicted by Defendants themselves, elsewhere in their brief: They admit Kent's money *did in fact* "accrue interest at a rate set by the particular yield protocol." (*E.g.*, PoolTogether MTD at 3 (citing Cusack Decl. ¶ 30.).) Where did that interest go? To the winner of the lottery. (*Id.* ("[A]t periodic intervals the savings protocol recalls and distributes either all or a portion of the accrued interest to randomly selected depositors in that pool.").) This is consideration.

Defendants support their bizarre denial of reality (and the Complaint's allegations) with a comparison that ignores binding law. According to Defendants, when assessing consideration, this Court should ask what would have happened to Kent's money had he done nothing at all with it. (*Id.*) New York law specifically instructs otherwise. Consideration is measured as "compared with other comparable [non-prize-generating] . . . accounts," N.Y. Banking Law § 9-v, and, indeed, such accounts exist for cryptocurrencies—we know this because Defendant Compound created one, which is where the PoolTogether DAO in fact sends users' money. There

is thus no "contrast"—let alone a "stark" one (PoolTogether MTD at 21)—between what Kent forewent and what an ordinary banking customer would forego.

Regardless, Defendants argument is inconsistent with the allegations in the complaint (and reality). Kent's money was in fact delivered to the Compound protocol where it generated interest, and that interest was in fact taken from him, pooled together, and given to the lottery winner. Defendants' observation, then, that Kent "had no entitlement to interest" is bizarre and false. But, again, *cash* does not generate an "entitlement to interest" on its own, yet its forbearance does constitute consideration for a lottery, as Defendants concede. *See, e.g.*, *Miller*, 2 N.E.3d at 39.

Perhaps Defendants mean to emphasize the fact that the interest was generated by Compound and the other yield protocols rather than by the PoolTogether DAO itself. (PoolTogether MTD at 21 (noting "third party" protocol).) Why this observation matters is left unsaid. After all, depository institutions do not magically generate interest themselves. They lend money to borrowers and use that interest to compensate depositors at a lower rate. *See, e.g.*, Julia Kagan, INVESTOPEDIA, *3-6-3 Rule*, Jan. 2, 2021, https://www.investopedia.com/terms/1/3_6_3_rule.asp ("The 3-6-3 rule describes how bankers would supposedly give 3% interest on their depositors' accounts, lend the depositors money at 6% interest, and then be playing golf by 3 p.m."). This fact, true of all banks, does not exempt them from New York's definition of a lottery, nor does it exempt PoolTogether tickets.

> 3.   *Alternatively, Gamblers Forgo The Use of Their Assets, Which Has Value*

The foregoing subsection is enough to defeat Defendants' motion to dismiss, but even assuming that users *did not* forgo any interest, Defendants are *still* wrong. New York law holds that the time value of money is valuable consideration, and Defendants' scant support for its contention that this is somehow different for USDC and GUSDC (as opposed to USD, or GBP, or EUR, say) cannot bear the weight Defendants put on it.

All agree, as they must, that staking the time value of cash (called "fiat currency" in crypto jargon) is sufficient to constitute consideration for a lottery ticket. *E.g.*, *Carl Co.*, 148 N.Y.S at 377 ("It is idle to say that a sum or an obligation for a sum due and payable to-day, or at an early day, is of no more value than an obligation for an equal amount, without interest, payable at a remote and indefinite time."). Defendants argue that GUSD (the cryptocurrency) and USD (the dollars backed by the U.S. government) are different such that losing the time value of the former asset is not consideration. (*E.g.*, *id.* at 13, 21.) This goes against clear New York caselaw, and doesn't make sense.

In support of their distinction, Defendants cite no case but instead offer only the comparison between Treasury Department requirements for holders of sanctioned parties' cash (which must be held in an interest-bearing account) and holders of sanctioned parties' cryptocurrency (which need not be). (PoolTogether MTD 13–14 & n.8) For starters, this is an awfully thin reed to put this weight on—the Treasury Department was (a) not addressing New York law, (b) not considering what constitutes "value" or "consideration," and (c) offered no reasoning for its distinction,

which could well be motivated by the simple logistical hassle of using cryptocurrency generally. But regardless, even if Defendants are right, their comparison fails. The *Carl Company* case confirms that the difference between one dollar *worth of merchandise* today and the same dollar worth of merchandise in the future *does* constitute a thing of value, but the Treasury Department surely wouldn't require holders of terrorists' sweaters, sneakers, or knickknacks to generate interest on that stuff. *See* 148 N.Y.S. at 377. Defendants make no attempt to distinguish *Carl Company* on this score.

This is all confirmed further by the fact that Kent's money was in fact at risk of loss. (SAC ¶ 24; PoolTogether MTD at 22.) In exchange for a lottery ticket, Kent forewent (in addition to interest, described above) both the time-value of his money and the certainty that he would get it back. The relevant comparator for assessing consideration, then is not what would have happened to Kent's money if he had kept it under his mattress; it is what would have happened to his money had he sent it directly to Compound, for indeed that is where his money went. There was consideration here.

*        *        *

It is useful to briefly take stock. Defendants operate a protocol that has been marketed as a "lottery" and repeatedly described as one by its founder, among others. As the forgoing makes clear, Cusack and PoolTogether were not wrong: they were, and are, running a lottery. But no one may operate lotteries in New York except for

the State, charities, or certain regulated financial institutions, and PoolTogether is none of them. Its product is illegal.

The next question is: who is responsible for breaking the law? These Defendants spend the vast majority of their briefing attempting to persuade the Court that the answer is "no one." Not the corporation called PoolTogether, Inc.; not its founder; not those who joined the partnership with the purpose of operating a lottery; not those who invested in it knowing it was a lottery and seeking to profit off the proceeds siphoned from the prize pool; and not those who enabled it and sold tickets to it. As the following sections explain, that is wrong. It's also dangerous. It implies that these same business arrangements would be sufficient to avoid liability for selling firearms, laundering money, promoting child pornography, or anything else. The remainder of this brief now explains why the Complaint states a claim against these Defendants.

## C.    The PoolTogether General Partnership Is Liable For Selling Lottery Tickets

The first answer to who sells PoolTogether lottery tickets comes from *Defendants*' theory of this case as articulated in their pre-motion letters (and as pleaded in the Second Amended Complaint): The PoolTogether DAO sells the tickets. The DAO is operated by the Investor Defendants, Cusack, and some unknown others, as a general partnership. They are accordingly jointly and severally liable.

By its own description, the PoolTogether DAO is an organization governed "by majority vote of those holding the PoolTogether governance token: the 'POOL' token," which was created "through a 'smart contract' on the Ethereum network on February

24

17, 2021." (Cusack Decl. ¶¶ 12, 13.) That organization, Kent plausibly alleges (again based on Defendants' own statements and actions), exists for the purpose of making a profit. And, of course, the PoolTogether DAO did not register for any form of limited liability with any state or nation. At a high level of generality, then, the PoolTogether DAO must be a general partnership because it is a business organization that never registered for limited liability, and general partnerships are the default business organization. *E.g.*, Carla L. Reyes, *If Rockefeller Were a Coder*, 87 GEO. WASH. L. REV. 373, 391 (2019) ("As a default entity, when a business venture with multiple owners fails to file paperwork to operate the business in some other form (such as an LLC or corporation), a partnership is automatically formed.").

Several important figures in the "nascent decentralized finance industry"—the "upend[ing]" of which Investor Defendants supposedly fear (Galaxy MTD at 21)— have reached the same conclusion. Miles Jennings is general counsel for cryptocurrency issues at Andreesen Horowitz, which—with $28.2 billion in assets under management and $3.1 billion in its crypto fund alone—is probably an entity that can pay for the most sophisticated legal advice available on those issues. As Jennings has explained:

> a DAO's decision to not create a legal entity does not offer protection from responsibilities that may arise in the operation of a DAO. From a legal perspective, when two or more individuals are engaged in even a tenuous business relationship, the imputed structure is that of a general partnership. Significant legal precedent exists for U.S. courts utilizing a functional approach to determining whether a partnership was formed irrespective of disclaimers and specific intent to not form a partnership. General partnerships have no corporate form and do not

25

provide partners with the liability limitations contained in
other common entity structures (e.g., LLCs, C-Corps, etc.).

David Kerr & Miles Jennings, ANDREESEN HOROWITZ, *A Legal Framework for Decentralized Autonomous Organizations*, https://a16z.com/wp-content/uploads/2021/10/DAO-Legal-Framework-Jennings-Kerr10.19.21-Final.pdf (Oct. 19, 2021); *see also* ANDREESEN HOROWITZ, *About*, a16z.com/about (last accessed May 2, 2021, at 11:05 AM EST) (listing assets).

In fact, counsel for Defendant Compound Labs shared this view as recently as days before the Complaint in this case was filed. In an article dated October 20, 2021, Jason Gottlieb & Alexandra Wang—who appear here as counsel for Compound Labs (*See* Compound MTD 18)—noted that, "[w]hile the law has long imposed the useful fiction of personhood on corporations[,] . . . DAOs do not yet enjoy these privileges (for the most part)."[7] *How to Do Business as a DAO*, COINDESK, Oct. 20, 2021, https://www.coindesk.com/policy/2021/10/20/how-to-do-business-as-a-dao/.     They correctly observed that "[t]here is a risk the DAO could be considered a general partnership or unincorporated association" and "[t]his might expose its members to personal liability for any of the DAO's actions and obligations." *Id*. They even noted that the "lack of legal protections and practicalities available to [DAOs]" presents "their lawyers . . . with a host of execution and analytical challenges." *Id*. The Complaint in this case was filed eight days after Compound's counsel published that

---

[7] This qualification likely refers to the fact that a few states, like Wyoming, have begun to offer explicit legal recognition to DAOs who comply with certain formalities. *E.g.*, Wyoming Secretary of State, DAO: Frequently Asked Questions, https://sos.wyo.gov/Business/Docs/DAOs_FAQs.pdf (last accessed May 19, 2021, at 10:02 AM EST).

analysis, yet Defendants tell the Court that the PoolTogether general partnership relies on "*Kent's* novel theory." (Galaxy MTD at 21 (emphasis added).)

The specifics of this particular case make the conclusion that Defendants formed a partnership even clearer. A general partnership is formed under New York law whenever "[1] two or more persons . . . [2] carry on as [3] co-owners a [4] business for profit." N.Y. P'ship Law § 10. To determine whether business partners are carrying on as co-owners, courts ask whether they formed "an agreement, either express or implied, to participate in the profits or loss of the business." *Laundry v. Hencken*, 203 A.D. 140, 144 (1st Dep't 1922). "No one characteristic of a business relationship is determinative in finding the existence of a partnership in fact." *Brodsky v. Stadlen*, 138 A.D.2d 662, 663 (2d Dep't 1988). Instead, "[f]actors to be considered by the court include the sharing of profits and losses, the ownership of partnership assets, joint management and control, joint liability to creditors, the intention of the parties, compensation, the contribution of capital, and loans to the organization." *Giffuni v. Towler*, 119 N.Y.S.3d 703 (S. Ct., Suffolk County 2019) (citing *Brodsky*, 138 A.D.2d at 663).

Kent pleads facts giving rise to a plausible (indeed likely conclusive) inference that the Investor Defendants and Cusack formed a general partnership. Kent alleges that Investor Defendants pooled their money (SAC ¶ 53) by purchasing smart *contracts*—read: agreements—to jointly govern PoolTogether (SAC ¶¶ 58, 59). Kent alleges that, through the smart contract, they jointly own the profits PoolTogether has so far made. (SAC ¶ 58.) Kent alleges that they worked together with Cusack and

others to manage the affairs of the partnership (SAC ¶ 59), making day-to-day operational decisions (*e.g.*, SAC ¶ 72) and large strategic ones (SAC ¶¶ 64, 65) through majority votes (SAC ¶ 56). And Kent alleges that their purpose in doing so was to make a profit, with the profit to be held in the PoolTogether treasury and either paid out in the form of buybacks of POOL tokens or other distributions, or simply held indefinitely in the treasury for the purpose of increasing the value (or "tokenomics," as Cusack put it) of the partners' holdings. (SAC ¶¶ 74, 69–76.) This is a general partnership.

Defendants' arguments to the contrary all fail. First, Defendants argue that "Kent has not alleged any facts showing that the Investor Defendants made an agreement to share profits and losses." (Galaxy MTD at 19.) This is factually and legally wrong. Factually, Investor Defendants contend that Kent failed to allege that the money PoolTogether DAO holds "in 'reserve'" has *already* been paid out to the Investor Defendants, but Investor Defendants ignore that Kent clearly alleges—and this is incontrovertible regardless—that Investor Defendants *currently own* those assets, as they agreed to do jointly when they transferred almost six million of their dollars into the PoolTogether treasury. And the Investor Defendants have already agreed to share any losses that arise in the PoolTogether DAO up to approximately six million dollars when they put that money in the treasury.

Legally, Investor Defendants wrongly conflate distributing assets with agreeing to share them. Investor Defendants have not yet agreed (and may not ever agree) on how to liquidate the treasury and wind down the partnership, but they have

28

agreed to share the money in the treasury. Defendants have in fact opened the cryptocurrency equivalent of a joint bank account through the treasury. *Contra Tedesco v. Ecobank Transnat'l Inc.*, 102 A.D.3d 607, 607 (1st Dep't 2013) (noting absence of "joint accounts" in finding no partnership in fact); *Slabakis v. Schik*, 164 A.D.3d 454, 455 (1st Dep't 2018) (holding no joint venture formed where, inter alia, no sharing of financial resources). Defendants cite no authority in support of the argument that Kent be required to allege the exact plan of distribution for partnership assets, and there is no such authority. *See generally* N.Y. P'ship L. The Investor Defendants' argument is like saying that a law firm that does not distribute profits for a few years but instead holds the firm's assets in a business account for future use or distribution has somehow not agreed to share profits. This is wrong.

Next, Investor Defendants argue that "Kent fails to allege facts showing the Investor Defendants exercised control over the alleged partnership business." (Galaxy MTD at 20.) Factually and legally wrong again. Factually, Investor Defendants contend that Kent "alleges only that the Investor Defendants could theoretically participate in decisionmaking because they, like all other POOL tokenholders (including many thousands of his fellow depositors), possess small fractional voting rights." (*Id.*) But Kent alleged, based on who owned the voteable POOL tokens, that for at least some time (a) *one* Investor Defendant *alone* controlled the PoolTogether DAO (SAC ¶ 51) and (b) the Investor Defendants collectively controlled the PoolTogether DAO by themselves (SAC ¶ 55). Earlier in this case, the Investor Defendants represented to this Court that, in fact, they "participate in . . .

29

decisionmaking about the workings of the protocol." (SAC ¶ 60 (quoting Doc. 44 at 1, pre-motion letter from Investor Defendants)). Investor Defendants may eventually attempt to walk back their earlier statement and contest the veracity of these claims, but the plausible allegations in the Complaint are accepted as true for purposes of a motion to dismiss.

Legally, Investor Defendants wrongly conflate control with *sole* control. They point to no authority requiring Kent to sue partners who collectively control a majority share of a partnership such that they could alone direct its affairs. And indeed such a requirement makes no sense. Partners are jointly and severally responsible for the liabilities of the partnership. N.Y. P'ship L. § 26. A plaintiff who sues one partner is entitled to collect the debts of all, and so such a plaintiff surely needn't find enough defendants to constitute a majority interest. Here, there is no question that all Investor Defendants hold significant shares of the tokens by which the DAO is governed. Even if they are alone unable to direct its affairs with a controlling stake, they are still general partners.[8]

Finally, Investor Defendants argue that Kent "offers no factual allegations about any transactions that suggest the Investor Defendants . . . intended to become co-owners of the PoolTogether protocol business." (Galaxy MTD at 21.) This, again,

---

[8] That said, there is a reasonable inference from the Complaint that PoolTogether is an example of decentralization theater, where small amounts of tokens are distributed to a large number of holders but control remains in the hands of the founder and a few large investors. *See, e.g.*, Dave Michaels & Paul Kiernan, *Crypto's 'DeFi' Projects Aren't Immune to Regulation, SEC's Gensler Says*, THE WALL STREET JOURNAL, Aug. 19, 2021, at A1 ("These platforms facilitate something that might be decentralized in some aspects but highly centralized in other aspects."). More facts about how the protocol is controlled will surely emerge in discovery.

ignores the Complaint. Kent alleges that Investor Defendants put about six million of their dollars *together* into the PoolTogether treasury in exchange for which they collectively acquired a controlling ownership share in the business, in whose governance they then proceeded to "participate." (SAC ¶ 60.) If that isn't "join[ing] their property, interests, skills, and risks," *Matter of Steinbeck v. Gerosa*, 4 N.Y.2d 302 (N.Y. 1958), it is hard to imagine what would be. And in any event, "the sharing of profits and losses demonstrates an intent to form a partnership," *Picard v. Sage Realty*, No. 20 CIV. 10057 (JFK), 2022 WL 1125643, at *29 (S.D.N.Y. Apr. 15, 2022), and as just explained that's exactly what the Investor Defendants did.

Cusack and Investor Defendants, then, formed a general partnership through the PoolTogether DAO. And that means that they are liable here. Defendants do not dispute—nor could they—that, if a general partnership was in fact formed and that partnership is the "seller" of lottery tickets, then its partners are jointly and severally liable accordingly. And, as explained in more detail below, Investor Defendants concede that if they formed a general partnership, they are subject to this Court's personal jurisdiction for the claims in this suit. Therefore, except for standing— which, as explained below, should be uncontroversial here—this Court can stop here and deny Investor Defendants' motions without even addressing the question whether New York law imposes secondary liability for selling lottery tickets.

### D. Dharma And PoolTogether, Inc., Are Liable For Selling Lottery Tickets or, in The Alternative, For Aiding And Abetting Sales

PoolTogether, Inc. ("PoolTogether," for this section) and Dharma, operated, by their own descriptions, "interface[s]" through which users could exchange money for

the lottery tickets that were generated by the PoolTogether DAO. Dharma and

PoolTogether sold lottery tickets or, in the alternative, aided and abetted the sale of

lottery tickets. Either way, they are liable here.

>    1.   *New York Law Creates a Cause of Action Against Both Direct*
>         *Sellers and Those Who Operate or Profit From Illegal Lotteries.*

Dharma and PoolTogether rely (as do the Defendants resisting secondary

liability below) on an unusual and unexplained reading of the statute at issue here.

In full, the statute reads:

> Any person who shall purchase any share, interest, ticket,
> certificate of any share or interest, or part of a ticket, or
> any paper or instrument purporting to be a ticket or share
> or interest in any ticket, or purporting to be a certificate of
> any share or interest in any ticket, or in any portion of any
> lottery, may sue for and recover double the sum of money,
> and double the value of goods or things in action, which he
> may have paid or delivered in consideration of such
> purchase, with double costs of suit.

> Any person who shall have paid any money, or valuable
> thing, for a chance or interest in any lottery or distribution,
> prohibited by the penal law, may sue for and recover the
> same of the person to whom such payment or delivery was
> made.

N.Y. Gen. Oblig. L. § 5-423.

Defendants assume without argument that the last clause—the phrase "may

sue for and recover the same of the person to whom such payment or delivery was

made"—limits the application of the second *and* first paragraphs. (Galaxy MTD at

11; Dharma MTD at 9.) In their reading, *all* purchasers of illegal lottery tickets may

sue *only* "the person to whom such payment or delivery was made." But they offer no

explanation for how this reading doesn't render the entire statute internally contradictory.

The two paragraphs authorize different recoveries. The first paragraph authorizes "recover[y] of *double* the sum of money, and *double* the value of goods or things in action . . . paid or delivered in consideration of [a lottery-ticket purchase]," while the second paragraph authorizes only "recover[y] of the same" amount "paid . . . for a chance or interest in any lottery or distribution." *Id.* If the first paragraph were limited identically as the second is, the statute would be saying that plaintiffs may recover (1) double the amount they paid and (2) the exact amount they paid from the same person in the same action, and only from that person. Defendants reject as "absurd" any construction that *doesn't* result in this contradiction. (*See* Galaxy MTD at 10.)

The much better reading of these two paragraphs together—indeed, the only one that makes sense of the whole provision and the one that has been adopted as binding by the Court of Appeals—is instead that a buyer is entitled to a refund from the person to whom the buyer hands over the money ("payment or delivery was made"), and the buyer is entitled to a refund plus an effective penalty against the true operators of the lottery if they can be located, and perhaps against others (explained in more detail below). This is how the New York Court of Appeals has understood the law. In *Grover v. Morris*, relied on by Defendants on several occasions, the plaintiff purchased lottery tickets in Rochester from an "agent, Thomas," of a lottery operation in Kentucky. 73 N.Y. 473, 478 (1878). The Court of Appeals held

33

that the plaintiff could maintain an action against the operators of the lottery under

what is now the first paragraph of § 5-423, reasoning

> It may very well be that the plaintiff could have brought
> his action under the statute against Thomas, regarding
> and treating him as the seller; but the object of the section
> [*i.e.*, what is now the first paragraph[9]] was to discourage
> the business of selling lottery tickets, and it would go very
> far to defeat its benificent [*antiq.*] purpose if it should be
> held that the owners and managers of lottery schemes
> could escape personal liability under this section, and
> deprive the purchaser of any substantial remedy by the
> easy device of appointing irresponsible agents to make the
> sales.

*Id.* at 477.

Three points are important here. First, the Court assumed in dicta that the

statute contemplates *multiple* sellers of the same ticket—the "irresponsible" agent,

against whom the plaintiff "could have brought his action," and also the "owners and

managers," against whom he did. Second, the court confirmed that the question of

who sells lottery tickets must be answered, among other things, according to

"common understanding." *Id.* at 477. Shell games that result in the conclusion—

evidently advanced by Defendants here—that lottery tickets sold themselves (or have

no sellers?) do not accord with any reasonable person's common understanding.

Finally, Defendants' reading abrogates *Grover* entirely, for the Kentucky lottery

operators were not the people "to whom . . . payment or delivery was made," yet the

---

[9] At the time of *Grover*, what is now the second paragraph of § 5-423 was found in a
different provision in substantially the same form as it exists today. The reference to the
"object of the section" in *Grover* is a reference to the nearly identical language that was then
codified at 1 R.S. 667. *See Grover*, 73 N.Y. at 475.

Court of Appeals stated a case could proceed against them. That interpretation binds this Court.

Since *Grover*, the New York legislature moved what is now the second paragraph of Section 5-423 from the penal law to the general obligations law, and it changed the word "raffle" in that provision to the words "lottery or distribution" (Galaxy MTD at 11 (citation omitted)). Defendants contend that this changes everything, including evidently the holding in *Grover*. (*Id.*) But they fail to grapple with how the two paragraphs can be read together if that is so. And there is no good reason to believe that it is. After all, the legislature replaced the word "raffle" with *two* words, only one of which appears in the first paragraph. The first paragraph, then, provides a double recovery for only lottery purchasers against a broad array of defendants who participate in the selling of illegal tickets. The second paragraph goes on to provide a single recovery against the immediate agent who sells lottery tickets (which makes sense as a refund: sue the person you just handed the money to, not some faraway seller) and a single recovery against operators of other, perhaps less pernicious, gambling schemes.

Read this way—the only way that avoids a fatal contradiction—"seller" as used in *Grover* is not nearly so limited as Defendants would hope. Instead, it covers the people who profit from and operate the lottery scheme (Investor Defendants and Cusack) and those who hand the tickets over to the Plaintiffs (Dharma and PoolTogether).

### 2.    *PoolTogether, Inc., and Dharma Sold Lottery Tickets*

Dharma and PoolTogether operated websites and mobile phone applications that appeared to the outside world to be offering lottery tickets for sale. Here, for instance, is the front page of app.pooltogether.com from mid 2021. It lists different prize pools, and then it permits users to deposit to win.



After choosing one prize pool, the user sees the screen below, which says "deposit USDT [a type of currency] to win," and lists the odds of winning.



And here is the success screen, telling users how many tickets they bought and when the next drawing will be:



Meanwhile, here is a screenshot of a user opening the Dharma app and being invited to "Deposit to PoolTogether to win up to $80,000."

37



And this is what it looks like when a user elects to make a deposit to PoolTogether directly from Dharma.



PoolTogether and Dharma now contend that this is an illusion of some kind. PoolTogether argues that it operates a mere interface, allowing users to send money to the protocol, but never taking possession of the money itself, and is therefore exempt from the legal concept of "sale." (PoolTogether MTD at 22–23.) And Dharma claims it operated a mere transaction facilitator, allowing users to connect cryptocurrency wallets to a broad array of financial products, only one of which happened to be—to Dharma's evident surprise—an illegal lottery. (Dharma MTD at 9–10); *but cf. White v. Cuomo*, ___ N.Y.3d ___, No. 2022-01954, 2022 WL 837573, at *11 (Mar. 22, 2022) (Wilson, J., dissenting) ("The majority's explanation of why something everyone knows is gambling is not actually gambling brings to mind a brief exchange in *Casablanca*: 'Rick: How can you close me up? On what grounds? Captain Renault: I'm shocked, shocked to find that gambling is going on in here! [A croupier hands Captain Renault a pile of money.].'").

Take the two direct sellers in reverse order. Dharma begins with an analogy to traditional lottery tickets that is a helpful frame for the questions here. According to Dharma, PoolTogether is like a bodega where users can buy things directly, while Dharma is like the bodega's credit-card processor. (Dharma MTD at 10.) The implication is that the card processor would not be liable for illegal sales at the bodega under any reasonable theory. But that ignores the Complaint (and reality). Dharma is—at least on this motion, where Kent's well-pleaded facts are taken as true—more like the bodega. After all, Dharma advertised PoolTogether's lottery directly in its app—including by enticing users to win money by using it—and then created an interface to permit Dharma users to directly deposit into PoolTogether and receive lottery tickets. In other words, Dharma takes the money from users and gives them tickets; the money goes to the PoolTogether DAO, which takes a cut and runs the lottery; and the tickets are sent through Dharma and PoolTogether to users. That's selling.

*Grover* confirms this conclusion. There, the Court of Appeals assumed that plaintiffs could sue the people who handed them lottery tickets (the agents) and those who ran the lottery (the operators). Here, Dharma and PoolTogether act effectively as sales agents for the PoolTogether DAO. Dharma agreed with Cusack—a member of the PoolTogether general partnership and an employee of PoolTogether, Inc.—to offer PoolTogether tickets on Dharma's app and to send the money straight to the PoolTogether DAO with a fee kept by Dharma. (*See* SAC ¶ 88.) That is exactly how lottery tickets are usually sold in New York. *See, e.g.*, NEW YORK LOTTERY,

40

*Information For Retailers*, https://nylottery.ny.gov/page/information-retailers (last accessed May 3, at 9:30 AM EST) ("Our network of approximately 15,000 Sales Agents brings Lottery Games to New Yorkers across the State. . . . Sales Agents earn commissions on Lottery sales and can build their business offering the fun and excitement of New York Lottery Games.").

Dharma resists this conclusion because many different products were available on its interface and because it is paid a flat fee that is also applicable to other kinds of transactions. (Dharma MTD 7.) But it seriously overstates that case: Only a handful of "protocols" were available on its interface; Dharma very prominently advertised PoolTogether DAO's illegal lottery, enticing users to purchase tickets by offering them a chance to win "up to $80,000" (SAC ¶ 98); and Dharma did so only after agreeing with Cusack to set the system up. (SAC ¶ 88.)

But it gets worse for Dharma. Even if Dharma were right that it merely provided an interface by which users may access lottery tickets beyond its operations, New York courts have made clear that kind of activity is illegal. In the early 1990s, a company called ABL Ventures allowed its retail sales agents to install terminals in their stores to allow access to out-of-state lotteries.

> The terminal accepts orders from customers in New York for out of state lottery tickets and issues a receipt to the customer memorializing the transaction. For each $1.00 purchase order placed, customers are charged a $1.00 service fee. [The] terminals are linked to a private national computer network in New Jersey which transmits the order to an ABL agent located in the state hosting the lottery. The ABL agent then purchases a lottery ticket from a state-licensed lottery salesperson and holds it for the customer.

*Chun v. State of New York*, 807 F. Supp. 288, 290 (S.D.N.Y. 1992). New York courts held that the individuals who operated ABL terminals in New York were "[people] who sell[], give[], or in any way whatever furnish[] or transfer[]" lottery tickets, *People v. Kim*, 585 N.Y.S.2d 310, 314 (Crim. Ct., Bronx County 1992), and the Supreme Court in Albany granted a preliminary injunction sought by the Attorney General against operation of the scheme, *see Chun*, 807 F. Supp. at 290 (citing *New York v. Fortune U.S.A. New York-Queens, Ltd.*, Index No. 43670/91 (Sup. Ct. N.Y. County 1991)). The application is straightforward. Those who operated the terminals to sell out-of-state lottery tickets were sellers, just like Dharma's (supposed) terminal to PoolTogether's tickets makes it a seller.

The case against PoolTogether is even easier. PoolTogether offers nothing for sale other than PoolTogether lottery tickets. And its relationship to the PoolTogether DAO is at least a very close one. Employees of PoolTogether and DAO members treat the two organizations as effectively interchangeable. (SAC ¶¶ 79, 81–82). PoolTogether is thus easily a seller under the rule in *Grover*. For now, on a motion to dismiss, this Court must at least credit Kent with the reasonable inference that the corporation called PoolTogether is acting as a sales agent for the DAO bearing the same name.

Finally, PoolTogether's contention that Kent must meet the commercial-law definition of "sale" to satisfy Section 5-423 (PoolTogether MTD 22–23) is wrong, and regardless Kent easily does meet that definition. PoolTogether offers no support for its argument that Section 5-423 incorporates the commercial-law definition of "sale,"

and it does not; who is liable under Section 5-423 is governed by the Court of Appeals' interpretation of *that* statute. *Grover*, 73 N.Y. at 476. And in any event Kent alleges "'an agreement by which one of two contracting parties, called the seller, gives a thing and passes title to it, in exchange for a certain price in current money, to the other party, who is called the buyer or purchaser who, on his part, agrees to pay such price.'" (PoolTogether MTD at 23 (quoting *In re Estate of Franks*, 277 N.Y.S. 573, 575 (Sur. Ct. 1935))); (SAC ¶¶ 91, 101.)

### 3.   If It's Not a Direct Seller, Dharma Aided and Abetted the Sale of Lottery Tickets.

As explained, Dharma is directly liable as a seller of lottery tickets under § 5-423. But, if it weren't considered a seller, liability would still attach because Dharma aided and abetted the sale of lottery tickets.[10]

Under New York law, a statute need not explicitly provide for secondary liability for aiding-and-abetting liability to attach. *See Pittman by Pittman v. Grayson*, 149 F.3d 111, 122–23 (2d Cir. 1998) (noting that the standard for aiding-and-abetting liability applies to torts generally). Indeed, it's apparently undisputed that New York law generally allows for aiding and abetting liability based on a tort, so the only question is whether statutory causes of action are somehow excluded from this general rule. *See Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 455 (S.D.N.Y. 2017) ("[A]bsent any indication in New York law to the contrary, the tort of

---

[10] The Complaint also asserts theories of secondary liability against Compound and the Investor Defendants. Compound's liability for aiding and abetting is discussed *infra* at subsection F. The Investor Defendants' liability for conspiracy is discussed *infra* at subsection E. To be clear, Kent does not attempt to state a claim for aiding and abetting against the Investor Defendants.

aiding and abetting negligent misrepresentation exists."). But there is no reason to think that the New York Legislature intended such a broad exemption, and New York courts have likewise not held such claims are precluded. Logically, there would be no reason to make such a distinction, as at least one court has found on the closely analogous question of the availability of civil conspiracy claims based on statutory causes of action. *Varela v. Flintlock Const., Inc.*, No. 01-cv-2736, 2002 WL 342657, at *3 (S.D.N.Y. Mar. 5, 2002) ("[I]ndependent research has uncovered no case law making a distinction [with respect to the availability of civil conspiracy] between torts having a basis in statute as opposed to the common law.").

Dharma's proposed framework, which it articulates in a single paragraph, puts the burden on Kent to affirmatively establish that aiding and abetting liability is available for this particular cause of action, but that gets the burden backwards. Dharma primarily relies on cases holding that aiding and abetting liability was unavailable because imposing that type of liability would expressly undermine a statutory scheme. *See Falbaum v. Pomerantz*, 891 F. Supp. 986, 992 (S.D.N.Y. 1995) (holding that aiding-and-abetting liability is not available where permitting aiding-and-abetting liability would undermine secondary liability limitations in the statute); *Tyszka v. Make & Take Holding, LLC*, 72 A.D. 3d 1620, 1621 (4th Dep't 2010) (holding that aiding-and-abetting liability is not available where the statute stated that "[e]xcept as explicitly provided in this article, civil liability in favor of any private party shall not arise against a person by implication from or as a result of the violation of a provision of this article or a rule, regulation or order hereunder."). But

44

this line of cases is irrelevant here because nothing in N.Y. Gen. Oblig. Law § 5-423 *bars* aiding-and-abetting liability, nor would permitting such liability to attach otherwise disturb the statutory scheme. Dharma points to no case where a court refused under New York law to allow a secondary liability claim to go forward where the statute was silent on aiding-and-abetting liability. This Court should not be the first.

Dharma also cites *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), for the general federal-law principle that, supposedly, secondary liability ought not be read into a statute where it is not expressly provided. (Dharma MTD at 11.) But the federal-law inquiry is sensitive to context and particular causes of action—as explained below, it does not apply to claims under the Copyright Act where the claim was that a software maker distributed software whose primary purpose was to abet copyright infringement, *see infra* subsection F—and it doesn't apply here. Partially for that reason, multiple Second Circuit cases have held that aiding and abetting liability would not attach under federal law, but it would under New York law. *See also Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 466 & n.8 (2d Cir. 2013) (noting that, while federal securities law did not permit aiding and abetting liability for the claims, New York state law could); *Filler v. Hanvit Bank*, 156 Fed. App'x 413, 417 (2d Cir. 2005) (analyzing New York state aiding and abetting claims under New York law while rejecting federal aiding and abetting claims under federal law). As explained above, the Legislature recognized that the scheme of selling lottery tickets typically involves a chain of

operations, including the point-of-sale sellers plus others involved in the scheme, like those running the lottery. It would make little sense to strictly construe this particular statute to artificially limit the defendants who may be held liable. That conclusion would be the same under federal and state law principles.

Next, assuming that aiding and abetting liability were available, Dharma still disputes that it meets the three elements of aiding and abetting liability, which are (1) existence of the underlying violation, (2) knowledge, and (3) substantial assistance. But it's trivially easy to see the three elements are met.

For the first element, someone here is selling lottery tickets, as explained above at Section II.B. That element is met.

The Complaint also clearly explains how Dharma had knowledge of the facts that constitute the violation: Dharma specifically promoted PoolTogether's protocol, promoted the potential prizes on its app, and took affirmative steps to permit Dharma users to deposit money to the protocol. (SAC ¶¶ 87, 97–105); *see also supra* at 38–39 (screenshots). These steps are impossible to take if Dharma did not know what the protocol was. Dharma does not dispute that it knew exactly what it was doing, but it claims that Kent also has to allege that Dharma knew that the "protocol constituted a breach of duty under N.Y. Gen. Oblig. Law § 5-423 or any other law." (Dharma MTD at 13.) In other words: Dharma would have the Court believe that it was totally ignorant of the law prohibiting non-state lotteries, and that this ignorance absolves it of liability.

Dharma is wrong. As any first-year law student learns quickly, "ignorance of the law is no excuse." *People v. Marrero*, 69 N.Y.2d 382, 385 (1987). This is true in the civil context too. Thus, in the analogous context of aiding and abetting fraud, a plaintiff may prove secondary liability with "circumstantial evidence of conscious misbehavior or recklessness." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F. Supp. 2d 292, 298 (S.D.N.Y. 2002). Plus, an aider and abetter's "knowledge need only be pleaded generally, particularly at the pre-discovery stage, . . . [where] a plaintiff lacks access to the very discovery materials which would illuminate a defendant's state of mind." *Oster v. Kirschner*, 77 A.D.3d 51, 55 (1st Dep't 2010). Here, the Complaint lays out that Dharma knew what PoolTogether was doing. Dharma supported only four applications, one of which was PoolTogether. (SAC ¶ 87.) And Dharma included in its own application an advertisement for PoolTogether's lottery encouraging users to "Deposit to PoolTogether to win up to $80,000." (SAC ¶ 98). These facts easily allow the inference that Dharma knew about the scheme it was supporting and advertising on its platform.

Finally, the third element, substantial assistance, is also easily met. A defendant provides "substantial assistance" if it has "affirmatively assist[ed], help[ed] conceal or fail[ed] to act when required to do so, thereby enabling the breach to occur." *Tarazi v. Quintessential Biosciences, LLC*, 2015 U.S. Dist. LEXIS 199144, at *12 (S.D.N.Y. Aug. 21, 2015). As the Complaint alleges, Dharma linked its interface to PoolTogether's to permit Dharma users to deposit into the protocol, advertised for users to do it, and then got paid when users did what Dharma wanted them to do.

47

(SAC ¶¶ 87, 97–105.) That's not just substantial assistance; it's direct selling, as explained above, just like a grocery store selling tickets for the State lottery. But, to the extent that this Court disagrees on the direct selling point, it must be *at least* substantial assistance.

Dharma's only defense misconstrues the Complaint. Dharma claims that Kent alleges only that "Dharma provided an interface that allowed Plaintiff to deposit funds held in his bank account into four decentralized finance applications on the Ethereum network" and that Dharma advertised that service. (Dharma MTD at 14.) Dharma thus argues that its actions were merely the sort of passive actions analogous to a bank permitting an account holder to transfer funds. But that's just wrong: Dharma was not just a service provider to PoolTogether; they worked together. PoolTogether was one of four application Dharma users could send cryptocurrency to, (SAC ¶ 87), and PoolTogether promoted Dharma as the "easiest way" for new users to use its services, (SAC ¶ 88). Dharma actively advertised PoolTogether's lottery in its application, including a pop-up graphic stating "Deposit to PoolTogether to win up to $80,000." (SAC ¶ 98.) Dharma enabled PoolTogether to expose more consumers to its illegal scheme.[11] It provided substantial assistance.

---

[11] Dharma further argues that "New York courts have held that the 'substantial assistance' provided must not be of a generalized nature but must be specifically geared toward furthering the underlying alleged wrong." (Dharma MTD at 13.) But, among other allegations, the Complaint alleges that Dharma advertised to users they could win up to $80,000 by using Dharma to deposit to PoolTogether. (SAC ¶ 98.) The alleged wrong is that buying a ticket to win $80,000 is illegal in New York, and the Complaint alleges that Dharma specifically provided assistance to make exactly that illegal purchase. It's hard to see what a more specific allegation could be.

### E.      Investor Defendants Conspired to Sell Lottery Tickets

#### 1.      Conspiracy Claims are Available Under Section 5-423

Under New York law, "[w]hile there is no cognizable action for a civil conspiracy, a plaintiff may plead conspiracy in order to connect the actions of the individual defendants with an actionable underlying tort and establish that those acts flow from a common scheme or plan." *American Preferred Prescription, Inc. v. Health Mgmt., Inc.*, 252 A.D.2d 414, 416 (1st Dept. 1998). New York case law makes no distinction between torts that have a basis in statute as opposed to a basis in common law. *Varela*, 2002 WL 342657, at *3 (S.D.N.Y. Mar. 5, 2002) (denying motion to dismiss for claim alleging civil conspiracy to violate statute because there is "no case law making a distinction [for availability of civil conspiracy claims] between torts having a basis in statute as opposed to the common law.").

Galaxy devotes substantial space in its Motion to an attempt to contravene established New York law with an interpretive bank shot that relies on the history of statutes generically prohibiting gambling, but not the lottery statute here. The bank shot doesn't work. For one thing, "[t]he starting point in determining legislative intent is to give effect to the plain language of the statute itself," *People v. Schneider*, 37 N.Y.3d 187, 196 (2021), and there is no text in the lottery prohibition that would bar conspiracy liability. Thus, under New York law, secondary liability is available.

In any event, Galaxy's argument is premised on the idea that what it calls a lottery "refund statute" (though it is more than that) is "modeled on the English common law of gambling," which supposedly sounds in contract or quasi-contract, which supposedly requires privity, and which therefore bars conspiracy claims for

49

this modern statutory cause of action. (Galaxy MTD 15–17.) But these logical leaps are unjustified. In fact, New York statutes differentiate between "typical wagering games and bets falling within the ambit of General Obligations Law §§ 5-419 and 5-421, [and] the lotteries regulated by General Obligations Law § 5-423." *Ford v. Henry*, 155 Misc. 2d 192, 194 (App. Term 1993). This case concerns only the latter. Defendant's entire historical argument concerns gambling, not lotteries, and is thus inapplicable. (*See, e.g.*, Galaxy MTD at 15 (citing N.Y. Gen. Oblig. Law § 5-419, which concerns wagering games).)

The difference matters. Regardless of how generic gambling statutes have been interpreted, historical case law concerning lotteries not only extends liability beyond mere direct sellers, but also makes clear that recovery under lottery statutes is not the same as a refund or debt action. In *Grover*, the Court considered the statutory provision essentially at issue here. 73. N.Y. at 477. As already explained, the Court of Appeals held that liability extended from the selling agent to the principal and expressly noted that an action under the lottery provision "*is not analogous to the actions of trover or replevin*, and it was sufficient, to establish the right of action, that the defendants received the benefit of the money paid by the plaintiff." *Id.* at 477–78 (emphasis added). It is not clear why Galaxy spills so much ink comparing the statute at issue to a gambling refund statutes when the Court of Appeals has definitively rejected the idea that the action under § 5-423's language is "not analogous to trover"—that is, conversion—"or replevin."

50

Galaxy also extends the inapt analogy when it argues that "courts have dismissed claims alleging secondary liability for violations of provisions of the New York General Obligations Law that, *like GOL § 5-423*, regulate and provide limited rights under certain contracts." (Galaxy MTD at 17.) Again, Galaxy draws not on the statute here but on others that it can claims are akin to contract actions, though this statute is not that. Regardless, the cases are not instructive. In *Solovay v. Greater N.Y. Sav. Bank*, 198 A.D.2d 27 (1st Dep't 1993), the plaintiff alleged a conspiracy between a bank and the bank's counsel for conspiring to refuse to honor statutory short form powers of attorney. *Id.* The court affirmed the dismissal of a conspiracy claims because there were no "wrongful acts" pleaded against the alleged conspirator, but the court never held that, had such acts been alleged, the case could not have proceeded. *Id* at 27–28. And in *SRW Assocs. v. Bellport Beach Prop. Owners*, 129 A.D.2d 328 (2d Dep't 1987), the court affirmed the well-worn principle that there is no freestanding tort of conspiracy. *Id.* at 333. That is not contested here.

Galaxy also relies on *John's Insulation, Inc. v. Siska Const. Co., Inc.*, 774 F. Supp. 156 (S.D.N.Y. 1991), but that case underscores why conspiracy is available. There, the underlying violation was quite literally a breach-of-contract claim, so of course the allegations "sounded in contract" and no conspiracy claim was available. *Id.* at 162. But—even accepting the debunked premise that the New York Legislature meant to create a contract-like action with § 5-423—the related tort of tortious interference with contract is available "where the Defendants had an alleged conspiracy to breach the contract." *EVEMeta, LLC v. Siemens Convergence Creators*

*Corp.*, 2018 N.Y. Slip Op. 32530, 9 (N.Y. Sup. Ct. 2018), *aff'd in relevant part* 173 A.D.3d 551 (1st Dep't 2019). To hold otherwise "would effectively deny the . . . Plaintiff its ability to recover against the conspiring, non-breaching, parties," but that would make little sense. *Id.* The Investor Defendants cite no evidence that the Legislature wished for liability under this lottery statute to be so narrow, and the conspiracy claim is conceptually similar to a tortious interference claim in a contract action. It is available here.

2.     *Kent Has Properly Pleaded a Conspiracy Claim Against the Investor Defendants.*

Not only is such a conspiracy claim available, Kent has sufficiently pleaded one here. To plead civil conspiracy, "a plaintiff must allege both a primary [violation] and also show the four elements of a conspiracy, namely: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Alt. Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 339 (E.D.N.Y. 2009). The Complaint contains allegations sufficient to support each element.

As to the underlying violation, someone is selling lottery tickets, as explained above at Section II.B.

The element of agreement is clear. The Complaint alleges that the Investor Defendants "all agreed to give money to PoolTogether, with the purpose of enabling it to illegally sell lottery tickets from within the State of New York." SAC ¶ 121, The Investor Defendants were aware that PoolTogether was a lottery, having variously

described PoolTogether as a "no loss lottery" and a "chance-based game." (SAC ¶ 141.) And the agreement was corrupt because PoolTogether's entire business model was illegal from the beginning.

And, of course, there were at least two key overt actions. The Complaint alleges, and the Investor Defendants do not deny, that they each invested money in the company or the protocol; this is sufficient. But there is more. Investor Defendants made decisions about the protocol to further its operations. Galaxy, ParaFi, and Maven 11 admitted it: According to their pre-motion letters to this Court, they "participate in . . . decisionmaking about the workings of the protocol." (SAC ¶ 60.) Cusack described Dan Elitzer, Nascent's co-founder and CEO, as among the "most active" participants in governance (SAC ¶ 61), and Cusack said that he "was hoping to 'work with Dragonfly'" to develop a "China strategy" for PoolTogether (SAC ¶ 64). While Investor Defendants now attempt to walk back these admissions in their motions, Investor Defendants cannot and do not deny that they actively participated in protocol governance and worked together to do so. (*E.g.*, SAC ¶ 60.). Investor Defendants acted on their corrupt agreement and intentionally participated in the furtherance of the illegal lottery.

The final two elements are relatively trivial. Intent is indisputable; the Investor Defendants were willing participants here, and there is no plausible argument that they lacked intent. Last, while injury is contested for purposes of standing, if Kent has standing (and he does) then that injury occurred as a direct

result of the participation in an illegal lottery that forms the basis of the civil conspiracy claim.

Nascent shows a fundamental misunderstanding of what conspiracy requires by ignoring the four established elements and instead imposing *sui generis* pleading requirements on Kent. But contrary to Nascent's argument, for conspiracy liability to attach, Kent need not show that any particular investor agreed to sell "PoolTogether tickets to Plaintiff," that it "had knowledge of any purported transaction with Plaintiff," that it "intended to injure Plaintiff in any way," or that it intended to "exercise joint control over PoolTogether" for conspiracy liability to apply. *See* Nascent MTD at 14–16. These are not elements of civil conspiracy. A conspiracy requires only an agreement, an overt act, participation in furtherance of the plan or purpose, and damages, all of which are present here.

Nascent also claims that its merely funding the illegal operation is not enough to support a conspiracy, and relies on *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018), in support. But that case is inapt. The court there observed that "nowhere in [the plaintiff's] complaint are there allegations that Defendants undertook [any] sales as part of the alleged conspiracy." That is plainly not the case here, where the allegations against Nascent include that Nascent "participates in the operation of the protocol using its tokens" and that Elitzer, Nascent's founder, "has been among the most active in governance proposals for the protocol and has commented and voted." SAC ¶ 61 (quotation marks omitted). The Complaint alleges that Nascent "holds a substantial amount of POOL tokens and has

54

entered into a so-called SAFE agreement (that is, a 'simple agreement for future equity') to purchase additional tokens." SAC ¶ 63. And, as noted in the Complaint, PoolTogether's founder has specifically praised several investors, like ParaFi and Nascent, for having "delivered 'proven value to the protocol over the last 2 years'" by, among other things, holding deposits and participating in governance. SAC ¶ 65. That is direct involvement sufficient to support a conspiracy claim.[12] True, Nascent didn't know about Joseph Kent specifically, but conspirators rarely know transaction-level details. If that were a bar to liability, it would never attach. That is not the law. Conspiracy has been properly pleaded here.

## F. PoolTogether, Inc., and Compound Aided and Abetted The Sale of Lottery Tickets by Making Tools With No Purpose Other Than to Sell Lottery Tickets

PoolTogether, Inc., is directly liable as a direct seller of illegal lottery tickets. But PoolTogether, plus Compound Labs, are also liable for another reason: Together they created the software by which the PoolTogether DAO's illegal lottery operates.[13]

---

[12] Nascent's other cases fare no better. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021), concerns aiding-and-abetting liability under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333. JASTA's aiding-and-abetting standard is derived directly from the statute, as is obvious from the *Kaplan* Court's analysis of the legislative history and specific wording of the statute, *see id.* § 2333(d)(2); *Kaplan*, 999 F.3d at 855. In *Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 704 (Bankr. S.D.N.Y. 2008), the plaintiffs pleaded only recklessness. And in *Ortiz v. Ledbetter*, No. 19-CV-2493 (CS), 2020 U.S. Dist. LEXIS 90354, at *17 (S.D.N.Y. May 22, 2020), the plaintiff included only a conclusory allegation that the defendants "agreed to act in concert." Here, Kent has alleged much more that the conclusory allegation in *Ortiz*.

[13] Kent alleges that "Cusack and several of his friends and collaborators wrote a piece of software . . . to sell lottery tickets." Cusack now contends that this was done within the scope of his employment at PoolTogether LLC and that PoolTogether, Inc., has assumed all of PoolTogether LLC's obligations. (Cusack Decl. ¶¶ 6, 7.) Because PoolTogether, Inc., now accepts responsibility for creating the protocol—its pre-motion letters and public statements had not made this clear—Kent consents to so much of Cusack's motion to dismiss as seeks to

(SAC ¶¶ 44, 148; Cusack Decl. ¶¶ 9.) That software has no conceivable purpose other than use in a lottery, and Defendants point to no conceivably legal lottery that they could have intended the software to be used in running. Under well-established Supreme Court precedent, that means these Defendants are liable.

The U.S. Supreme Court has addressed the liability of people who make tools whose only reasonable purpose is illegal on two occasions when interpreting the Copyright Act. That Act, like Section 5-423, authorizes private recovery against those "who violate[]" the substantive prohibitions of the law. *See, e.g.*, 17 U.S.C. § 501(a). In *Metro-Goldwyn-Mayer Studios Incorporated v. Grokster, Limited*, the Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. 913, 919 (2005). So too here.

*Grokster* concerned the operation of "peer-to-peer" file-sharing "protocols." *Id.* at 921. The defendant companies distributed those protocols, which allowed users to share copyrighted files with *each other*, but did not allow the defendants even to know which files were being shared. *Id.* at 923. And the defendant companies argued, just as the defendants do here, that the "decentralized" nature of their "protocols," *id.*, meant that they could not be held liable for the acts of others, *id.* at 936–37. Relying on analogies to patent law and to earlier copyright cases, the Court rejected these

---

preclude his liability for creating the protocol. (Cusack MTD at 11–12.) For the avoidance of doubt, Kent continues to press his claim against Cusack as a general partner in the PoolTogether DAO.

arguments. *Id.* at 933. And those earlier cases only confirm the rule's applicability here. The Court contrasted *Grokster* with *Sony Corporation of America v. Universal City Studios, Incorporated*—the famous "Betamax" case—in which the Court held that someone who distributes a product that is reasonably capable of legal use is *not* liable for the illegal acts of third parties on that basis alone. 464 U.S. 417, 432 (1984). Thus, a manufacturer of VCR recording machines is not liable for infringement because those machines were often used to "time shift[]" copyrighted programs, *id.* at 421, which was a legal, non-infringing use, *id.* at 442–43. By contrast, where a defendant's product has no commercially reasonable legal use and where the defendant indicates its intent to facilitate illegal use through, among other things, "advertisement or solicitation . . . to stimulate others to commit violations," *Grokster*, 545 U.S. at 937, the defendant is liable, *id*; *Sony*, 464 U.S. at 432–34.

This case is like *Grokster* and unlike *Sony*: The software's only reasonable uses are illegal, and, despite knowledge of illegality, the manufacturers promoted the illegal features of it. Compound argues that *Grokster* is a "world away" because "the Complaint does not allege that Compound Labs created the *Compound* Protocol for the purpose of conducting lotteries" (Compound MTD at 9 (emphasis added)), but Compound focuses on the wrong software. Kent does not allege that writing the Compound Protocol—which has plenty of lawful uses—subjects Compound Labs to liability. Rather, Kent alleges that writing the *PoolTogether* protocol, which has *no* lawful uses, subjects Compound Labs to liability. (SAC ¶ 148 ("Compound Labs designed *a PoolTogether* smart contract." (emphasis added).) Kent further alleges

that Compound designed the PoolTogether smart contract with the intent to facilitate an illegal lottery, as of course it did for that act had no other conceivable purpose. (SAC ¶ 149.) That's all the *Grokster* defendants did: they wrote software with the purpose of allowing other people to violate the law. And Compound does not and cannot contest that the PoolTogether protocol—assuming its lottery is illegal, which Kent establishes above—has any lawful purpose.

PoolTogether, Inc., fares even worse. PoolTogether, Inc., created the protocol that the PoolTogether DAO uses to operate an illegal lottery. It prominently advertises PoolTogether tickets to the public, plainly encouraging them to gamble. *See supra* Part I.A.*ii* (collecting allegations that PoolTogether, Inc., and its employees refer to PoolTogether tickets as lottery tickets and appeal to gambling impulses). "The classic case of direct evidence of unlawful purpose occurs when one induces commission of [a violation] . . . as by advertising." *Grokster*, 545 U.S. at 935. PoolTogether, Inc., is liable for creating the protocol and promoting its unlawful use.

## G.   Kent Has Standing to Bring This Action Because He Lost Assets

Defendants also seek to evade liability by arguing that Kent does not have standing to sue them. Defendants primarily argue that (1) Kent did not suffer any financial injury, and (2) if he did, that injury was self-inflicted and therefore insufficient under Article III. (*See, e.g.*, PoolTogether MTD at 10–19; Dharma MTD at 4–8.) Both arguments fail. Kent's deposits accrued interest that, absent Defendants' illegal scheme, would have been paid to Kent. The loss of that interest is tangible financial harm, which the Legislature made redressable under § 5-423. And this Court and many others have made clear that, both within and beyond the context

of illegal lotteries, a plaintiff's voluntary conduct creates standing if the plaintiff's harm is nonetheless caused by a defendant.

      *1.    Kent's Deposits Generated Interest That Defendants Kept For Themselves or Paid to The Lottery's Winner*

To begin, PoolTogether's assertion that Kent "did not 'forgo,' 'forfeit,' or 'lose' any interest that was 'due' to him when he made his deposit *because cryptocurrency does not accrue interest automatically*" (PoolTogether MTD 13 (emphasis added)) is easily answered. U.S. dollars likewise do not "accrue interest automatically," but if a bank decided to purloin its depositors' interest, or give that money to a third party, it would be no defense for the bank to argue, as PoolTogether appears to, that there's nothing to complain about because the money wouldn't have generated interest if it hadn't been deposited. (*Id.* at 14 ("Of course, what Plaintiff **could have done** was not convert his $10 into 10 GUSD to deposit it into the savings protocol." (emphasis in original)).)

Nor does the Court need to inquire whether Kent's deposit could have "accrue[d] interest based on some hypothetical transaction with a third party of protocol." (*Id.* at 21.) Kent's deposit *did* earn interest, which Defendants either paid to that week's winner or, in the case of Kent's second deposit, kept half of for themselves as a "reserve." When the Defendants kept that interest as part of an illegal scheme, Kent was injured.

That tangible financial harm suffices, because "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) (quoting

*LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002)) (cleaned up); *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing."). Indeed, one court in the Southern District recently specifically concluded that lost interest would be sufficient to confer standing and noted that "there is no *de minimis* exception to Article III." *Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 425 (S.D.N.Y. 2019) (distinguishing as "unpersuasive" another court's holding that lost interest was insufficient (citation omitted)). Tellingly, PoolTogether's own authorities agree. *See, e.g.*, *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'") (cited at PoolTogether MTD at 14).

So long as a harm "exists in the real world," no matter how small, a legislature may "elevate" that harm to a redressable claim consistent with Article III. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (cleaned up). And that's exactly what the Legislature did in passing § 5-423 and granting the right to recovery to individuals like Kent who bought lottery tickets. *See Wilson v. PTT, LLC*, No. C18-5275RSL, 2021 U.S. Dist. LEXIS 11618, at *5-6 (W.D. Wash. Jan. 21, 2021) (holding a plaintiff who "lost $1.99 on an allegedly illegal gambling application" had standing, because "the Washington legislature determined that a person who participates in illegal gambling is entitled to recover his or her losses").

Refusing to admit that lost interest is itself an injury, PoolTogether argues instead that Kent *would* have standing under a "loss of use" theory, but only if his

*deposit* was "wrongfully withheld." (PoolTogether MTD at 14–15 (collecting cases)). Yet PoolTogether ignores that New York courts have squarely held that lotteries wrongfully deprive ticket purchasers of the time-value of their money. *See supra* Section II.A.3. In any event, PoolTogether is simply wrong when it says Kent "alleges he can withdraw his funds and do what he wishes with them" (PoolTogether MTD at 15); while that is possibly true for his initial deposit,[14] the parties agree that Kent can't withdraw the interest his deposit generated—it's either been given to another gambler or is being held under Defendants' control. (*See* Cusack Decl. ¶ 46 (interest kept in the "reserve" "remains in the savings protocol and is subject to governance of POOL token holders").) Defendants believe that's not unlawful; Kent argues it is. Whoever is right, there is no question that Defendants' continued withholding of that money creates a case or controversy.

> ### 2.   *Voluntary Participation in Illegal Gambling Confers Standing*

Defendants also argue that because Kent voluntarily deposited his money knowing that he would file suit, his financial injury is "self-inflicted" and therefore cannot be the basis for standing. (PoolTogether MTD at 11–12) That argument is squarely foreclosed by the Supreme Court and the Second Circuit.

Indeed, just this week the Supreme Court held that a plaintiff's voluntary incursion of a financial loss *for the express purpose of suing* satisfied Article III. In *Federal Election Commission v. Ted Cruz*, the Solicitor General argued that the

---

[14] (*But see* SAC ¶¶ 38-43 (noting the "gas fees" Kent would have to pay to retrieve his initial deposit would dwarf his initial deposit amount); ¶ 24 (explaining that deposits are at risk of loss).)

plaintiff's injury was traceable only to himself, not the challenged statute, because it was "self-inflicted" with the "sole and exclusive motivation . . . to establish the factual basis for this challenge." 596 U. S. ____, slip op. at 4 (May 16, 2022) ("At bottom, the Government asks us to recognize an exception to traceability for injuries that a party purposely incurs."). The argument didn't detain the Court for long: "We have never recognized a rule of this kind under Article III," it observed, and it held that Article III was satisfied "even if the injury could be described in some sense as willingly incurred." *Id*. Nor was this a novel proposition; the Court relied on a long line of cases holding that a plaintiff who enters a transaction knowing they will be injured has standing to sue, so long as they were, in fact, injured. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) ("That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury.").

The Second Circuit, likewise, recently reiterated that "[t]he law is clear that testers have standing" so long as they can "show that they have suffered an Article III injury in fact." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 n.3 (2d Cir. 2022). In *Harty*, the plaintiff didn't have standing because he never made plans to actually visit the facility he claimed wasn't ADA compliant—if he had, he'd have been injured. *Id*. Here, of course, Kent did suffer the injury. That he knew Defendants' unlawful conduct would harm him is irrelevant. Charles Alan Wright, et al., Causation, in 13A FEDERAL PRACTICE AND PROCEDURE JURISDICTION § 3531.5 (3d ed. 2021) ("The voluntary choice to suffer the injury that conferred standing [i]s sufficient.*"); see also*

*McKeage v. Bass Pro Outdoor World, LLC,* 943 F.3d 1148, 1150 (8th Cir. 2019) (rejecting defendant's argument that customers suffered no injury when they "wanted what they got and got what they wanted," because they were actually charged the fee they alleged was unlawful).

Indeed, were this not the case, New York's and many other states' gambling-recovery laws would be unenforceable in federal court, since their entire purpose is to allow "voluntary" participants to recover. Yet federal courts routinely entertain state-law-based cases for recovery of gambling losses (including small ones), and at least one has rejected a nearly identical attempt to kick a meritorious case out of court for lack of standing. *See, e.g.*, *Wilson*, 2021 U.S. Dist. LEXIS 11618, at *5-*6 (W.D. Wash. Jan. 21, 2021).

In none of the cases that PoolTogether relies on for an exception to Article III for "manufactured" standing did the plaintiffs *actually* suffer a financial harm attributable to the defendants. (PoolTogether MTD at 11–12.) In *Taylor v. Bernanke*, for instance, key to this Court's analysis was that the plaintiffs "do not allege that they have actually lost any of their deposited funds, and [one] readily concedes that he has not lost any of his money." No. 13-CV-1013, 2013 U.S. Dist. LEXIS 128533, at *20 (E.D.N.Y. Sep. 9, 2013). Similarly, in *Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 541 (5th Cir. 2019), the court held there was no injury at all—the plaintiff "search[ed] for oil spills," and, lo, he found them. Nor is this case about some "hypothetical future harm," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), "pure speculation" that an injury might occur, *Illinois DOT v. Hinson*, 122 F.3d 370,

63

372 (7th Cir. 1997), or a pro se taxpayer's "concerns" about foreign policy, *Ackers v. U.N.*, No. 5-cv-1200-FB, 2005 U.S. Dist. LEXIS 5940, at *3 (E.D.N.Y. Apr. 8, 2005) (Block, J.). It's about dollars and cents—specifically, those that Kent lost gambling on the illegal platform Defendants operate.[15]

### 3.    Kent Has Standing to Pursue the Investor Defendants

The Investor Defendants and Compound raise a separate argument as to why Kent doesn't have standing to sue them—that their relationship to the PoolTogether protocol is too attenuated to be traceable to them. (Dharma MTD at 4–8; Galaxy MTD at 5–6; Nascent MTD at 18–19; Compound MTD at 17–18.) They rely primarily on *Mahon v. Ticor Title Ins. Co.*, in which the Second Circuit rejected the plaintiff's claim that, because everybody in the title insurance industry was engaged in the same fraudulent conduct, she could sue them all even though only one had actually defrauded her. 683 F.3d 59, 62–63 (2012). Here, by contrast, Kent's claim is that all of the Defendants injured *him* by constructing or governing the operation of the PoolTogether protocol that took his money. Thus, if the Court agrees that the Defendants operated a general partnership, or that they are secondarily liable under

---

[15] In the only case PoolTogether marshals that involved an *actual* financial harm, the plaintiffs alleged their exclusion from an exclusive dealing arrangement violated the antitrust laws—but they had been offered and declined the very deal they complained about *not* getting. *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006). Thus, the plaintiffs were the "primary cause" of their exclusion, *i.e.*, the only thing they alleged was unlawful. *Id.* ("[S]tanding is defeated only if it is concluded that the injury is *so completely due to the plaintiff's own fault* as to break the causal chain." (quoting Wright & Miller) (emphasis added)). Here, the primary cause of Kent's injury is Defendants' operation of an illegal gambling scheme.

a conspiracy or aiding-and-abetting theory, Kent has standing to bring claims against each one.

Dharma raises a separate argument that the fee Kent paid to Dharma isn't a cognizable injury because it isn't "fairly traceable" to Kent's injury. (Dharma MTD at 7.) But it is—Dharma charged Kent that fee in exchange for granting him access to the lottery Dharma prominently advertised it could grant access to. (SAC ¶¶ 87, 187.) Dharma raises two cases it says demonstrate that the mere payment of "transaction fees" isn't enough, but neither does the work Dharma would like them to. In *Evans v. Linden Research., Inc.*, the court held that because the plaintiff hadn't alleged that the misrepresentation defendants made actually affected his decision whether to make the purchase (and pay the transaction fee) at issue, the fee was not traceable to the claimed harm. 2012 U.S. Dist. LEXIS 166006, at *25 (N.D. Cal. Nov. 20, 2012) ("Plaintiffs failed to demonstrate any connection between transaction or tier fees paid to Linden and the claimed injury."). Here, the fee Kent paid to Dharma is directly linked to Defendants' unlawful scheme—it's what Dharma charges to give gamblers access to the lottery. (SAC ¶¶ 97–105.) Dharma's second authority, *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974 (6th Cir. 2012), is even further afield. In that First Amendment case, the plaintiff claimed that Cincinnati burdened speech by charging higher fees for bus bench ads than for bus shelter ads—but failed to include an allegation that it had actually paid such higher fees. *Id.* at 984 ("Bench Billboard, however, submitted no evidence to show that it had already paid fees in excess of those required for bus shelters, or bench billboards."). It suffices to say that Kent,

unlike Bench Billboard, *does* allege that he paid a fee to Dharma (SAC ¶ 101), and that Dharma charges this fee to facilitate the sale of illegal lottery tickets (SAC ¶ 187). That is sufficient under Article III.

### H.   This Court Has Personal Jurisdiction Over Out-of-State Defendants

Most of the Investor Defendants (all but Dragonfly) argue that the Court doesn't have personal jurisdiction over them in this case. (Galaxy MTD at 6–9; Nascent at MTD 5–17.) The Court has jurisdiction over all Defendants, because they (1) are members of a New York general partnership, (2) entered into a conspiracy based in New York to violate GOL § 5-423, and (3) transacted business in New York related to Kent's claim sufficient to confer jurisdiction over them under New York's long-arm statute.

### 1.    *Jurisdiction Over the Partnership*

"[I]t is well-settled under New York law that where a court has personal jurisdiction over a general partnership, it also has personal jurisdiction over the general partners." *United States Bank Nat'l Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 616 (S.D.N.Y. 2008). This is true even where the partners have never entered the forum. *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 2010 NY Slip Op 33909(U) at * 7 (Sup. Ct.).

The Investor Defendants don't dispute this straightforward proposition; they simply challenge the premise and argue no general partnership was created. (Galaxy MTD at 8–9; Nascent MTD at 15–17). That is, they concede (as they must) that if the Court deems them to have entered into a general partnership, the Court has personal

jurisdiction over them. Because that's exactly the business arrangement they entered into, *see supra* Section II.B, the Court has jurisdiction over all out-of-state defendants on that basis alone.

### 2. *Jurisdiction Over the Conspiracy*

The Court also has jurisdiction over the Investor Defendants under a conspiracy theory of jurisdiction. Under Second Circuit precedent interpreting New York's long-arm statute, the threshold requirement for exercising jurisdiction over a conspiracy is that the complaint plausibly alleges a *prima facie* case that a conspiracy exists, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018), that is, (i) a corrupt agreement; (ii) an overt act in furtherance of the agreement, (iii) intentional participation in the plan or purpose; and (iv) resulting injury. *Clemmons v. Hodes*, 2017 U.S. Dist. LEXIS 158550, *21–22 (S.D.N.Y. 2017). As discussed above, *see* Section II.D.2, Kent has satisfied that burden.

Once a conspiracy has been established, a court may exercise personal jurisdiction over its out-of-state members where "'(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, *or* at the request of or on behalf of the out-of-state defendant.'" *Berkshire Bank v. Lloyds Banking Grp. PLC*, No. 20-1987-cv, 2022 U.S. App. LEXIS 5095, *4-12 (2d Cir. 2022) (quoting *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 7 (1st Dep't 2013)). Awareness is clear—the Complaint alleges the Investor Defendants knew Cusack and PoolTogether, Inc., were based in New York, which of course they don't disclaim. (SAC

¶¶ 20, 121, 128, 131, 135.) With respect to the second element, the protocol was created in and operated from New York (SAC ¶¶ 106–120), and it was done to benefit owners of POOL tokens (*e.g.*, SAC ¶¶ 56–57) or PoolTogether, Inc. (SAC ¶¶ 79–83).

As for the third element, it "can be established by, for example, a co-conspirator being aware of the torts being committed by defendants in New York while not necessarily directing a defendant to commit tortious acts in New York." *Berkshire Bank*, 2022 U.S. App. LEXIS 5095, at *11; *Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012) (describing third element as a "modest burden"). The Complaint alleges—indeed, some Defendants admit—that the out-of-state defendants controlled the protocol through this token ownership. (SAC ¶¶ 58–60; Doc. 44 at 1 ("Galaxy and ParaFi . . . participate in . . . decisionmaking about the workings of the protocol").) Certainly the Complaint alleges that the Investor Defendants were aware PoolTogether, Inc., and Cusack were running a lottery in New York. (*E.g.*, SAC ¶¶ 20, 150.) That more than suffices under New York's long-arm statute. *See, e.g.*, *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019) (conspiracy jurisdiction proper where complaint alleged a foreign defendant's trader participated in a chat room in which a participant discussed coordinating trades with co-conspirator's New York office).

### 3. *"Transacting Business" Jurisdiction Exists and Comports with Due Process*

Even if there were no conspiracy, the Court would have jurisdiction over each of the Investor Defendants under New York's long-arm statute for "transacting business" in New York. C.P.L.R § 302(a)(1). Jurisdiction on this basis is proper if (1)

a defendant's activities in New York are purposeful and (2) there is a substantial relationship between the transaction and the claim asserted. *Vasquez v. H.K. & Shanghai Banking Corp.,* 477 F. Supp. 3d 241, 252 (S.D.N.Y. 2020). For each Investor Defendant, those elements are met—they don't disclaim that their purchase of POOL tokens was "purposeful," and the claim here is about running an illegal lottery of which they all participated in the governance. For example, Galaxy, Maven 11, ParaFi, and Nascent publicly stated that the purpose of their investments was to further PoolTogether's operation of lotteries, and Cusack touted the "value" Dragonfly was providing to the enterprise. (SAC ¶¶ 60–72.) Given that these sophisticated entities each made the considered business decision to invest in this New York enterprise, the long-arm statute is satisfied. *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 72 (2006) ("[A] sophisticated institutional trader knowingly entering our state—whether electronically or otherwise—to negotiate and conclude a substantial transaction is within the embrace of the New York long-arm statute.").

So too is due process, because these business entities could reasonably foresee being haled into court based on their control over the PoolTogether protocol. *Id.* at 71 ("So long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there, due process is not offended if that party is subjected to jurisdiction even if not 'present' in that State" (citation omitted)). Nascent cites *Contant v. Bank of America Corp.* for the proposition that a "conclusory allegation" that defendants "communicated regularly"

with New York defendants didn't sufficiently put the foreign defendants on notice that they could be haled into court here. (Nascent MTD 17–18) But the complaint there *only* alleged communications and not that those foreign defendants "engaged in suit-related conduct aimed at or taking place in New York." 385 F. Supp. 3d at 295. The court even noted it would have been sufficient if the complaint had alleged those defendants "were aware of their co-conspirators' in-forum overt acts." *Id.* Nascent easily meets this standard—it concedes that it owns POOL tokens (Doc. 42 at 2), and "Cusack [has] stated that 'Dan [Elitzer] from Nascent' has been among the 'most active' in governance proposals for the protocol and has 'commented and voted,'" (SAC ¶ 61). Thus, Nascent is more like the foreign defendants in *Contant* that the court held *did* reasonably expect being haled into court, because those defendants "encouraged" and "coordinat[ed] trades" with their New York co-conspirators. 385 F. Supp. 3d at 295. Due process would not be offended by holding Nascent responsible for helping to run this New York lottery.

## I.    The Motion to Strike Class Action Allegations Is Premature And Without Merit

Finally, Defendants move to strike Kent's class-action allegations on two grounds: that Kent is hopelessly conflicted from serving as class representative because the putative class includes POOL token-holders, and that Kent's nationwide putative class is "untenable" because "New York's gambling laws have no extraterritorial reach . . . ." (PoolTogether MTD at 25.) This motion is without merit. First, New York law in fact governs all the transactions here because PoolTogether tickets were sold *from* New York. Second, mere possession of a POOL token does not

make one a general partner on Kent's theory. Finally, this motion should at least await further factual discovery because publicly available data show that the overwhelming majority of activity at PoolTogether was conducted by users who do not own a single POOL token, which would mean that only a modest change to the class definition would be necessary in any event, and it appears that most users who acquire POOL tokens as part of their gambling get them after buying tickets.

As this Court has explained, "'[a] motion to strike class allegations under Rule 12(f) is disfavored because it requires a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification.'" *Wexler v. AT & T Corp.*, 323 F.R.D. 128, 129 (E.D.N.Y. 2018) (quoting *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 447 (E.D.N.Y. 2015)) (alterations in *Wexler* omitted). Only where the facts underlying the certification question are "undisputed" may the Court grant a motion to strike class-action allegations. *Id.*; *see also Davito v. AmTrust Bank*, 743 F. Supp. 2d 114, 115–16 (E.D.N.Y. 2010) (collecting cases).

### 1. *New York Law Governs This Case*

Defendants move to strike so much of Kent's class-action allegations as seek to certify a nationwide class, arguing that New York law does not govern claims of PoolTogether ticket purchasers outside of the state. (PoolTogether MTD at 25.) Defendants support this motion with one paragraph of argument (*id.*), and it fails for a straightforward reason: Defendants ignore that Kent at least plausibly alleges that the tickets were sold from New York.

In diversity cases like this one, this Court applies the choice-of-law rules of the state in which it sits: New York. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). New York courts employ an interests-analysis approach to choice-of-law problems, *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 683 (N.Y. 1985), asking essentially which state has the most significant relationship to the subject matter of a dispute, *Babcock v. Jackson*, 191 N.E.2d 279, 283–84 (N.Y. 1963). Here, that state is New York.

New York courts have been clear that its anti-gambling laws apply to transactions where a New York party accepts a bet from a foreigner, even where the New York party uses a foreign subsidiary to settle the deal. In *People ex rel. Vacco v. World Interactive Gaming Corporation*, the Supreme Court addressed an internet gambling operation that transmitted bets from its offices in New York to its computer servers in Antigua (where gambling is legal) and concluded that the operation violated New York gambling law. 185 Misc. 2d 852, 860 (N.Y. S. Ct., N.Y. County 1999). "A computer server cannot be permitted to function as a shield against liability," the court explained, "particularly in this case where respondents actively targeted New York as the location where they conducted many of their allegedly illegal activities . . .[,] the activity was transmitted from New York[,] . . . [and] the individuals who gave the computer commands operated from [a] New York office." *Id.* And, as explained above, New York courts have held that New York law applies where foreign companies use agents in New York to sell illegal lottery tickets specifically. *Chun*, 807 F. Supp. at 290 (citing *New York v. Fortune U.S.A. New York-Queens, Ltd.*,

Index No. 43670/91 (Sup. Ct. N.Y. County 1991)); *see also Benson v. Double Down Interactive, LLC*, 527 F. Supp. 3d 1267, 1275 (W.D. Wash. 2021) (denying motion to strike class claims in similar posture to that here because the law of the state where the defendant online gambling company was based applied to transactions of the entire proposed class).

So too here. The PoolTogether general partnership, Kent plausibly alleges, is centered and headquartered in New York. Cusack, its founder, leader, and central operator lives and works in Brooklyn. (SAC ¶¶ 106–120.) And notwithstanding its false registration statements, PoolTogether, Inc.—whose employees help with day-to-day protocol operations, which uses the PoolTogether DAO treasury as its piggy bank, and which offers to hold assets for the PoolTogether DAO in its own name (SAC¶¶ 81–83)—has its principal place of business in New York (SAC ¶¶ 106–120). As the Court is aware, PoolTogether is attempting to send this case to arbitration, and, if it is successful, that arbitration would occur in New York. *See* http://www.pooltogether.com/terms ("The arbitration will be conducted in New York, New York, unless you and PoolTogether agree otherwise."). Meanwhile, Defendants point to no other state—and obviously cannot—where PoolTogether tickets may alternatively have sprung into existence, and they identify no state with any conceivable interest in depriving its residents of a two-fold recovery for lottery tickets that were illegal where they issued. For choice-of-law purposes, then, New York's interest in regulating the conduct of a New York business offering illegal products to

(among others) New Yorkers trumps the non-existent alternative states' non-existent alternative interests in encouraging gambling beyond their borders.

Defendants' only case supporting their motion, *Richter v. Empire Trust Company*, is off point because neither party was located in New York when the gambling took place. 20 F. Supp. 289, 292–93 (S.D.N.Y. 1937). In *Richter*, the parties were gambling on a steamer from New York to San Francisco, and the loser's debt was settled by a check drawn on a Chicago account and repaid to a New York bank. *Id.* "As the complaint now stands," the court explained, "the court is unable to determine what law applies to the gambling transaction," and accordingly dismissed the complaint because New York's gambling laws have no "extraterritorial reach"— that is, reach where *neither* party is in New York. Where, as here, the seller of a lottery ticket is in New York, New York law applies. *E.g.*, *Chun*, 807 F. Supp. at 290.

2.    *Not All Tokenholders Are General Partners And Regardless Kent Pleads a Valid Class Action at This Stage*

Next, Defendants argue that Kent's proposed class is internally conflicted because some members of the class own POOL tokens and are therefore partners in the PoolTogether DAO, disallowing their claims under New York law. (PoolTogether MTD at 24–25.) There are three independently fatal problems with this argument.

First, mere possession of a POOL token does not necessarily make one a general partner. Rather, as Defendants explain (*e.g.*, Galaxy MTD at 18), one must *actively participate* in the governance of a business to be a general partner; the mere potential to do so is insufficient (*id.*). The fact that the PoolTogether DAO gave away some POOL tokens to some of its gamblers does not necessarily mean it minted

partners of them all. Second, even if POOL holders were general partners by dint of holding the tokens alone, that would suggest only a modification to the class definition to exclude them, not a wholesale striking of the class allegations as Defendants seek. Third, and finally, that definition—as Kent is entitled to prove after discovery—would not be all that different from the current one, most likely. According to publicly available blockchain data, the overwhelming majority of PoolTogether tickets were purchased by people whose wallets did not contain a single POOL token. Therefore, excluding them—if indeed they must be excluded, which is itself a factual question as explained above—may not make a large difference anyway.[16]

---

[16] Separately, Nascent moves to strike paragraph 139 of the Second Amended Complaint on the ground that it "improperly frames [a] quote [attributed to Dan Elitzer, Nascent's founder and CEO] [a]s referring to Nascent" when, in fact, "neither Nascent entity existed at the time Elitzer made the statement." (Nascent MTD at 28.) This request is frivolous. The paragraph explicitly makes the distinction that Nascent desires. The paragraph begins with the phrase "Nascent co-founder Dan Elitzer stated (*before founding Nascent*)," and it then gives the quote. (SAC ¶ 139 (emphasis added).) In what respect this paragraph "improperly frames" itself to say that Elitzer was really referring to entities that did not yet exist remains a mystery, and indeed Kent added the parenthetical as a courtesy to Nascent's counsel to resolve whatever trivial implication the paragraph may originally have made in prior versions of the Complaint.

Worse, Nascent does not even *try* to meet the standard for striking an allegation on these grounds, which, as its own case makes clear, would require showing that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Brady v. Basic Rsch., L.L.C.*, 101 F. Supp. 3d 217, 225 (E.D.N.Y. 2015). The quote is from a reliable online post and would be admissible if authenticated. Elitzer is Nascent's founder and CEO, and he is personally a major participant in the PoolTogether DAO—that he helped build the protocol is probative of his intent to participate in an enterprise governing the protocol, which he currently does in Nascent's employ. And Nascent does not and cannot articulate a scrap of prejudice from this paragraph remaining in the Complaint even if it were "improperly fram[ed]."

## III.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss and strike should be

denied.


Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Jason Harrow (*pro hac vice*)
GERSTEIN HARROW LLP
810 7th Street, NW Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
jason@gerstein-harrow.com
(202) 670-4809

*/s/ Jamie Crooks*
Jamie Crooks (*pro hac vice*)
FAIRMARK PARTNERS, LLP
1825 7th Ave., NW, Suite 821
Washington, D.C. 20001
jamie@fairmarklaw.com
(619) 507-4182

*Counsel for Plaintiff Joseph Kent*