UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH KENT,<br><br>                Plaintiff,<br><br>    v.<br><br>POOLTOGETHER, INC.; DHARMA LABS, INC.; OZONE NETWORKS, INC.; LEIGHTON CUSACK; KAIN WARWICK; STANISLAV KULECHOV; DRAGONFLY DIGITAL MANAGEMENT, LLC; NASCENT US, LLC; NASCENT LIMITED PARTNERSHIP; STICHTING MAVEN 11 FUNDS; GALAXY DIGITAL TRADING HK LIMITED, LP; PARAFI CAPITAL, LP; and COMPOUND LABS, INC.,<br><br>                Defendants. | Case No. 21-cv-6025-FB-CLP |

**MEMORANDUM OF LAW IN SUPPPORT OF DEFENDANTS OZONE NETWORKS, INC. AND DHARMA LABS, INC.'S MOTION TO DISMISS**

Jonathan H. Blavin (*admitted pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000

Erin J. Cox (*admitted pro hac vice*)
April Youpee-Roll (*admitted pro hac vice*)
Brandon Teachout *(admitted pro hac vice)*
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
(213) 683-9100

John P. Amato
THOMPSON COBURN HAHN & HESSEN LLP
488 Madison Ave #14
New York, NY  10022
(212) 478-7200

*Attorneys for Defendants Ozone Networks, Inc. and Dharma Labs, Inc.*

**TABLE OF CONTENTS**

|     |     | Page |
| --- | --- | --- |
| I.  | INTRODUCTION | 1 |
| II. | FACTUAL AND PROCEDURAL BACKGROUND | 2 |
| III.| LEGAL STANDARD | 4 |
| IV. | ARGUMENT | 4 |
|     | A. Plaintiff's Self-Inflicted Injury Is Insufficient to Confer Article III Standing | 4 |
|     | B. Plaintiff Has Failed to State a Claim Against Dharma for the Sale of Illegal Lottery Tickets | 8 |
|     |    1. Dharma Is Not Directly Liable Because It Did Not Sell Any Lottery Tickets to Plaintiff | 9 |
|     |    2. Dharma Cannot Be Secondarily Liable for Aiding and Abetting the Sale of Lottery Tickets | 11 |
| V.  | CONCLUSION | 14 |

## TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*,
  515 F.Supp.2d 298 (N.D.N.Y. 2007) ................................................................................... 13

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) ................................................................................................. 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................. 4

*Bandler v. Town of Woodstock*,
  832 F.App'x 733 (2d Cir. 2020) ........................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 4

*Bench Billboard Co. v. City of Cincinnati*,
  717 F.Supp.2d 771 (S.D. Ohio 2010) ................................................................................... 7

*Calcutti v SBU, Inc.*,
  273 F.Supp. 2d 488 (S.D.N.Y. 2003) .............................................................................. 8, 12

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ........................................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................................. 5

*Congregacion de la Mision Provincia de Venezuela v Curi*,
  978 F.Supp. 435 (E.D.N.Y. 1997) ...................................................................................... 13

*Cruz v. TD Bank, N.A.*,
  855 F.Supp.2d 157 (S.D.N.Y. 2012) .................................................................................... 9

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................................................. 5

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
  135 F.3d 837 (2d Cir. 1998) ............................................................................................... 11

*Ellerman Lines, Ltd. v. The Steamship President Harding*,
  288 F.2d 288 (2d Cir. 1961) ................................................................................................. 6

## TABLE OF AUTHORITIES
## (Continued)

**Page**

*Evans v. Linden Rsch., Inc.*,
    No. C 11-01078 DMR, 2012 WL 5877579 (N.D. Cal. Nov. 20, 2012) ....................................7

*Falbaum v. Pomerantz*,
    891 F.Supp. 986 (S.D.N.Y. 1995)..........................................................................................11

*Geren v. Quantum Chem. Corp.*,
    832 F.Supp. 728 (S.D.N.Y. 1993)............................................................................................8

*Linde v. Arab Bank, PLC*,
    944 F.Supp.2d 215 (E.D.N.Y. 2013) .....................................................................................11

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012)..................................................................................................4, 5

*Miele v. Am. Tobacco Co.*,
    2. A.D.3d 799 (2d Dept. 2003) .............................................................................................12

*Segal v. Bitar*,
    No. 11 CIV. 4521 (LBS), 2012 WL 273609 (S.D.N.Y. Jan. 30, 2012)..................................12

*Slepoy v. City of New York*,
    No. 10-CV-1814 (ARR), 2010 WL 1945773 (E.D.N.Y. May 11, 2010) ...............................11

*St. Pierre v. Dyer*,
    208 F.3d 394 (2d Cir. 2000)....................................................................................................5

*Taylor v. Bernanke*,
    No. 13-CV-1013, 2013 WL 4811222 (E.D.N.Y. Sept. 9, 2013) .............................................6

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
    454 F.Supp.2d 62 (E.D.N.Y. 2006) ........................................................................................6

**NEW YORK CASES**

*Bank of Baroda v. Shah*,
    191 A.D.2d 237 (1st Dept. 1993)...........................................................................................13

*Caravello v. One Mgmt. Grp., LLC*,
    131 A.D.3d 1191 (2d Dept. 2015) .........................................................................................13

*Foley v. Mobil Chem. Co.*,
    170 Misc.2d 1, 647 N.Y.S.2d 374 (Monroe Cty. 1996) ........................................................12

## **TABLE OF AUTHORITIES**
### **(Continued)**

**Page**

*Grover v. Morris*,
   73 N.Y. 473 (1878) ................................................................................................................9

*McBride v. KPMG Int'l*,
   135 A.D.3d 576 (1st Dept. 2016) .........................................................................................13

*Sheehy v. Big Flats Community Day, Inc.*,
   73 N.Y.2d 629 (1989) .............................................................................................................9

*Tyszka v. Make & Take Holding, LLC*,
   72 A.D.3d 1620 (4th Dept. 2010) ........................................................................................11

**STATUTES**

N.Y. Gen. Oblig. Law § 5-423 ............................................................................................. passim

I.  **INTRODUCTION**

When Plaintiff Joseph Kent filed this action in October 2021 alleging that the PoolTogether protocol was an unlawful lottery, and asserting claims against 10 defendants, he did not purport to have grounds for any claims against Dharma Labs, Inc. or Ozone Networks, Inc.  Plaintiff did not even download the Dharma application (the "app") until January 17, 2022—more than two and a half months into this litigation, and after he had already amended his complaint once.  Using the Dharma app, Plaintiff linked his bank account to the PoolTogether protocol, depositing two dollars' worth of USD Coins (a cryptocurrency) into the protocol.  (Second Amended Complaint ("SAC") ¶¶ 96, 100, 3.)  It was only at this point that Plaintiff filed a Second Amended Complaint, naming Dharma Labs, Inc. and Ozone Networks, Inc. as defendants (together, "Dharma").[1]  Plaintiff's attempt to manufacture claims against Dharma by depositing funds into the PoolTogether protocol after initiating this action, and knowingly paying the associated fees, is unavailing.  Plaintiff's claim against Dharma should be dismissed.

*First*, Plaintiff lacks standing to sue.  His voluntary decision to deposit additional funds into the PoolTogether protocol and pay the associated fees constitutes a self-inflicted injury which is not cognizable under Article III.  Moreover, the small transaction fee ($2.70) Plaintiff alleges that he paid directly to Dharma is not fairly traceable to the challenged conduct at issue—the purported nature of the PoolTogether protocol as an unlawful lottery.  Rather, as Plaintiff's own allegations demonstrate, Dharma assessed that fee for the use of its neutral interface—which simply "link[ed] traditional bank accounts to blockchain-based products," allowing users to convert or exchange their traditional currency to cryptocurrency.  (SAC ¶ 3.)  Dharma interfaced

---

[1] Ozone purchased Dharma in early 2022.  (SAC ¶ 90.)  The Second Amended Complaint contains no substantive allegations against Ozone.  (S*ee id.* ¶ 189 ("Ozone merged with Dharma and is its successor in interest.")  All arguments in this motion are made on behalf of both defendants.

with several different decentralized finance applications, one of which was the PoolTogether protocol. (*Id.* ¶¶ 3, 84, 87.) Any fee Plaintiff paid Dharma is thus divorced from his assertions of illegality.

*Second*, Plaintiff has failed to state a claim against Dharma for violation of N.Y. Gen. Oblig. Law § 5-423, the state statute governing the sale of unlawful lottery tickets. At the outset, Plaintiff fails to allege that the PoolTogether protocol is an unlawful lottery under the statute for the reasons articulated in PoolTogether's motion to dismiss, which Dharma joins. But beyond that threshold defect, Dharma is not alleged to have sold any lottery tickets to Plaintiff; rather, it merely "linked traditional bank accounts to blockchain-based products." (*Id.* ¶ 3.) As a result, Dharma's alleged conduct does not fall within the scope of the statute, which attaches liability only to those who *sell* unlawful lottery tickets. Plaintiff's secondary liability theory fares no better. New York law does not recognize secondary liability in this instance, and even if it did, the Second Amended Complaint does not allege that Dharma knowingly provided substantial assistance to PoolTogether in the commission of any violation of law.[2]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On October 21, 2021, Plaintiff deposited ten dollars' worth of cryptocurrency (specifically, Gemini Dollars) into the PoolTogether protocol using the website app.PoolTogether.com. (ECF No. 1 ¶ 39.) Plaintiff then commenced this action on October 29, 2021, claiming that the PoolTogether protocol constituted an illegal lottery under N.Y. Gen. Oblig. Law § 5-423 and suing 10 different parties; Dharma was not named. (ECF No. 1 ¶¶ 3-12,

---

[2] Dharma also joins PoolTogether, Inc.'s motion to strike Plaintiff's class allegations. (PoolTogether Br. at 23-25.) Additionally, if the Court grant's PoolTogether's motion to compel Plaintiff's claim against PoolTogether to arbitration, (*see* PoolTogether Br. at 5-10), Dharma reserves the right to arbitrate Plaintiff's claims against Dharma as they are wholly derivative of Plaintiff's arbitrable claim against PoolTogether.

2

24-38.)³ By December 2021, Plaintiff became aware that PoolTogether, Inc. intended to move to compel arbitration based on its Terms of Service ("Terms") and an arbitration clause contained therein. (*See* ECF No. 31 at 2.)⁴

After filing a First Amended Complaint, Plaintiff then downloaded the Dharma app and connected his bank account on January 17, 2022. (SAC ¶¶ 3, 96-97.) Dharma was a mobile application operating on the Ethereum network that allowed users to transfer funds between their traditional bank accounts and several Ethereum-based decentralized finance applications, one of which was the PoolTogether protocol. (*See id.* ¶¶ 3, 84, 87.) The Dharma interface functioned as a "link" between traditional and decentralized finance, allowing users to effectively convert or exchange their traditional currency (e.g., dollars) to cryptocurrency. (*Id.* ¶¶ 3, 84.) Dharma directly charged users a "fee[] for executing transactions" through its interface. (*See id.* ¶¶ 86, 101.) Cryptocurrency users also must pay a "gas" fee to the Ethereum network to execute any transaction. (*Id.* ¶ 38.) Dharma offered its users discounts on these fees. (*Id.* ¶ 85.)

Notwithstanding Plaintiff's then-pending litigation asserting that the PoolTogether protocol constituted an unlawful lottery, Plaintiff used the Dharma interface to deposit two dollars' worth of the USD Coin cryptocurrency into the PoolTogether protocol. (*Id.* ¶¶ 100-101.) The Second Amended Complaint alleges that Plaintiff paid discounted "gas lite" fees of $99.87 for the transaction to be executed on the Ethereum blockchain, and "a $2.70 fee to be paid

---

³ Plaintiff's initial claims about the PoolTogether protocol are substantially identical to claims contained in the operative Second Amended Complaint. (*Compare* ECF No. 1, *with* SAC.) Plaintiff's First Amended Complaint also contains these same allegations. (*See, e.g.,* ECF No. 18 at ¶¶ 24-38.)
⁴ Dharma understands that Plaintiff's counsel also learned of the arbitration provision during the pre-motion conference. (PoolTogether Br. at 4.)

3

directly to Dharma" (in other words, the fees vastly exceeded the $2 value of his deposit).  (*Id*. ¶ 101.)  After the deposit, Ozone purchased Dharma.  (*See id*. ¶¶ 90, 189.)

On January 26, 2022, Plaintiff's counsel wrote to the Court that Plaintiff intended to file a Second Amended Complaint containing "claims based on a post-complaint transaction," and claimed that "the anticipated new claim . . . is not subject to arbitration no matter what." (ECF No. 60 at 3.)  Plaintiff filed the operative Second Amended Complaint, naming Dharma, on February 15, 2022.  (ECF No. 63.)  Plaintiff asserts a single claim against Dharma, alleging that it "sold lottery tickets," or in the alternative, that it "aided and abetted the sale of lottery tickets," in violation of N.Y. Gen. Obligation. Law § 5-423.  (SAC ¶¶ 187-188.)

### III.   LEGAL STANDARD

To survive a Rule 12(b)(1) motion to dismiss, Plaintiff "must allege facts that affirmatively and plausibly suggest that [he] has standing to sue."  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145, 148-49 (2d Cir. 2011) (per curiam) (affirming dismissal of complaint for lack of standing).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  If a pleading offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action," or provides only "naked assertions devoid of further factual enhancement," it is insufficient.  *Id.* (cleaned up).

### IV.   ARGUMENT

#### A.   Plaintiff's Self-Inflicted Injury Is Insufficient to Confer Article III Standing

Plaintiff's claim against Dharma in the Second Amended Complaint should be dismissed for lack of standing, a jurisdictional prerequisite of Article III.  *See Mahon v. Ticor Title Ins. Co.*,

683 F.3d 59, 62 (2d Cir. 2012) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim") (citation and quotation marks omitted).

As the Supreme Court has made clear, "a plaintiff must demonstrate standing for each claim [it] seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). Thus, a plaintiff must establish that each individual defendant caused the plaintiff cognizable harm sufficient to establish Article III standing. *See Mahon*, 683 F.3d at 62-66 (holding that plaintiff failed to establish injury as to particular defendants; rejecting theory that "a plaintiff's injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants, even if they engaged in similar conduct that injured other parties."). "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Here, Plaintiff fails to allege conduct by Dharma "fairly traceable to the challenged action"—precluding Article III standing—for two independent reasons: (1) Plaintiff improperly sought to manufacture standing as to Dharma by engaging in a transaction after the original and First Amended Complaints were filed; and, at any rate, (2) Plaintiff has identified no injury stemming from his use of the Dharma interface that is fairly traceable to the alleged illegality of the PoolTogether protocol, which is the focus of the Second Amended Complaint.

"To establish the traceability requirement of standing, a plaintiff must establish that the injury was not 'self-inflicted' or 'so completely due to the plaintiff's own fault as to break the causal chain.'" *Bandler v. Town of Woodstock*, 832 F.App'x 733, 734 (2d Cir. 2020) (citing *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000)); *see also Clapper*, 568 U.S. at 416 (a plaintiff cannot "manufacture standing" under Article III "merely by inflicting harm on [himself]"). Put

5

simply, "[a] plaintiff cannot establish Article III standing to pursue a cause of action where that plaintiff is the primary cause of [his] own alleged injury." *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F.Supp.2d 62, 71 (E.D.N.Y. 2006); *cf. Ellerman Lines, Ltd. v. The Steamship President Harding*, 288 F.2d 288, 290 (2d Cir. 1961) ("fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted").

Here, Plaintiff's transparent efforts to use the Dharma interface to deposit additional funds into the PoolTogether protocol—*after* he filed the original and amended complaints alleging that the protocol constitutes an unlawful lottery—plainly constitutes "self-inflicted" (alleged) injury. Plaintiff made a voluntary choice to utilize Dharma to deposit such funds into the PoolTogether protocol. He alleges that the Dharma application notified him of each cost, and "asked whether he wanted to 'confirm and execute' the transaction." (SAC ¶ 101.) The Second Amended Complaint does not allege that Dharma took any action that caused or induced Plaintiff to deposit additional funds into PoolTogether, to pay "gas" fees to the Ethereum network, or to pay for the use of Dharma's interface to process the transaction. Rather, the representations of Plaintiff's counsel in their January 26, 2022 letter to the Court demonstrate that Plaintiff used Dharma solely to escape the obligations of his arbitration agreement. (ECF No. 60 at 3; *see also* ECF No. 49 at 7 (claiming that there "is nothing unusual, let alone improper, about plaintiffs attempting to create standing to sue by engaging in transactions with defendants" (cleaned up)). Such manufactured "injury" is not cognizable under Article III, and Plaintiff's claim against Dharma should be dismissed on this basis alone. *E.g., Taylor v. Bernanke*, No. 13-CV-1013, 2013 WL 4811222, at *10 n.5 (E.D.N.Y. Sept. 9, 2013) ("[P]laintiffs' decisions whether to deposit their money in a bank at all and with which bank to enter into a commercial relationship

6

are personal choices. Self-inflicted injury that results from a plaintiff's personal choices rather than a defendant's conduct will not confer standing.").

Even if Plaintiff's Dharma transaction and purported injury were not self-inflicted, the costs Plaintiff claims he incurred to complete the underlying transaction would still not constitute a cognizable injury under Article III because they are not traceable to the underlying alleged unlawful conduct. As Plaintiff alleges, the only fee he "paid directly to Dharma" was a "$2.70 fee" for "executing [the] transaction[]." (SAC ¶¶ 86, 101).[5] Courts have consistently rejected attempts to cast fees as "economic injury" where those fees are not "fairly traceable" to the challenged conduct (here, the allegedly unlawful lottery). *See, e.g.*, *Evans v. Linden Rsch., Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *8 (N.D. Cal. Nov. 20, 2012) (lack of Article III standing where plaintiffs failed to establish economic harm from alleged misrepresentation concerning virtual land, and rejecting the plaintiffs' standing theory based on a "transaction fee" associated with the land purchases); *Bench Billboard Co. v. City of Cincinnati*, 717 F.Supp.2d 771, 783 (S.D. Ohio 2010) (no Article III standing based on payment of fee).

Plaintiff's own allegations compel this conclusion. In the Second Amended Complaint, Plaintiff acknowledges that Dharma advertised "four specific applications to which Dharma users could send cryptocurrency via their U.S. bank accounts." (SAC ¶ 87.) Plaintiff does not—and could not—allege that the fee he paid to Dharma was assessed based on his choice to select

---

[5] The Second Amended Complaint also alleges that when Plaintiff deposited two dollars' worth of USDC cryptocurrency into the PoolTogether protocol, he also paid $99.87 in discounted "gas" fees to "compensate the [Ethereum] network for" the "significant computing power" required to process "every transaction in a cryptocurrency." (SAC ¶¶ 38, 101.) There is no allegation that this fee was paid to Dharma. At any rate, Dharma hereby joins and incorporates by reference the arguments made by other Defendants regarding the insufficiency of alleged injury based on Plaintiff's recoverable deposit of $2 in USDC (*see* PoolTogether Br. at 12-13) and the Ethereum "gas" fees (*see* PoolTogether Br. at 16-18.)

7

the PoolTogether protocol from among the four Ethereum-based applications to which Dharma users could send cryptocurrency. Instead, as Plaintiff alleges, these generally applicable fees were charged by Dharma for "executing transactions" or, in other words, "transfer[ring] money from traditional bank accounts to decentralized-finance applications," not to PoolTogether specifically. (*Id.* ¶¶ 84, 86.) The $2.70 fee paid to Dharma is not fairly traceable to the alleged unlawful conduct at issue and thus cannot constitute Article III injury.

### B. Plaintiff Has Failed to State a Claim Against Dharma for the Sale of Illegal Lottery Tickets

Even if Plaintiff had adequately alleged standing, his claim against Dharma still fails on the merits. Plaintiff has alleged that, because "Dharma provided an interface through which users could give Dharma money in exchange for PoolTogether lottery tickets," Dharma itself "sold lottery tickets" in violation of N.Y. Gen. Oblig. Law § 5-423. (*Id.* ¶ 187.) Alternatively, Plaintiff claims that Dharma can be held liable for "aid[ing] and abet[ting] the sale of lottery tickets." (*Id.* ¶ 188.) Plaintiff's theories of direct and secondary liability are patently flawed and are defeated by his own allegations.

At the outset, Dharma joins and incorporates by reference the arguments by PoolTogether, Inc. that the PoolTogether protocol does not constitute an unlawful lottery under N.Y. Gen. Oblig. Law § 5-423. (*See, e.g.,* PoolTogether Br. at 19-23.) Because the PoolTogether protocol does not constitute an unlawful lottery, Plaintiff's direct and secondary liability theories against Dharma necessarily fail; indeed, New York common law requires a "primary violation" before secondary liability may attach at all. *Calcutti v SBU, Inc.*, 273 F.Supp. 2d 488, 493 (S.D.N.Y. 2003) (elements of aiding and abetting liability under New York common law); *Geren v. Quantum Chem. Corp.*, 832 F.Supp. 728, 737-38 (S.D.N.Y. 1993)

8

("Where the primary violation is barred …, a claim for aiding and abetting this primary violation fails to state a claim.").

But even if the PoolTogether protocol itself was an unlawful lottery under the statute, liability cannot attach to Dharma under either a direct or secondary liability theory.

### 1. Dharma Is Not Directly Liable Because It Did Not Sell Any Lottery Tickets to Plaintiff

Dharma cannot be subject to direct liability because it did not *sell* any lottery tickets to Plaintiff, as N.Y. Gen. Oblig. Law § 5-423 requires. Plaintiff's conclusory assertion that Dharma "sold lottery tickets" is implausible on its face and contradicted by his own allegations.

Where, as here, "the Legislature has not been completely silent but has instead made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish, the courts should ordinarily not attempt to fashion a different remedy, with broader coverage . . . ." *Sheehy v. Big Flats Community Day, Inc.*, 73 N.Y.2d 629, 636 (1989); *Cruz v. TD Bank, N.A.*, 855 F.Supp.2d 157, 172-173 (S.D.N.Y. 2012) (same). The statute at issue provides that "[a]ny person who shall purchase any share, interest, ticket, certificate of any share or interest, or part of a ticket" of an unlawful lottery may sue the "person to whom such payment [of money] or delivery [of valuable things] was made" in exchange for the lottery ticket (or a share or part thereof). N.Y. Gen. Oblig. Law § 5-423; *see Grover v. Morris*, 73 N.Y. 473, 477 (1878) (statute "designates the seller as the person against whom the action is to be brought"). The Dharma interface plainly does not constitute a seller of lottery tickets and falls outside the scope of the statute under Plaintiff's own allegations.

As Plaintiff acknowledges, Dharma was a simple interface that "linked traditional bank accounts to blockchain-based products." (SAC ¶ 3.) As alleged, the Dharma interface allowed users to "transfer money from traditional bank accounts to decentralized finance applications,"

9

not to Dharma itself. (*Id*. ¶ 84.) Plaintiff further alleges that he transferred (using Dharma) two dollars from his bank account to "purchase . . . 2 USDC tickets *from PoolTogether*," not from Dharma, and that he received the purported "tickets" from PoolTogether, not from Dharma. (*Id*. ¶ 101; *see also* ¶ 31 (referencing money "delivered to PoolTogether"); ¶ 185 ("Kent and all members of the putative class delivered things of value to the PoolTogether protocol in exchange for lottery tickets.").) To analogize Plaintiff's theory to a familiar real-life lottery, PoolTogether allegedly is the blockchain version of a bodega selling the tickets, while Dharma simply plays a role akin to a purchaser's credit or debit card provider. Plaintiff's theory of direct liability against Dharma simply fails to allege that Dharma was a "person to whom" Plaintiff "paid any money, or valuable thing, for a chance or interest in any lottery." N.Y. Gen. Oblig. Law § 5-423.

Any argument that the fees Plaintiff paid in connection with the transaction constituted "payment" for a lottery ticket is likewise untenable. As set forth above, *supra* at pp. 5-7, the "gas" fee went to the Ethereum network, not to Dharma, and the transaction fee was charged for the use of interface services as to multiple Ethereum-based applications to which Dharma users could send cryptocurrency; it was not a fee for a transaction with PoolTogether specifically, let alone for the sale of any tickets. The Second Amended Complaint itself makes clear that Dharma "separately charged users fees" not for "a chance or interest in any lottery," as required by the statute, but simply "for executing transactions." (SAC ¶ 86.) Even Plaintiff's allegation that "Dharma specifically earned money from purchases of PoolTogether tokens because . . . Dharma charged [users] fees" separates the actual "purchase" of those "tokens" from any associated "fees" paid to Dharma. (*Id*. ¶ 89.)

### 2. Dharma Cannot Be Secondarily Liable for Aiding and Abetting the Sale of Lottery Tickets

Plaintiff's alternative theory of liability—that Dharma "aided and abetted the sale of lottery tickets"—also fails as a matter of law, for several reasons. (*Id.* ¶ 188.)

First, N.Y. Gen. Oblig. Law § 5-423 does not provide for secondary liability at all, and Plaintiff cannot graft such provisions onto the plain text of the statute. Courts consistently have rejected attempts by parties to rely on aiding-and-abetting theories where New York statutes do not provide for aiding-and-abetting liability, and instead impose statutory limitations on who may be held liable. *See, e.g., Falbaum v. Pomerantz*, 891 F.Supp. 986, 992 (S.D.N.Y. 1995) (dismissing aiding-and-abetting claim seeking to impose liability on individuals under New York Human Rights Law where "limitation embodied in the statutory definition of 'employer' … could be easily evaded by alleging claims either under an aiding and abetting or retaliation theory"); *see also Tyszka v. Make & Take Holding, LLC*, 72 A.D.3d 1620, 1621 (4th Dept. 2010) (where the "only violation alleged … is aiding and abetting a violation of the [Franchise Sales] Act itself, not a free-standing common law violation," the Act "provides the plaintiffs with their exclusive remedy"); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (observing that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors").[6] This alone dooms Plaintiff's aiding-and-abetting claim.

---

[6] The Second Amended Complaint only pleads direct and aiding-and-abetting claims against Dharma in its cause of action. (SAC ¶¶ 187-88.) There is, though, an allegation that conclusorily asserts that all Defendants "conspired" with one another. (*Id.* ¶ 20.) Even if this claim were properly pled, it would likewise fail because the statute does not provide for liability for conspiracy. *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998) ("Critically, as in the case of aiding and abetting, there is no mention of conspiracy in the text of § 10(b). Just as Congress clearly knew how to impose aiding and

Even if the statute provided for secondary liability, Plaintiff's claims would still fail because New York courts have interpreted state statutes expressly providing for secondary liability (unlike the statute here) to observe certain common-law limitations that would clearly exclude the allegations as to Dharma. For example, in *Foley v. Mobil Chem. Co.*, 170 Misc.2d 1, 647 N.Y.S.2d 374 (Monroe Cty. 1996), the court held that the "concept of an aider and abettor" explicitly "written into" the New York Human Rights Law (unlike N.Y. Gen. Oblig. Law § 5-423)—which applied to "any person" who "aid[ed], abet[ted], incite[d], compel[led] or coerce[d] the doing of any of the acts forbidden under this article"—"must retain its common law characteristics in the absence of statutory definition or other clear expression of contrary legislative intent contained in the 'language used in the statute.'" *Id*. at 12. The court thus concluded that as to "aider and abettor" liability under the statute, the "common law meaning of the term controls." *Id*. at 13.

To establish "aiding and abetting" liability in the civil tort context under New York common law, plaintiffs must demonstrate that the defendant (1) "kn[ew] that another's conduct constitute[d] a breach of duty" and (2) "g[ave] substantial assistance or encouragement to the other." *Miele v. Am. Tobacco Co.,* 2. A.D.3d 799, 805 (2d Dept. 2003); *see also Calcutti*, 273 F.Supp.2d at 493 (collecting cases). Plaintiff's allegations fail to satisfy either element.

---

abetting liability when it chose to do so, thereby suggesting that its absence from § 10(b) should not be disregarded, the existence of statutes expressly providing for conspiracy liability warrants the same conclusion here."); *Linde v. Arab Bank, PLC*, 944 F.Supp.2d 215, 216-17 (E.D.N.Y. 2013) (applying reasoning of *Central Bank of Denver* and *Dinsmore* and holding that there is no cause of action for conspiracy to commit a violation of the Anti-Terrorism Act). And at any rate, this lone allegation does "not contain sufficient factual allegations of a conspiracy" to "meet the plausibility standard under *Twombly*. Indeed, plaintiff's conspiracy claim against defendants is conclusory and vague." *Slepoy v. City of New York*, No. 10-CV-1814 (ARR), 2010 WL 1945773, at *2 (E.D.N.Y. May 11, 2010).

First, there is no allegation in the Second Amended Complaint that Dharma *knew* that the PoolTogether protocol constituted a breach of duty under N.Y. Gen. Oblig. Law § 5-423 or any other law. Rather, the complaint simply alleges that Dharma provided an interface to the protocol. Such allegations are insufficient to plead the requisite knowledge element. *See, e.g., Segal v. Bitar,* No. 11 CIV. 4521 (LBS), 2012 WL 273609, at *8 (S.D.N.Y. Jan. 30, 2012) (dismissing aiding-and-abetting claims where "Plaintiffs have alleged no facts demonstrating that the Individual Defendants knew that the other defendants' actions constituted a breach of duty"); *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.,* 515 F.Supp.2d 298, 321 (N.D.N.Y. 2007) (dismissing aiding-and-abetting claim where plaintiff "has not clearly alleged" that defendants "knew that another's conduct constituted a breach of duty").

Second, Plaintiff's allegations fail to establish the required "substantial assistance." New York courts have emphasized that providing substantial assistance "means more than just performing routine business services for the alleged" violator. *See McBride v. KPMG Int'l*, 135 A.D.3d 576, 579 (1st Dept. 2016). In *McBride*, for example, a bank did not "substantially assist" a customer in committing fraud by simply "allowing [the customer] to transfer funds between" an account with the bank and an outside account, which is similar to the allegations at issue here as to Dharma. Such activity was a "routine business service," even though that conduct did aid in the commission of the fraud. *See id*. Likewise, New York courts have held that the "substantial assistance" provided must not be of a generalized nature but must be specifically geared toward furthering the underlying alleged wrong. *See Bank of Baroda v. Shah*, 191 A.D.2d 237, 238 (1st Dept. 1993) (requiring "substantial assistance by the plaintiff Bank *in furthering the alleged securities laws violations*" (emphasis added)); *Caravello v. One Mgmt. Grp., LLC*, 131 A.D.3d 1191, 1193 (2d Dept. 2015) (requiring "substantial assistance by the

13

aider and abettor *in the achievement of the fraud*" (emphasis added)); *cf. Congregacion de la Mision Provincia de Venezuela v Curi*, 978 F.Supp. 435, 450 (E.D.N.Y. 1997) ("Nothing in the complaint says that Feinstein's affirmative acts *helped Curi perpetrate the alleged securities fraud* or that his inaction violated an independent duty to act." (emphasis added)).

No such allegations exist here. The complaint's factual allegations amount only to a claim that Dharma provided an interface that allowed Plaintiff to deposit funds held in his bank account into four decentralized finance applications on the Ethereum network, that Dharma advertised the four applications to which Dharma users could send cryptocurrency using the app, and that Plaintiff used Dharma to engage with the PoolTogether protocol. (SAC ¶¶ 85-87.)[7] Such "routine business services" plainly do not qualify as "substantial assistance" under New York aiding-and-abetting law. Moreover, Plaintiff has not alleged any activities by Dharma which specifically helped achieve or perpetuate the unlawful conduct alleged under N.Y. Gen. Oblig. Law § 5-423. Indeed, Plaintiff does not allege that Dharma played any role with the actual operation of the PoolTogether protocol.

Thus, Plaintiff has failed to plead aiding-and-abetting liability even if it were available under the statute.

## V. CONCLUSION

For the foregoing reasons, Dharma respectfully requests that the Court dismiss Plaintiff's claim against Dharma.

---

[7] The complaint also alleges that *PoolTogether's* founder "promoted the use of Dharma as a way to access PoolTogether," "offered to 'pay' an individual who would develop 'a tutorial for joining PoolTogether using Dharma,'" and "indicated that [he] was directly in communication with Dharma." (SAC ¶ 88.) This claim does not concern any action *taken by Dharma*, let alone any action constituting substantial assistance.

14

DATED: April 19, 2022

By: */s/ John P. Amato*
Jonathan H. Blavin (*admitted pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000

Erin J. Cox (*admitted pro hac vice*)
April Youpee-Roll (*admitted pro hac vice*)
Brandon Teachout (*admitted pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
(213) 683-9100

John P. Amato
THOMPSON COBURN HAHN &
HESSEN LLP
488 Madison Ave #14
New York, NY 10022
(212) 478-7200

Attorneys for Defendants
OZONE NETWORKS, INC. and
DHARMA LABS, INC.