# Exhibit A



RECEIVED CFTC

Office of Proceedings
Proceedings Clerk

**3:30 pm, Sep 22, 2022**

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

|   |   |
|---|---|
| In the Matter of:<br><br>bZeroX, LLC; Tom Bean; and<br>Kyle Kistner,<br><br>Respondents. | )<br>)<br>)<br>)<br>)   CFTC Docket No. 22-31<br>)<br>)<br>) |

ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTION 6(c) AND (d) OF THE COMMODITY EXCHANGE ACT, MAKING
FINDINGS, AND IMPOSING REMEDIAL SANCTIONS

## I.     INTRODUCTION

The Commodity Futures Trading Commission ("Commission") has reason to believe that, from at least approximately June 1, 2019 to approximately August 23, 2021 (the "bZx Relevant Period"), bZeroX, LLC ("bZeroX"); Tom Bean ("Bean"); and Kyle Kistner ("Kistner") (collectively, "Respondents") violated Sections 4(a) and 4d(a)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a), 6d(a)(1), and Commission Regulation ("Regulation") 42.2, 17 C.F.R. § 42.2 (2021); and that, from approximately August 23, 2021 to the present (the "DAO Relevant Period," and together with the bZx Relevant Period, the "Relevant Period"), Bean and Kistner violated Sections 4(a) and 4d(a)(1) of the Act and Regulation 42.2.  Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions ("Order"), and acknowledge service of this Order.[1]

---

[1]     Respondents consent to the use of the findings of fact and conclusions of law in this Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof.  Respondents do not consent, however, to the use of this Order, or the findings or conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party or

## II.  FINDINGS

The Commission finds the following:

**A.  SUMMARY**

During the Relevant Period, Respondents designed, deployed, marketed, and made solicitations concerning a blockchain-based software protocol that accepted orders for and facilitated margined and leveraged retail commodity transactions (functioning similarly to a trading platform).  This protocol (the "bZx Protocol") permitted users to contribute margin (collateral) to open leveraged positions whose ultimate value was determined by the price difference between two digital assets from the time the position was established to the time it was closed.  The bZx Protocol purported to offer users the ability to engage in these transactions in a decentralized environment—i.e., without third-party intermediaries taking custody of user assets.

In so doing, Respondents—who have never registered with the Commission—unlawfully engaged in activities that could only lawfully be performed by a registered designated contract market ("DCM") and other activities that could only lawfully be performed by a registered futures commission merchant ("FCM").  In addition, Respondents did not conduct know-your-customer ("KYC") diligence on their customers as part of a customer identification program ("CIP"), as required of FCMs.

**B.  RESPONDENTS**

**bZeroX, LLC** is a Delaware limited liability company ("LLC") with its registered agent in Delaware.  bZeroX was founded and was co-owned and controlled during the bZx Relevant Period by Bean and Kistner.  During the bZx Relevant Period, bZeroX created and operated the bZx Protocol that facilitated the unlawful transactions described herein.  On approximately August 23, 2021, bZeroX transferred control of the bZx Protocol to the bZx DAO, a decentralized autonomous organization ("DAO"), which subsequently, on approximately December 18, 2021, renamed itself and is now doing business as the Ooki DAO.[2]  bZeroX has never been registered with the Commission in any capacity.

**Tom Bean** is a Georgia resident who, with Kistner, founded, co-owned, and controlled bZeroX during the bZx Relevant Period.  Bean is also a member of the Ooki DAO (formerly

---

claimant, other than:  a proceeding in bankruptcy or receivership; or a proceeding to enforce the terms of this Order.  Respondents do not consent to the use of the Offer or this Order, or the findings or conclusions in this Order, by any other party in any other proceeding.

[2]   As set forth below, the Ooki DAO is an unincorporated association comprised of holders of Ooki DAO Tokens ("Ooki Tokens") who vote those tokens to govern (e.g., to modify, operate, market, and take other actions with respect to) the bZx Protocol (which the Ooki DAO has renamed the "Ooki Protocol").  The Ooki DAO (formerly doing business as the bZx DAO) has never been registered with the Commission in any capacity.  By this Order, the Commission is resolving charges with bZeroX relating to its conduct during the bZx Relevant Period; with Bean and Kistner as control persons of bZeroX during the bZx Relevant Period, as well as for their active participation in the Ooki DAO (i.e., voting their BZRX or Ooki Tokens to govern the BZX DAO (later the Ooki DAO) by, for example, directing the operation of the bZx Protocol (later the Ooki Protocol)) during the DAO Relevant Period.  This Order does not resolve charges with the Ooki DAO itself.

doing business as the bZx DAO) and has performed certain work (such as protocol development and marketing work) on the Ooki DAO's behalf during the DAO Relevant Period. Bean has never been registered with the Commission in any capacity.

**Kyle Kistner** is a Georgia resident who, with Bean, founded, co-owned, and controlled bZeroX during the bZx Relevant Period. Kistner is also a member of the Ooki DAO (formerly doing business as the bZx DAO) and has performed certain work (such as business and budget planning and marketing work) on the Ooki DAO's behalf during the DAO Relevant Period. Kistner has never been registered with the Commission in any capacity.

### C. FACTS

#### 1. Respondents Designed, Deployed, Operated, Marketed, and Controlled the bZx Protocol During the bZx Relevant Period.

During the bZx Relevant Period, the bZx Protocol was a collection of smart contracts on the Ethereum blockchain that purported to facilitate transactions without intermediaries.[3] The bZx Protocol enabled any person with an Ethereum wallet to contribute margin (collateral) to open leveraged positions whose value was determined by the price difference between two digital assets from the time the position was established to the time it was closed.[4] For example, if a trader believed that the price of ETH would rise relative to the price of DAI, the trader might open a 5x long position in ETH versus DAI (i.e., a position worth five times the increase in the price of ETH relative to DAI from the time the position was established to the time it was closed). To do so, the trader would proceed as follows:

1. The trader would post collateral (e.g., ETH) to a bZx Protocol smart contract as margin to open the leveraged position.[5]

2. The smart contract would borrow DAI from a bZx Protocol liquidity pool, whose assets were supplied by liquidity providers who, in exchange, had received interest-generating

---

[3] A blockchain is a distributed, shared, immutable ledger that facilitates the process of recording transactions and tracking digital assets in a consensus-based network. A "smart contract" is a self-enforcing piece of computer code containing all terms of a contract—meaning the software can execute the agreement contained in the contract without additional input from the parties.

[4] A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Digital assets include virtual currencies, which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value. Ether ("ETH") is the Ethereum blockchain's native virtual currency. In addition, Ethereum's ERC-20 token standard permits the conversion of non-ETH virtual currencies into tokens that can be traded on Ethereum. For example, DAI is an ERC-20 token that can be transacted with on the Ethereum blockchain and whose value is pegged one-to-one to the price of the U.S. dollar.

[5] Notably, positions on the bZx Protocol were required to be overcollateralized—i.e., the value of the collateral was required to exceed the value of the borrowed asset. This was to ensure repayment of the borrowed asset. Prior to a trader closing an open position, if the position had lost too much value, the bZx Protocol was designed to facilitate the automatic liquidation of the position and retention and sale of the posted collateral to cover the loss.

tokens, as well as BZRX Protocol Tokens ("BZRX Tokens") conferring voting rights on certain matters relevant to bZx Protocol governance.[6]

3. The smart contract would exchange the borrowed DAI for ETH on a separate, on-chain decentralized exchange.

4. The smart contract would lock (i.e., prevent from being withdrawn absent conditions expressly written in to the smart contract) the newly received ETH and create a token representing the newly established 5x long position.

5. The smart contract would send that token to the trader.

If the trader was correct (i.e., that the price of ETH would rise relative to the price of DAI), the trader could redeem the token reflecting the position for a profit (i.e., the smart contract would transfer the resulting profit to the trader). If the trader was incorrect (i.e., the price of ETH did not rise relative to the price of DAI), the trader could still redeem the token, except instead of paying profits, the smart contract would retain however much of the collateral was needed to cover the loss. If the trader wished to open a short position, the trading mechanics would be similar, except the trader would borrow ETH and swap it into DAI. Traders could open similar positions involving various additional virtual currencies.

The transactions on the bZx Protocol did not involve contracts of sale of digital assets; rather, they involved leveraged positions whose value was determined by the price difference between two digital assets. Positions on the bZx Protocol automatically rolled over every 28 days (and could thus exist perpetually) and could be liquidated at any time.

bZeroX, through Bean and Kistner, among others, developed a website to market, solicit orders for, and facilitate access to the bZx Protocol. For example, bZeroX's website claimed that it offered a superior margin trading experience because "[t]here is no need for any verification, KYC or AML." The website further claimed that bZeroX did not take custody of users' assets, and there were minimal liquidation penalties. Bean and Kistner also made public statements, appeared in interviews, wrote articles, led calls with community members that are publicly available on YouTube, and otherwise publicly marketed and solicited members of the public to utilize the bZx Protocol. The bZeroX website enabled users, through the click of a few buttons, to transfer assets and open positions on the bZx Protocol using the mechanics described above. bZeroX collected fees from users, including origination fees, trading fees, and a percentage of interest paid to lenders. bZeroX purports to have collected approximately $50,000 in fees prior to June 2020 (all of which was paid to auditors) and, between June 2020 and August 2021, approximately $500,000 in fees (approximately $350,000 of which was paid to employees, service providers, contractors, and other third parties for similar expenses).[7]

---

[6] The BZRX Tokens conferred voting rights in proportion to the holder's percentage of total BZRX Tokens issued. Additional BZRX Tokens were otherwise minted and allocated to certain individuals, including Bean and Kistner.

[7] Fees are held in BZRX Tokens or 3CRV (a stablecoin that is redeemable for DAI, USDT, or USDC on Curve.Finance). The listed figures reflect approximate conversions to U.S. Dollars as of approximately September 14, 2021.

Prior to August 23, 2021 (at which time bZeroX transferred control of the bZx Protocol to the bZx DAO), bZeroX (through Bean and Kistner exclusively) retained "administrator keys" ("Keys") permitting bZeroX to access and control the operation of, and the funds held in, the smart contracts involved in the above processes. The Keys enabled bZeroX, for example, to update relevant smart contract code to adjust how the smart contracts operated; pause or suspend trading; pause or suspend contributions or withdrawals of assets and redemptions of tokens to close positions; and otherwise direct disposition of the funds held in the bZx Protocol smart contracts.[8]

During the bZx Relevant Period, bZeroX did not maintain a CIP and explicitly advertised the lack of KYC or AML compliance as a positive feature of the bZx Protocol. bZeroX offered any user anywhere in the world, including in the United States, the ability to trade on the bZx Protocol and, specifically, did not take any steps to exclude U.S. and/or non-eligible contract participants ("non-ECPs") (as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18)) from the bZx Protocol.

Bean and Kistner controlled bZeroX during the bZx Relevant Period. For example, Bean and Kistner were the only members of bZeroX and were exclusively responsible for approving bZeroX's business conduct, regulatory decisions, and the technical development of the bZx Protocol.

**2. During the DAO Relevant Period, Bean and Kistner Were Members of the bZx DAO (Eventually Renamed the Ooki DAO During the DAO Relevant Period), Which Controlled and Operated the bZx Protocol (Eventually Renamed the Ooki Protocol During the DAO Relevant Period).**

On approximately August 23, 2021, bZeroX transferred control of the bZx Protocol (including relevant Keys) to the bZx DAO. From that point forward, the bZx DAO could act with respect to the bZx Protocol only through a vote of BZRX Token holders. Bean and Kistner determined that transitioning to a DAO would insulate the bZx Protocol from regulatory oversight and accountability for compliance with U.S. law. As Kistner stated in a public call with the bZx community regarding the transition to the bZx DAO:

> It's really exciting. We're going to be really preparing for the new regulatory environment by ensuring bZx is future-proof. So many people across the industry right now are getting legal notices and lawmakers are trying to decide whether they want DeFi companies to register as virtual asset service providers or not – and really what we're going to do is take all the steps possible to make sure that when regulators ask us to comply, that we have nothing we can really do because we've given it all to the community.

---

[8] During the bZx Relevant Period, bZeroX did, in fact, utilize the Keys several times to pause trading and suspend users' ability to withdraw funds following several alleged incidents on the bZx Protocol involving alleged third-party exploitation of deficiencies in the bZx Protocol's code and theft of users' assets.

In practice, however, the bZx DAO controlled and operated the bZx Protocol just as bZeroX before it had done. Just as bZeroX (like any LLC) governed the bZx Protocol through the votes of its members (i.e., Bean and Kistner), the bZx DAO governed the bZx Protocol through the votes of BZRX Token holders. Specifically, any BZRX Token holder had the right to propose, and to vote his or her BZRX Tokens to effect, changes to the bZx Protocol or otherwise shape the direction of the bZx DAO's business. The general process was that any new proposals were first discussed on the bZx Community Forum ("bZx Forum"). Proposals that were not widely supported typically ended there. If there was sufficient support, a non-binding "snapshot vote" could be conducted to gauge support for a particular proposal. If a proponent believed there was sufficient support, a binding vote could be held directly on the bZx Protocol through a fork of the Compound Bravo Governance Module smart contract that enabled BZRX Token holders to vote those tokens for or against a proposal. Approved proposals were implemented by individuals as authorized by the bZx DAO.

For example, on approximately August 24, 2021, Bean and Kistner proposed in the bZx Forum that the bZx DAO approve an omnibus funding plan for going-forward bZx DAO operations—including release of funds for marketing, operations, development, community management, and legal expenses. The proposal passed a snapshot vote unanimously, and BZRX Token holders voted to approve the proposal in September 2021. Funds were subsequently released from the bZx DAO Treasury (which contained bZx Protocol revenue) to pay certain of the approved expenses. Similarly, in approximately December 2021, the bZx DAO voted to utilize funds from the bZx DAO Treasury to compensate certain bZx DAO members who lost funds in connection with an alleged security breach and theft of funds on the bZx Protocol. More generally, Bean and Kistner possess BZRX Tokens and have participated in bZx DAO governance, including by participating in many discussions in online governance forums, making other governance proposals, and voting their BZRX Tokens in favor of such proposals.

During the DAO Relevant Period, the bZx Protocol otherwise operated as described in Section II.C.1 *supra*, through the votes and acquiescence of the bZx DAO. With the bZx DAO's support, Bean and Kistner continued to market and publicly solicit members of the public to trade on the bZx Protocol. The bZx DAO controlled all Keys previously controlled by bZeroX. Like bZeroX, the bZx DAO did not maintain a CIP, explicitly advertised the lack of KYC or AML compliance as a positive feature of the bZx Protocol, and did not take any steps to exclude U.S. and/or non-ECPs from the bZx Protocol.

On approximately December 18, 2021, through a vote of BZRX Token holders, the bZx DAO renamed itself the Ooki DAO. The bZx DAO repeatedly publicly described this process as merely a "rebrand." This process did not result in legal changes to the DAO's business or material changes to its operations.[9] The Ooki DAO now operates the bZx Protocol (which the

---

[9] Respondents represent that, at this time, bZeroX (which, as described above, was the predecessor to the bZx DAO and had not operated the bZx Protocol since it transferred control over the bZx Protocol to the bZx DAO on or about August 23, 2021) ceased engaging in any business activities; and, from this point forward, that certain members of the bZx DAO did not engage in additional activities relating to the newly renamed Ooki Protocol. In addition, Respondents represent that, in connection with this rebrand, the Ooki DAO deployed additional smart contracts that controlled staking and governance for the Ooki DAO, just as previous smart contracts controlled staking and governance for the bZx DAO. These additional smart contracts were largely necessitated by the fact that the renamed Ooki DAO now offered Ooki Tokens (instead of BZRX Tokens) to govern the renamed Ooki

Ooki DAO has renamed the Ooki Protocol) in the exact same manner that the bZx DAO operated the bZx Protocol (i.e., through the votes of Ooki Token holders). The Ooki DAO website describes specific Ooki DAO procedures for proposing and voting on Ooki DAO governance proposals, which are consistent with the procedures utilized when the Ooki DAO was doing business as the bZx DAO, as summarized above.

### III. LEGAL DISCUSSION

**A. During the bZx Relevant Period, Respondents Violated Sections 4(a) and 4d(a)(1) of the Act and Regulation 42.2.**

    **1. Respondents Engaged in Unlawful Off-Exchange Leveraged and Margined Retail Commodity Transactions in Violation of Section 4(a) of the Act.**

Virtual currencies such as ETH, DAI, and others traded on the bZx Protocol are "commodities" under the Act. *See, e.g.*, *United States v. Reed*, No. 20-cr-500 (JGK), 2022 WL 597180, at *3-5 (S.D.N.Y. Feb. 28, 2022); *CFTC v. McDonnell*, 287 F. Supp. 3d 13, 228-29 (E.D.N.Y. 2018); *In re Coinflip, Inc.,* CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015).

Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D), applies to "any agreement, contract, or transaction in any commodity that is . . . entered into with, or offered to (even if not entered into with), a [non-ECP] . . . on a leveraged or margined basis . . . ." and which does not result in actual delivery within 28 days (hereafter, "leveraged or margined retail commodity transactions"). Act § 2(c)(2)(D)(i), (ii)(III)(aa), 7 U.S.C § 2(c)(2)(D)(i), (ii)(III)(aa). Section 4(a) of the Act, 7 U.S.C. § 6(a), applies to leveraged or margined retail commodity transactions as if those transactions were contracts of sale of a commodity for future delivery. Act § 2(c)(2)(D)(iii), 7 U.S.C § 2(c)(2)(D)(iii).

Section 4(a) of the Act, 7 U.S.C. § 4(a), in relevant part, makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery, unless such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market for the specific commodity (i.e., a DCM).

During the bZx Relevant Period, utilizing the bZx Protocol, bZeroX offered to enter into, entered into, executed, confirmed the execution of, and/or conducted business in the United States for the purpose of soliciting and/or accepting orders for, and/or otherwise dealing in, leveraged or margined retail commodity transactions with non-ECP U.S. residents that did not result in actual delivery within 28 days. These leveraged or margined retail commodity transactions were not conducted on or subject to the rules of a board of trade that has been

---

Protocol, and BZRX Token holders needed the ability to convert those tokens into Ooki Tokens (as they were permitted to do), and votes by holders of those Ooki Tokens (instead of holders of BZRX Tokens) would now be used to govern the Ooki Protocol.

designated or registered by the CFTC as a contract market. Thus, Respondents violated Section 4(a) of the Act.

### 2. Respondents Unlawfully Engaged in Activities That Could Only Lawfully Be Performed by Registered FCMs in Violation of Section 4d(a)(1) of the Act.

Section 1a(28) of the Act, 7 U.S.C. § 1a(28), in relevant part, defines an FCM as any individual, association, partnership, corporation or trust that engages in soliciting or in accepting orders for "any agreement, contract, or transaction described in… section (2)(c)(2)(D)(i)" and, in connection therewith, "accepts any money… or property (or extends credit in lieu thereof) to margin . . . trades or contracts that result or may result therefrom." Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), in pertinent part, makes it unlawful for any person to act as an FCM unless registered with the Commission as an FCM. *See, e.g.*, *Reed*, 2022 WL 597180, at *2-3 (holding indictment sufficiently alleged that entity operated as an unregistered FCM where entity solicited and accepted orders for trades in futures contracts and other derivative products tied to the value of virtual currencies, accepted virtual currency to margin and guarantee its derivative products, and offered leverage to customers on certain products).

As described above, during the bZx Relevant Period, bZeroX, utilizing the bZx Protocol, while not registered as an FCM, acted as an FCM as defined in Section 1a(28) of the Act by soliciting and accepting orders for leveraged or margined retail commodity transactions with customers; and accepting money or property to margin those transactions. Thus, Respondents violated Section 4d(a)(1) of the Act.[10]

### 3. Respondents Failed to Adopt a CIP in Violation of Regulation 42.2.

Regulation 42.2, 17 C.F.R. § 42.2 (2021), provides that every FCM shall comply with the Bank Secrecy Act and related regulations, which require the FCM to adopt a CIP to facilitate KYC diligence on the FCM's customers. Regulation 42.2 applies to individuals and entities acting as unregistered FCMs. *See, e.g.*, *CFTC v. HDR Global Trading Limited*, No. 1:20-cv-08132, 2021 WL 3722183 at ¶ 39 (S.D.N.Y. Aug. 10, 2021) (consent order) (finding defendant who acted as an unregistered FCM liable for failing to adopt a CIP as required by Regulation 42.2).

During the bZx Relevant Period, by acting as an unregistered FCM, bZeroX was required to adopt a CIP but failed to do so, and in fact explicitly marketed the lack of KYC diligence as a positive feature of the bZx Protocol. In so doing, Respondents violated Regulation 42.2.

---

[10] The Commission issues this Order because Respondents, who were not registered with the Commission, engaged in certain activities that could only lawfully be performed by a registered DCM, and other activities that could only lawfully be performed by a registered FCM. It was (and remains) Respondents' responsibility to avoid unlawfully engaging in activities that could only be performed by registered entities and, should they ever wish to register, to structure their business in a manner that is consistent with Commission registration requirements. *See, e.g.*, *Reed*, 2022 WL 597180, at *3 (holding that even if an entity might have fallen within multiple of the Act's registration categories, "the [Act's] registration categories are not exclusive of one another," and whether an entity unlawfully acted as an unregistered FCM should be determined simply by whether the entity "fall[s] . . . within the definition of an FCM").

### 4. Respondents Bean and Kistner Are Liable as Controlling Persons for bZx's Violations of the Act and Regulation 42.2.

Controlling persons are liable for violations of the entities they control under certain circumstances.  Section 13(b) of the Act, 7 U.S.C. § 13c(b), states that a controlling person of an entity is liable for the violations of that entity if the controlling person knowingly induced the violations, directly or indirectly, or did not act in good faith.  "A fundamental purpose of Section 13[(b)] is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself."  *R.J. Fitzgerald*, 310 F.3d at 1334 (citation omitted) (holding defendant was a controlling person when the defendant was the company's principal and "exercised the ultimate choice-making power with the firm regarding its business decisions," "reviewed and approved the activities that . . . violated the Act," and "was ultimately responsible for compliance with all applicable rules on commodities solicitations").

During the bZx Relevant Period, Bean and Kistner controlled bZeroX, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, bZeroX's act or acts in violation of the Act and Regulations; therefore, pursuant to Section 13(b) of the Act, Bean and Kistner are liable for bZeroX's violations of Sections 4(a) and 4d(a)(1) of the Act and Regulation 42.2.

**B.** **During the DAO Relevant Period, the Ooki DAO (formerly d/b/a the bZx DAO) Violated Sections 4(a) and 4d(a)(1) of the Act and Regulation 42.2, and Bean and Kistner, as Members of the Ooki DAO, Are Personally Liable for the Ooki DAO's Violations. [11]**

### 1. The Ooki DAO Is an Unincorporated Association.

An unincorporated association is "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective."  *See, e.g.*, *So. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 927 (9th Cir. 2014) (holding that former incorporated entity promoting competitive play of darts whose corporate powers had been suspended was an unincorporated association under federal law); *Heinold Hog Market, Inc. v. McCoy*, 700 F.2d 611, 613-14 (10th Cir. 1983) (holding that the "National Commodity Exchange" ("NCE"), an affiliate of an organization devoted to tax reform that converted customers' federal reserve notes to gold and silver and then back to federal reserve notes to pay customer creditors, was an unincorporated association where multiple individuals operated the NCE with the purpose of allowing customers to pay creditors without generating a paper trail in the Federal Reserve System); *Seattle Affiliate of October 22nd Coalition to Stop Police Brutality, Repression and the Criminalization of a Generation v. City of Seattle*, No. C04 0860L, 2005 WL 3418415, at *2 (W.D. Wash. Dec. 12, 2005) (holding that local advocacy group was an unincorporated association despite that group did not have an official "membership" list where group had existed in city for years; operated as a local affiliate of a national group; participated in publications,

---

[11]    In this section, the Commission uses the term "Ooki DAO" as shorthand for the "Ooki DAO (formerly d/b/a the bZx DAO)."  Likewise, in this section, the Commission uses the term "Ooki Protocol" as shorthand for the "Ooki Protocol (formerly branded as the bZx Protocol)."

events, and rallies; and utilized an egalitarian, volunteer-oriented structure to meet its objectives).

The Ooki DAO meets the federal definition of an unincorporated association. It is a "voluntary group of persons" (Ooki Token holders who voluntarily vote their Ooki Tokens), "without a charter" (no Ooki DAO corporate charter exists), "formed by mutual consent for the purpose of promoting a common objective" (Ooki Token holders who voluntarily vote for the purpose of promoting the common objective of governing the Ooki Protocol). Notably, the Ooki DAO exists for exactly the same purpose as bZeroX before it—to run a business (i.e., to govern and operate the Ooki Protocol). The Ooki DAO is thus an unincorporated association.

While the Ooki DAO does not explicitly define its own membership, the federal definition of an unincorporated association makes clear that the Ooki DAO is comprised of individuals who voluntarily join together to pursue the common objective of participating in the governance of the Ooki Protocol. An unambiguous way that individuals join together to govern the Ooki Protocol is by voting their Ooki Tokens. Once an Ooki Token holder votes his or her Ooki Tokens to affect the outcome of an Ooki DAO governance vote, that person has voluntarily participated in the group formed to promote the common objective of governing the Ooki Protocol and is thus a member of the Ooki DAO unincorporated association.

### 2. The Ooki DAO Violated Sections 4(a) and 4d(a)(1) of the Act and Regulation 42.2 During the DAO Relevant Period.

The Ooki DAO controlled and operated the Ooki Protocol (including the Keys to the Ooki Protocol) during the entirety of the DAO Relevant Period in the same manner that bZeroX controlled and operated the bZx Protocol during the bZx Relevant Period.

Thus, during the DAO Relevant Period, utilizing the Ooki Protocol, the Ooki DAO offered to enter into, entered into, executed, confirmed the execution of, and/or conducted business in the United States for the purpose of soliciting and/or accepting orders for, and/or otherwise dealing in, leveraged or margined retail commodity transactions with non-ECP U.S. residents that did not result in actual delivery within 28 days. These leveraged or margined retail commodity transactions were not conducted on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market. Thus, the Ooki DAO violated Section 4(a) of the Act.

Similarly, during the DAO Relevant Period, the Ooki DAO, while not registered as an FCM, acted as an FCM as defined in Section 1a(28) of the Act by soliciting and accepting orders for leveraged or margined retail commodity transactions with customers; and accepting money or property to margin those transactions. Thus, the Ooki DAO violated Section 4d(a)(1) of the Act.

Finally, during the DAO Relevant Period, by acting as an unregistered FCM, the Ooki DAO was required to adopt a CIP but failed to do so, and in fact explicitly marketed the lack of KYC diligence as a feature of the Ooki Protocol. In so doing, the Ooki DAO violated Regulation 42.2.

### 3. As Members of the Ooki DAO, Bean and Kistner Are Personally Liable for the Ooki DAO's Violations of the Act and Regulation 42.2.

Individual members of an unincorporated association organized for profit are personally liable for the debts of the association under principles of partnership law. *See, e.g.*, *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 125 (5th Cir. 1994) (citations omitted) (distinguishing liability of individual members of for-profit unincorporated associations, which is determined by partnership law, with liability of individual members of non-profit unincorporated associations, which is determined by the law of agency); *Shortlidge v. Gutoski*, 484 A.2d 1083, 1086 (N.H. 1984) (citations omitted) (noting that each member of an unincorporated association organized for profit is treated as a partner of the association, is jointly liable with other members for the association's debts, and can have his or her personal assets reached by creditors of the association; and noting that membership in unincorporated associations often "results from sheer ignorance of the possible degree of personal liability of its members"); *Libby v. Perry*, 311 A.2d 527, 533 (Me. 1973) (citation omitted) (noting established rule that in for-profit voluntary unincorporated associations, "members are mere partners and as such are personally liable for all its debts").

The Ooki DAO is a for-profit unincorporated association. It charges fees for its products and services, generates revenue, has distributed revenue to its members in various forms, offers ownership rights in the Ooki DAO in the form of Ooki Tokens, collects and liquidates collateral from users, and has never sought to be characterized as a non-profit organization in any federal or state registration or tax filing. *See, e.g.*, *Heinold Hog Market*, 700 F.2d at 615-16 (noting that unincorporated association NCE appeared to operate for profit where it charged for its services, bought and sold commodities, assumed the risk of commodity market price declines, and recouped losses from account holders when prices increased).

As members of the for-profit Ooki DAO unincorporated association (i.e., as Ooki Token holders who voted their Ooki Tokens to govern the Ooki DAO by, for example, directing the operation of the Ooki Protocol), Bean and Kistner are personally liable for the Ooki DAO's debts. Accordingly, they are personally liable for the Ooki DAO's violations of the Act and Regulations set forth in Section III.B.2 *supra*.[12]

---

[12]   As set forth in Note 2 *supra*, by this Order, the Commission is resolving charges against Bean and Kistner for their actions as members of the Ooki DAO, but is not resolving charges against the Ooki DAO itself. As such, the Commission does not take a position in this Order as to the appropriate monetary sanctions against the Ooki DAO for the violations of law described herein.

11

## IV. FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, Respondents violated Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a) and 6d(a)(1), and Regulation 42.2, 17 C.F.R. § 42.2 (2021).

## V. OFFER OF SETTLEMENT

Respondents have submitted the Offer in which they, without admitting or denying the findings and conclusions herein:

A. Acknowledge service of this Order;

B. Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C. Waive:

1. The filing and service of a complaint and notice of hearing;

2. A hearing;

3. All post-hearing procedures;

4. Judicial review by any court;

5. Any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

6. Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148, relating to, or arising from, this proceeding;

7. Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this proceeding; and

8. Any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief, including this Order;

D. Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer;

E.     Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1. Makes findings by the Commission that Respondents violated Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a) and 6d(a)(1), and Regulation 42.2, 17 C.F.R. § 42.2 (2021);

2. Orders Respondents to cease and desist from violating Sections 4(a) and 4d(a)(1) of the Act and Regulation 42.2;

3. Orders Respondents to pay, jointly and severally, a civil monetary penalty in the amount of two hundred and fifty thousand dollars ($250,000) within ten (10) days of the date of entry of this Order, plus post-judgment interest in the event such civil monetary penalty is not paid within ten days of the date of entry of this Order;

4. Orders Respondents and any of bZeroX's successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VI of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VI.    ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

1. Respondents and any of bZeroX's successors and assigns shall cease and desist from violating Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a) and 6d(a)(1), and Regulation 42.2, 17 C.F.R. § 42.2 (2021).

2. Respondents shall pay, jointly and severally, a civil monetary penalty in the amount of two hundred and fifty thousand dollars ($250,000) ("CMP Obligation"), within ten (10) days of the date of the entry of this Order. If the CMP Obligation is not paid in full within ten days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

   Respondents shall pay the CMP Obligation and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

       MMAC/ESC/AMK326  
       Commodity Futures Trading Commission  
       Division of Enforcement  
       6500 S. MacArthur Blvd.  
       HQ Room 181  
       Oklahoma City, OK 73169

> (405) 954-6569 office
> (405) 954-1620 fax
> Tonia.King@faa.gov

If payment is to be made by electronic funds transfer, Respondents shall contact Tonia King or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding.  The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and to Charles Marvine, Deputy Director, Commodity Futures Trading Commission, 2600 Grand Boulevard, Suite 210, Kansas City, MO 64108.

3. Respondents and any of bZeroX's successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

   1. Public Statements:  Respondents agree that neither they nor any of bZeroX's successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents':  (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party.  Respondents and any of bZeroX's successors and assigns shall comply with this agreement and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

   2. Cooperation, in General:  Respondents shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement and any other governmental agency or any self-regulatory organization, in this action, and in any current or future Commission investigation, civil litigation, or administrative matter relating to, or arising from, this action, including but not limited to any Commission lawsuit against the Ooki DAO.  As part of such cooperation, Respondents agree to voluntarily, for example, produce documents, things, and information as requested, provide declarations, respond to written discovery, and give testimony.

   3. Participation in the Ooki DAO:  Respondents shall cease all participation in the governance, operation, or any other activities of the Ooki DAO.  Without limitation, Respondents shall not make proposals, directly or indirectly through others, related to Ooki DAO governance; or vote any Ooki Tokens they own or control.

   4. Partial Satisfaction:  Respondents understand and agree that any acceptance by the Commission of any partial payment of Respondents' CMP Obligation shall

        not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

5.     Change of Address/Phone: Until such time as Respondents satisfy in full their CMP Obligation as set forth in this Order, Respondents shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten calendar days of the change. Notice should be provided to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and to Charles Marvine, Deputy Director, Commodity Futures Trading Commission, 2600 Grand Boulevard, Suite 210, Kansas City, MO 64108.

6.     Until such time as Respondents satisfy in full their CMP Obligation, upon the commencement by or against Respondents of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Respondents' debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership bankruptcy or other proceedings, shall be sent to the address below:

                Secretary of the Commission
                Office of the General Counsel
                Commodity Futures Trading Commission
                Three Lafayette Centre
                1155 21st Street N.W.
                Washington, DC 20581

**The provisions of this Order shall be effective as of this date.**

By the Commission.

_/s/ Christopher J. Kirkpatrick_
Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: September 22, 2022