UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>OOKI DAO,<br><br>Defendant. | Case No. 3:22-cv-05416-WHO<br><br>**ORDER CONCLUDING THAT SERVICE HAS BEEN ACHIEVED**<br><br>Re: Dkt. Nos. 16, 22, 31, 36 |

The Commodity Futures Trading Commission ("CFTC") is a federal regulatory agency that administers and enforces the Commodity Exchange Act ("CEA") and related regulations. Complaint ("Compl.") [Dkt. No. 1] ¶ 10. The CFTC filed the underlying complaint in this action against Ooki DAO, a decentralized autonomous organization ("DAO") that the CFTC alleges violated the CEA by enabling users to engage in retail commodity transactions without abiding by CEA requirements, including registering its "platform" and conducting certain customer due diligence. *See id.* ¶ 1. The CFTC contends that Ooki DAO was structured intentionally to render its activities "enforcement proof," including by erecting significant obstacles to traditional service of process.

This appears to be a case of first impression, and it begins with questions of sufficiency of service. Several amici represented by national law firms claim that the CFTC cannot serve Ooki DAO, and if it can, has not done so properly. I disagree. Ooki DAO has received both actual notice and the best notice practicable under the circumstances. As explained below, I reject the arguments of the amici. Ooki DAO is deemed to be served as of the date of this Order.

**BACKGROUND**

In order to assess the sufficiency of the CFTC's service of the complaint on Ooki DAO, it

is essential to understand the underlying technology. This Order outlines some of the factual background from the complaint and some relevant information from amicus briefs.

## I.       Factual Background

According to the complaint, bZeroX, LLC, operated a blockchain-based software called the "bZx Protocol" from June 1, 2019 until August 23, 2021. Compl. ¶ 1. The bZx Protocol operated on the Ethereum blockchain through the use of "smart contracts"[1] that permitted anyone with "an Ethereum wallet" to, essentially, make investments and bet on the relative rise and fall of particular virtual currencies. *See id.* ¶¶ 25-28, 31. As the CFTC explains it, these investments and bets allowed users to "contribute margin (collateral) to open leveraged positions whose ultimate value was determined by the price difference between two digital assets from the time the position was established to the time it was closed."[2] *Id.* ¶ 28. This technology is functionally the same as using a trading platform and, according to the CFTC, constitutes an "exchange" for commodity derivative transactions. *See id.* ¶¶ 1, 13-15, 52-60.

bZeroX LLC had a website to market its technology to prospective users, solicit orders, and facilitate access to the software Protocol. *Id.* ¶ 32. bZeroX LLC also charged and collected fees for access to its technology. *Id.* ¶ 33. Additionally, bZeroX LLC had a "liquidity pool" that contained assets supplied by "liquidity providers." *Id.* ¶ 28(b). In exchange for supplying liquidity, these providers received both "interest-generating tokens" and "BZRX Tokens," the latter of which conferred voting rights on the holders ("Token Holders") for certain questions related to governance of the Protocol. *Id.* Finally, bZeroX LLC had "Administrator Keys" which allowed bZeroX to "access and control" the operation of the smart contracts (pieces of software code) and the funds held in those smart contracts, including by updating code, pausing or

---

[1] "Smart contracts" are pieces of computer code or software code, not necessarily contracts as understood in the legal sense. Compl. ¶ 25; *see also* LeXpunK ("LeXpunK Mot.") [Dkt. No. 16] 3 n.9.

[2] For related context, *see U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 969 (9th Cir. 2019) ("Through [the defendant company], investors can purchase commodities on 'margin.' Also known as 'leverage,' the concept is simple: A customer buys [the commodity] by paying only a portion of the full price. The remaining amount is financed through [the defendant].").

United States District Court
Northern District of California

suspending trading, and directing deposits of funds to users.  *Id.* ¶ 34.

According to a CFTC regulatory settlement against the founders of bZeroX, the LLC never registered with the CFTC nor conducted the customer due diligence required to protect against fraud, money-laundering, and terrorist activity, as required by the CEA for most exchanges that enable commodity derivative transactions.  *See In the Matter of: Bzerox, LLC; Tom Bean; and Kyle Kistner, Respondents*, CFTC No. 22-31, 2022 WL 4597664, at *1 (September 22, 2022).

In August 2021, bZeroX LLC "transferred control" of the software Protocol[3] to "the bZx DAO," which was subsequently renamed "Ooki DAO."  Compl. ¶¶ 38, 46.  A DAO is a "decentralized autonomous organization" which is "a way to organize people, a social-coordination technology that relies on blockchain-based smart contracts and incentives" to facilitate collaboration and collective action.  Paradigm Operations LP ("Para. Mot.") [Dkt. No. 31] 2:16-18.  Put differently, DAOs allow "unrelated parties" to use software code on a blockchain without needing a "centralized coordinating authority," and permit users "to take actions to edit open-source software."  DeFi Education Fund ("DEF Mot.") [Dkt. No. 22] 3:24-4:1, 7:7-8.  The CFTC alleges that "the bZx Founders believed that transition to a DAO would insulate the bZx Protocol from regulatory oversight and accountability for compliance with U.S. law" due to its structure and built-in anonymity of users.  Compl. ¶ 40.

The DAO continued operating the underlying Protocol software in the same way as the LLC had, permitting users to engage in the same retail commodity transactions and continuing the collection of user fees.  *See id.* ¶ 41.  Those fees and revenue were collected in a central DAO Treasury.  *See id.* ¶¶ 44-45.

In the transition, the bZeroX founders also transferred control of their Administrator Keys to the DAO, which allowed the DAO to access and operate the Protocol and control the funds held in the smart contracts.[4]  *Id.* ¶¶ 38, 41(d).  How those Keys were used was determined by votes of

---

[3] The "bZx Protocol" was later renamed the "Ooki Protocol."  Compl. ¶ 46.

[4] The funds held in the smart contracts are separate from the funds held in the liquidity pool or central DAO Treasury.  The former consists of the virtual currency bets and investments made by users.  *See* Compl. ¶ 34.  The latter consists of separately charged user fees and other DAO revenue, and apparently also investments from "liquidity providers."  *See id.* ¶¶ 28, 44-45.

United States District Court
Northern District of California

United States District Court
Northern District of California

Token Holders.  *Id.* ¶ 42.  Token Holders could propose any changes to the Protocol or to "the direction of the . . . DAO's business," usually after discussion on the DAO's online Community Forum, and usually after conducting a "non-binding 'snapshot vote'" of anyone on the Forum.  *Id.* ¶¶ 42-43.  If a Token Holder believed there was sufficient community support, the Token Holders would "vote" their tokens in a binding vote which occurred "directly on" the Protocol (blockchain software).  *Id.*

The CFTC contends that Ooki DAO is an unincorporated association comprised of Token Holders that used ("voted") their tokens to "govern" the Protocol.  *Id.* ¶¶ 11, 47.  For example, the CFTC alleged that the DAO Token Holders voted to change the DAO name to Ooki DAO, *id.* ¶ 46, and to use funds from the central DAO Treasury to compensate DAO users that lost funds due to security breaches and theft, *id.* ¶ 45.

But the CFTC asserts that Ooki DAO never registered with the CFTC, as required by the CEA for most exchanges that enable commodity derivative transactions.  *See id.* ¶¶ 52-67.  Ooki DAO also did not implement a Customer Information Program ("CIP") or conduct Know Your Customer ("KYC") or anti-money laundering procedures, all allegedly in violation of the CEA.  *See id.* ¶¶ 68-72.

## II.     Procedural Background

The CFTC filed its complaint on September 22, 2022.  Dkt. No. 1.  On September 27, it filed both a First Administrative Motion for Alternative Service ("Svc. Mot.") [Dkt. No. 11] and an Administrative Motion Supplement ("Svc. Mot. Supp.") [Dkt. No. 13].

The Motion for Alternative Service requested permission to serve Ooki DAO "via the online mechanisms the Ooki DAO has created to allow itself to be contacted by the public," namely a "Help Chat Box" and "an online discussion forum" on its public website.  Svc. Mot. 1-2.  The CFTC reiterated allegations from the complaint that Ooki DAO had been intentionally structured to attempt to render its activities "enforcement-proof" including by "erect[ing] significant obstacles to traditional service of process."  *Id.* at 4.  The CFTC noted that it "took extensive steps to attempt to identify an individual authorized to accept service of process" on behalf of Ooki DAO but was unable to do so, in large part because Ooki DAO has no physical

4

address or publicly identifiable persons associated with it. *Id.* at 2, 5. In the Supplement, the CFTC explained that it in fact served the documents through the Chat Box and Discussion Forum and that soon after, a post appeared in the Discussion Forum acknowledging the litigation and discussing next steps. Svc. Mot. Supp. 1-2. I granted its Motion for Alternative Service. Dkt. No. 17.

Four groups moved for leave to file amicus briefs: "LeXpunK is a community of lawyers and software developers dedicated to providing open source legal resources and support for DeFi [decentralized finance] and DAOs, providing a voice for groups that wish to use DeFi systems or associate through DAOs, and advocating for these communities." LeXpunK Mot. 2:8-11. DeFi Education Fund ("DEF") "is a nonpartisan advocacy group based in the United States with a mission to educate policymakers about the benefits of decentralized finances ('DeFi') and to achieve regulatory clarity for the DeFi ecosystem." DEF Mot. 1. Paradigm Operations LLP "is an investment firm that backs disruptive crypto-web3[5] companies and protocols." Para. Mot. 1:2-3. Andreessen Horowitz, known in this litigation as "a16z" is "a venture capital firm that invests in seed to venture to late-stage technology companies . . . with dedicated funds that have raised more than $7.6 billion to invest in crypto and web3 startups." Andreessen Horowitz ("a16z Mot.") [Dkt. No. 36] 1:2-5.

I granted the motions, permitted each amicus to file an amicus brief, and construed those briefs as Motions for Reconsideration regarding my order granting alternative service. [Dkt. Nos. 27, 37, 49]. The CFTC filed its consolidated opposition to the motions ("Oppo.") [Dkt. No. 53], and three amici filed replies, ("LeXpunK Repl.") [Dkt. No. 55], ("a16z Repl.") [Dkt. No. 56], ("DEF Repl.") [Dkt. No. 57]. I held a hearing on December 7, 2022 at which counsel for the CFTC and for the four amici appeared.

At the hearing, the CFTC stated that Tom Bean and Kyle Kistner, the founders of bZeroX

---

[5] Web3 refers to the "third era of the internet." a16z Mot. 1. The first era was from approximately 1990-2005 and was defined by "open protocols" that were "decentralized and community governed." *Id.* The second era was from approximately 2005-2020 and it "favored siloed, centralized services." *Id.* This third era, web3, "combines the decentralized, community-governed ethos of the first era with the advanced, modern functionality of the second era." *Id.*

LLC, are Token Holders.  I ordered the CFTC to serve Bean and Kistner, Dkt. No. 59, and the CFTC did so, Dkt. No. 61.

## LEGAL STANDARD

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Omni Cap. Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  District courts have discretion to determine the sufficiency of service of process.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002).

This motion is governed by Federal Rule of Civil Procedure ("FRCP") 4(h), which reads in relevant part as follows:

> Unless federal law provides otherwise or the defendant's waiver has been filed, a domestic or foreign corporation, or a partnership or *other unincorporated association that is subject to suit under a common name*, must be served:
> (1) in a judicial district of the United States:
> (A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or
> (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant.

Fed. R. Civ. Proc. 4(h) (emphasis added).  Also relevant is FRCP 4(e)(1), which reads:

> Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by:
> (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made.

Fed. R. Civ. Proc. 4(e)(1).

## DISCUSSION

The amici's arguments fall into two main categories: (1) Ooki DAO can neither be served nor stand as a defendant in this case because (A) it is a technology, not an entity, (B) it is not subject to enforcement under the CEA, and (C) it is not an unincorporated association; and (2) even if Ooki DAO is an unincorporated association and subject to enforcement under the CEA, it was not properly served here under federal or state service provisions.  I address each argument in turn.

United States District Court
Northern District of California

## I.     Ooki DAO as an Entity

The amici argue that Ooki DAO cannot be sued at all, and therefore cannot be served at all, because it is not an entity that can be sued or accept service and that the CFTC failed to allege otherwise in the complaint.  The amici sub-arguments to this point both overlap and are distinct in certain ways, so I group some together and separate others into the following categories.

### A.  The CFTC Is Suing an Entity, Not a Technology.

First, the amici contend that Ooki DAO is a technology, not an entity or group of persons, and so suing it is akin to suing any other technology, or like trying to hold "the internet" liable. *See* Para. Mot. 6:17-23; DEF Mot. 4:20-21.  But the history of the development and control of the Protocol shows that this is incorrect, at least in this specific case.

The CFTC's complaint alleges that the Protocol was developed by two individuals who controlled it via their LLC, bZeroX—including by making changes to the software, deciding to distribute funds to defrauded users, and eventually choosing to transition control of the software— through use of their Administrator Keys.  Compl. ¶ 34.  When control of the software transitioned to Ooki DAO, control of those Keys transitioned to Token Holders.  *Id.* ¶¶ 38, 41(d).  Those Token Holders, according to the CFTC, comprise Ooki DAO, and it is their actions and choices taken on behalf of the DAO that the CFTC seeks to hold liable.  The CFTC would have been able to sue bZeroX, LLC as an entity for its use of Keys to control and govern the Protocol.  The CFTC may now sue Ooki DAO as an entity for its use of Keys to control and govern the Protocol.  That the CFTC is choosing to sue the organization rather than the Token Holders individually is a litigation strategy the CFTC is permitted to make, at least at this preliminary stage before the parties can litigate otherwise.

### B.  The CFTC Need Not Prove, At This Point, That Ooki DAO Is Subject to Liability Under the CEA.

Amici argue that Ooki DAO is not subject to suit under the CEA because it is not a person or unincorporated association.  *See* LeXpunK Br. 8-15; DEF Mot. 6-9; *see also* a16z Mot. 12:3-13:14 (asserting that the CFTC failed to join or identify any individuals liable under the CEA); Para. Mot. 9:3-10:20 (same).  Amici also contend that the CFTC must instead pursue its claims

against individuals, LeXpunK Br. 8-15, or alternatively that individual DAO participants cannot be liable under the CEA merely for voting on Ooki DAO governance, Para. Br. 9:1-10:20.

The CEA assigns liability to "[a]ny person" who takes particular actions, 7 U.S.C. § 13c(a)-(b), and defines "person" to include "individuals, associations, partnerships, corporations, and trusts," *id.* § 1a(38); *see also id.* § 2(a)(1)(B). The CFTC alleges that Ooki DAO is an unincorporated association and therefore falls within the definition of "person" in the CEA, which encompasses "association." The amici disagree. But the briefs go back and forth between arguing whether an unincorporated association can be sued under the CEA, whether the DAO can be sued under the CEA, whether the DAO is an unincorporated association under the CEA, whether the DAO is an unincorporated association under federal or state law, and whether the DAO can be served as an unincorporated association (the final question is addressed *infra* Part II). The critical question for *this* motion is whether and how the DAO can be *served*, which requires answering if it has the capacity to be sued and if it was properly served in that capacity. The question of whether the DAO is subject to regulation under the CEA is a separate question that goes to the heart of the merits of this case. It cannot and should not be resolved on a Motion for Reconsideration or a Motion for Alternative Service. As such, I do not further analyze that question here.[6]

It is worth noting that the amici all argue that these questions cannot be put off for a later stage of litigation because, they assert, this litigation was designed to lead to default judgment so no defendant will appear to litigate the merits. *See* LeXpunK Mot. 10:21-23; DEF Mot. 5:20-26.; LeXpunK Repl. 10:17-19 . I find this unconvincing in large part because of the reasons explained in Part II, that service was sufficient and that Ooki DAO received actual notice of this litigation, so Ooki DAO should be able to appear and argue the merits.[7] If the DAO fails to appear, it will be

---

[6] For the same reason, I do not address amici's contention that the CFTC has acted in an arbitrary or capricious manner by filing this suit. *See* LeXpunK Mot. 9:20-10; *see also id.* 18:1-19:26. Whether suing a DAO violates the APA is a question that goes to the merits of the case, not to service, and can be addressed at a later stage of litigation.

[7] For the same reason, I do not address amici's other arguments presented in their briefs that go to the merits of the case. *See, e.g.*, a16z Mot. 12-15; Para Mot. 9-10; DEF Mot. 5:21-22.

because of its strategic decision, not because it was unaware of the lawsuit.

### C. The CFTC Sufficiently Alleged that Ooki DAO Has the Capacity to Be Sued as an Unincorporated Association.

The CFTC is suing Ooki DAO as an unincorporated association. Compl. ¶¶ 11, 47. Amici argue that Ooki DAO is not an unincorporated association and cannot be sued as such. *See, e.g.*, LeXpunK Mot. 8-15; DEF Mot. 6-9; Para. Mot. 5-8; a16z Mot. 8-9; *see also* a16z Mot. 12:3-13:14.

FRCP 17(b) determines capacity to be sued. *See So. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 926 (9th Cir. 2014). In relevant part, the Rule provides that for parties other than individuals or corporations, capacity to sue is determined "by the law of the state where the court is located, except that: (A) a partnership or unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws." Fed. R. Civ. Proc. 17(b)(3), (3)(A).

Amici correctly point out that California provides a mechanism for unincorporated associations to be sued via California Civil Procedure Code section 369.5(a): "A partnership or other unincorporated association, whether organized for profit or not, may sue and be sued in the name it has assumed or by which it is known." *See also Vosburg v. Cnty. of Fresno*, 54 Cal. App. 5th 439, 452, 268 Cal. Rptr. 3d 591, 604 (2020) ("[T]he ability of an unincorporated association to participate in litigation [is] a subject addressed by [Cal. Code Civ. Proc. Section 369.5]."); a16z Mot. 4 n.2. This capacity rule applies here if Ooki DAO constitutes an "unincorporated association" under state law. But if Ooki DAO does not constitute an unincorporated association under state law, then it would have "no such capacity under . . . state[] law [to] sue or be sued" and so I would turn back to FRCP 17(b) to determine whether Ooki DAO has the capacity to be sued.

California state law defines an unincorporated association as "an unincorporated group of two or more persons joined by mutual consent for common lawful purpose, whether organized for profit or not." Cal. Corp. Code § 18035(a). "The criteria applied to determine whether an entity is an unincorporated association are no more complicated than (1) a group whose members share a common purpose, and (2) who function under a common name under circumstances where

United States District Court
Northern District of California

United States District Court
Northern District of California

1    fairness requires the group be recognized as a legal entity. Fairness includes those situations

2    where persons dealing with the association contend their legal rights have been violated." *Church*

3    *Mut. Ins. Co., S.I. v. GuideOne Specialty Mut. Ins. Co.*, 72 Cal. App. 5th 1042, 1059, 287 Cal.

4    Rptr. 3d 809, 822 (2021), *as modified on denial of reh'g* (Jan. 11, 2022) (quoting *Barr v. United*

5    *Methodist Church*, 90 Cal. App. 3d 259, 266-67, 153 Cal. Rptr. 322, 327-28 (1979)); *see also*

6    *Niantic, Inc. v. Global++*, No. 19-CV-03425-JST, 2019 WL 8333451, at *2 (N.D. Cal. Sept. 26,

7    2019) ("An unincorporated association [under California law] is defined as '(1) a group whose

8    members share a common purpose, and (2) who function under a common name under

9    circumstances where fairness requires the group be recognized as a legal entity.'" (citations

10   omitted)).

11        For several reasons, I conclude that the CFTC sufficiently alleged, for the purposes of their

12   service motion, that Ooki DAO is an unincorporated association under state law.

13        First, the CFTC shows that Ooki DAO is a "group of two or more persons." As discussed

14   above, the amici contend that the DAO cannot establish this requirement because the DAO is a

15   technological tool, not a group of persons. *See* Para. Mot. 6:17-23; DEF Mot. 7:5-13. But as

16   discussed above, the CFTC sufficiently explained that it is suing the DAO, which is comprised of

17   individual Token Holders. *Supra* Part I.A. And the amici do not assert that the Token Holders are

18   not persons. This element is satisfied.

19        Second, the CFTC sufficiently showed that two or more persons joined Ooki DAO "by

20   mutual consent." Amici contend that different persons casting different votes at different times

21   does not constitute mutual consent. Para. Mot. 6:24-7:23; DEF Mot. 8:22-25. That argument

22   misunderstands the element, which asks whether the persons *joined* by mutual consent. Here the

23   bZeroX LLC founders formed Ooki DAO and transitioned control of its governance—including

24   its Treasury funds—to the Token Holders. Compl. ¶¶ 38, 41(d), 44-46. There are no factual

25   allegations (or arguments made by amici) that suggest this formation or transfer of power was not

26   consensual. Nor are there allegations or arguments that suggest any Token Holders did not

27   "consent" to the inherent power that came from holding a token and thus being able to play a role

28   in governance choices. And if Token Holders did not "consent" to this power, they could have

sold or given away the tokens, as amici themselves point out. *See* DEF Mot. 4:8-10.

Additionally, choosing to vote or abstain on particular actions at different times does not preclude a finding of mutual consent. The underlying common goal—as discussed in the next paragraph—was to govern the DAO. Voting against a proposition that was ultimately implemented does not mean a particular Token Holder did not consent to govern the DAO.

Third, the CFTC sufficiently demonstrated that Ooki DAO has a "common lawful purpose," despite amici's contentions to the contrary. *See* a16z Mot. 5:4-8:2. As outlined in the complaint, Ooki DAO is comprised of Token Holders who own tokens that can be used to vote on certain governance decisions, which may include pausing or suspending trading, making changes to the software protocol, distributing funds from the central Treasury, or choosing to rebrand the DAO. The common purpose is governing the DAO, particularly through the use and distribution of funds from its central Treasury. *See* Oppo. 17:17:14-18:6; *see also* DEF Mot. 13:28-14:2 (conceding that Ooki DAO's vote "to compensate victims of a security breach . . . was lawful"). Contrary to amici's contentions, it is irrelevant that some Token Holders voted against certain decisions or that they abstained from voting.[8] *See* Para. Mot. 3:23-26; *see also* DEF Mot. 4:8-10. Not voting and voting against a proposal are both voluntary choices made to further the common purpose of governing the DAO. Indeed, based on the complaint it seems that individuals who own but do not vote their token still comprise the DAO because the purpose of holding a token is being able to vote on the DAO's governance. There are no other factual allegations that provide for other reasons to hold tokens, and the amici do not offer any alternatives. Thus, the DAO and its Token Holders have a common objective: making choices to govern the DAO.

And, as the CFTC alludes to, it is not inherently unlawful to operate retail commodity

---

[8] It is similarly irrelevant that tokens can be bought and sold or that voting rights can be given away, at least for the purposes of service. The CFTC seeks to sue the DAO as comprised of Token Holders during a particular time period. Whether those Token Holders held their tokens before or after that time period, or even whether they only held the tokens for part of the time period, does not matter for the purpose of ascertaining that the DAO was comprised of anyone holding a token during that time. And under the CFTC's theory, even if any particular Token Holder gave away the voting rights, they made the decision to hold the token during that time period and thus comprise the DAO.

exchanges; doing so merely requires following federal regulations. *See* a16z Repl. 10:15-19 (acknowledging the CFTC's clarified position that it "does not view decentralized finance as inherently unlawful"). The CFTC does not assert that the purpose of Ooki DAO was to violate these regulations, despite its assertion that the structure was chosen to avoid regulations. Rather, based on the complaint, it seems the purpose of the DAO was to govern the use of new technology to provide a relatively easily accessible software platform for users to trade, invest, and bet on virtual currencies. Providing this technology—and governing its use—is not inherently unlawful, even if the CFTC asserts that Ooki DAO did not comply with all applicable laws when doing so.[9]

As counterargument, amici rely heavily on various state law cases explaining that street gangs are not unincorporated associations under California law because they were not formed for a "common lawful purpose." *See* a16z Mot. 5:4-8:2 (citing *People ex rel. Reisig v. Broderick Boys*, 149 Cal. App. 4th 1506, 1520-22, 59 Cal. Rptr. 3d 64, 73-75 (2007); *People ex rel. Spitzer v. Townsend St. Gang*, No. G060293, 2022 WL 2747293, at *1 (2022), *review denied* (Oct. 12, 2022) (unpublished); *People ex rel. Spitzer v. Fullerton Tokers Town*, No. G058720, 2021 WL 1851483, at *1 (2021) (unpublished)). For hopefully obvious reasons, Ooki DAO is very different from "a criminal gang under the Penal Code, a 'terrorist' group with 'no social benefits.'" *See Reisig*, 149 Cal. 4th at 1521. Amici themselves contend that the blockchain technology used by Ooki DAO could "be used to solve a host of social problems," DEF Mot. 14:4-6, and that the decentralized finance software specifically used by Ooki DAO is "novel technology" that "let[s] people all over the world interact over the Internet in 'peer-to-peer' trading, borrowing, and lending," LeXpunK Mot. 3:4-6, 7:10. These activities can be lawful, and may provide social benefits, if implemented within the confines of the law. The gang cases are inapposite. The CFTC sufficiently established common lawful purpose for the purposes of capacity here.

Finally, the CFTC sufficiently shows, for the purposes of capacity, that Ooki DAO

---

[9] In *Niantic*, this court determined that the plaintiffs sufficiently alleged "an association of hackers that creates and distributes unauthorized derivative versions of [the plaintiff's] mobile apps" for profit had a common purpose as an unincorporated association under California law. 2019 WL 83333451, at *2. Though the case did not analyze whether this purpose was "lawful" it provides helpful context here for how to define the "purpose" of an unincorporated association.

United States District Court
Northern District of California

"function[s] under a common name under circumstances where fairness requires the group be recognized as a legal entity." *Church Mut. Ins. Co., S.I.*, 72 Cal. App. 5th at 1059. No amicus contests that "Ooki DAO" is the common name. And at this point in the proceeding, fairness requires recognizing the DAO as a legal entity because as alleged in the complaint, the Protocol itself is unregistered in violation of federal law, and *someone* must be responsible. Holding responsible the entity that governs the Protocol is fair—again, at least for the purposes of the present motion. *See also id.* ("Fairness includes those situations where persons dealing with the association contend their legal rights have been violated.").

For those reasons, Ooki DAO has the capacity to be sued as an unincorporated association under state law. It meets the requirements under FRCP 17(b) as well, because it has the capacity to be sued under "the law of the state where the court is located."[10]

I reiterate that my determination that Ooki DAO has the *capacity* to be sued does not necessarily establish that the DAO is an association that can be held liable under the CEA. *See* LeXpunK Mot. 9:6-19. As discussed above, that is a question going to the merits of the case and can be addressed on a dispositive motion later in litigation. *Supra* Part I.B.

## II. Service on Unincorporated Associations

The amici also argue that even if Ooki DAO may be sued as an unincorporated association, the CFTC failed to properly serve Ooki DAO. The arguments fall into three general categories. First, the amici argue that the CFTC was required to satisfy California service law under Civil Procedure Code section 416.40 but failed to do so. Second, they contend that even under California's alternative service provision, service was not reasonably calculated to provide actual

---

[10] For this reason, I need not consider whether Ooki DAO constitutes an unincorporated association under federal law, because it has the capacity to be sued under the federal rule providing for capacity as defined by the state law. But Ooki DAO would still have capacity to be sued in this case under FRCP 17(b) because the CFTC is seeking to enforce federal substantive law under the CEA and because Ooki DAO meets the federal law definition of "unincorporated association." *See Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996) (defining unincorporated association as "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective" (citations omitted)); *see also So. Cal. Darts Ass'n*, 762 F.3d at 927 (same). The elements are essentially the same as the California requirements discussed above except that the CFTC need not allege a common *lawful* purpose under federal law.

United States District Court
Northern District of California

notice to voting Token Holders.  Third, they assert that the CFTC should have and could have

identified individual members of Ooki DAO to serve.

**A.  Applicable Law**

Service in federal court is governed by FRCP 4, while provides in relevant part:

> Unless federal law provides otherwise . . . [an] unincorporated association that is subject to suit under a common name, must be served:
> (1) in a judicial district of the United States
> (A) in a manner prescribed by Rule 4(e)(1) for serving an individual; or
> (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and –if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant.

Fed. R. Civ. Proc. 4(h).  Though LeXpunK argues that the bZeroX LLC founders constituted

"agents" that could be served under this rule, LeXpunK Repl. 7:18-28, the other amici and the

CFTC seem to argue that Ooki DAO had no agents authorized for service under FRCP 4(h)(1)(B).

Indeed, making the determination that any individual constituted an officer or agent seems to

defeat the decentralized structure of the DAO.  Therefore, FRCP 4(h)(1)(A) applies.  This rule

requires looking to FRCP 4(e)(1), which provides for service "in a judicial district of the United

States by . . . following state law for serving a summons in an action brought in courts of general

jurisdiction in the state where the district court is located or where service is made."

> Under California law, unincorporated associations may be served:
> by delivering a copy of the summons and of the complaint . . . to the person designated as agent for service of process in a statement filed with the Secretary of State or to the president or other head of the association, a vice president, a secretary or assistance secretary, a treasurer or assistant treasurer, a general manager, or a person authorized by the association to receive service of process . . . [or] [w]hen authorized by Section 18220 of the Corporations Code.

Cal. Code. Civ. Proc. § 416.40 (b)-(c).  Because none of the designated agents or individuals exist

here, I turn to California Corporations Code section 18220, which provides:

> If designation of an agent for the purpose of service of process has not been made as provided in Section 18200, or if the agent designated cannot with reasonable diligence be found at the address specified in the index referred to in Section 18205 for delivery by hand of the process, and it is shown by affidavit to the satisfaction of a court or judge that process against an unincorporated association cannot be served with reasonable diligence upon the designated agent by hand or the unincorporated association in the manner provided for in Section 415.10 [personal delivery] or 415.30 of the Code of Civil Procedure [service by mail]

14

or subdivision (a) of Section 415.20 of the Code of Civil Procedure [leaving summons at office, dwelling usual place of abode or business, usual mailing address, mail], **the court or judge may make an order that service be made upon the unincorporated association by delivery of a copy of the process to one or more of the association's members designated in the order and by mailing a copy of the process to the association at its last known address.** Service in this manner constitutes personal service upon the unincorporated association.

Cal. Corp. Code § 18220 (emphasis added).

Here the CFTC sufficiently established that Ooki DAO has no address, and that it could not be served via personal delivery, mail, or by leaving the summons and complaint at any office, dwelling, or usual place of abode or business. Therefore, California law permits service "by delivery of a copy of the process to one or more of the association's members designated in the order and by mailing a copy of the process to the association at its last known address." *Id.*

The amici contend that section 18220 governs and that the CFTC should and could have identified specific members to serve. a16z Mot. 9:24-11:1; a16z Repl. 3:19-7:5. At the hearing, the CFTC stated for the first time that Bean and Kistner, the bZeroX founders who transferred control of the Protocol to Ooki DAO, are Token Holders, and so are identifiable members who comprise the entity the CFTC is suing. I ordered the CFTC to serve Bean and Kistner, and service was properly executed. [Dkt. Nos. 59, 61]. This element of section 18220 is now met.

But ultimately, it seems that section 18220 cannot govern service in this case because it only applies when an unincorporated association has an address. The CFTC showed that Ooki DAO does not have an address (or at least, the CFTC exercised significant diligence in trying to find one and could not), a fact that amici do not contest, so it is impossible to meet that requirement of the service law. Because section 18220 apparently does not provide for service in cases like this, it does not apply here.[11]

_____

[11] Even if section 18220 applied to associations without addresses, as amici seem to assert by their references to *Broderick Boys*, 59 Cal. Rptr. 3d 64, 75-76 (2007), it was met here by serving Bean and Kistner. The discussion in *Broderick Boys* about service on unincorporated associations is arguably dicta because the court determined the gang was not an unincorporated association, but even assuming it applies, its mandate is met. That court noted that service on a single member of an unincorporated association could be constitutionally sufficient to serve the association so long as the serving party provided "proof that [the individual] was of sufficient rank and character within the [association] that it is reasonable to infer that service on him effectively apprised the [association] of the pendency of the legal proceeding." *Id.* at 76. Here the CFTC sufficiently pleaded that Bean and Kistner created the underlying technology and intentionally transferred it to

15

Accordingly, the alternative service provision governs. It reads:

> Where no provision is made in this chapter or other law for the service of summons, the court in which the action is pending may direct that summons be served in a manner which is reasonably calculated to give actual notice to the party to be served and that proof of such service be made as prescribed by the court.

Cal. Code Civ. Proc. § 413.30.

## B. Service Under California Code of Civil Procedure Section 413.30

Under section 413.30, service must be reasonably calculated to give actual notice to the party being served. This aligns with constitutional due process requirements, which provide that service must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Rio Props.*, 284 F.3d at 1016 (citation omitted). Amici argue that even if section 413.30 governs service, the CFTC failed to meet the requirements because service via the Chat Box and Forum was not reasonably calculated to provide actual notice to the voting Token Holders, DEF Repl. 2:24-4:5; DEF Mot. 9:18-21, and that those methods of service did not in fact provide actual notice to the voting Token Holders, LeXpunK Repl. 7:10-17, 9:1-10:14; DEF Repl. 4:8-5:14.

Permitting service through electronic means is not a novel concept. Since at least 2002, the Ninth Circuit has permitted service by email on international defendants under FRCP 4(h)(2). *See, e.g.*, *Rio Props.*, 284 F.3d at 1017-18 ("agree[ing] wholeheartedly" with the notion that "[c]ourts . . . cannot be blind to changes and advances in technology . . . No longer must process be mailed to a defendant's door when he can receive complete notice at an electronic terminal inside his very office" (citation omitted)). California expressly permits service "by electronic means" provided that certain requirements are met. *See* Cal. Code Civ. Proc. § 1010.6. Some courts across the country have even permitted service by social media or via publication on websites when defendants cannot otherwise be reached or are intent on evading service. *See, e.g.*, *Transam. Corp. v. TransAm. Multiservs. Inc. et al.,* No. 1:18-cv-22483 (S.D. Fla. Sept. 18, 2018)

---

the DAO to render the Protocol "enforcement-proof." Compl. ¶ 3. Their ability and power to make those decisions, coupled with their ongoing status as Token Holders in the DAO, show that they are different from a single gang member of unknown rank in *Broderick Boys*. Service on these individuals was sufficient to effectively apprise Ooki DAO of this litigation, especially combined with the evidence of actual notice, as discussed below.

[Dkt. No. 17] (permitting plaintiff to serve defendants at their email address and "via publication by posting a copy of the Complaint and Summons on the Internet website appearing at [a given] URL"); *Kipu Sys., LLC v. ZenCharts, LLC*, No. 17-24733-CIV, 2018 WL 8264634, at *2 (S.D. Fla. Mar. 29, 2018) (finding good cause to permit service on international defendants via email, messages on LinkedIn, and posting on defendant's website); *K.A. v. J.L.*, 450 N.J. Super. 247, 253, 161 A.3d 154, 157 (2016) ("Given that the Facebook and Instagram accounts at issue are the sole conduits of the purported harm, service via Facebook is reasonably calculated to apprise the account holder of the pendency of this action and afford him or her an opportunity to defend against plaintiffs' claims [after service via certified mail was ineffective]."); *Baidoo v. Blood-Dzraku*, 48 Misc. 3d 309, 311-13, 5 N.Y.S.3d 709, 712-13 (N.Y. Sup. Ct. 2015) (permitting service solely by Facebook where plaintiff had no other way to find or contact evasive defendant); *Chanel, Inc. v. Partnerships & Unincorporated Ass'ns*, No. CV H-12-2085, 2012 WL 12894807, at *1-2 (S.D. Tex. Oct. 10, 2012) (finding service by email and website publication were reasonably calculated to give international defendants notice of the lawsuit).

I find the analysis in *Rio Properties* particularly persuasive, even though it concerned a distinct rule for service on international parties. There the Ninth Circuit permitted service by email because the defendant had "structured its business such that it could be contacted *only* via its email address. [It] listed no easily discoverable street address. . . . Rather, on its website and print media, [the defendant] designated its email address as its preferred contact information." *Rio Props.*, 284 F.3d at 1018. The court wrote, "[i]f any method of communication is reasonably calculated to provide [the defendant] with notice, surely it is email—the method of communication which [the defendant] utilizes and prefers." *Id.* And the court recognized the "limitations" of email service, including that (at the time) "there is no way to confirm receipt of an email message." *Id.* Yet the court permitted the district court to exercise its discretion "to balance the limitations of email service against its benefits in any particular case." *Id.*

Here too Ooki DAO has structured its business—at least as alleged by the CFTC—in such a way that it can only be contacted via its online website, or perhaps through its social media accounts. As alleged by the CFTC, and not seriously contested by the amici, Ooki DAO has no

easily discoverable address. Its Chat Box and Online Forum seem to be the DAO's chosen and preferred method of communication, which is only bolstered by the fact that posts recognizing service of the litigation documents for this case appeared in the Online Forum. And even though many courts permit service via social media or publication on a website *alongside* service via email, that is apparently not possible here, where the only forms of communication the DAO presents to the public are through the Chat Box and Discussion Forum. Thus while service via Chat Box and Forum themselves may be new, decades-old circuit court reasoning, along with more recent extensions to new technology, confirms that these choices were reasonable.

There are two reasons why posting on the Chat Box and online Discussion Forum was reasonably calculated to apprise Ooki DAO of this litigation. *See* Cal. Code Civ. Proc. § 413.30. First, the CFTC alleges that Ooki DAO controls its website via Token Holders voting on Administrator Keys to make changes, including to branding. *See* Compl. ¶¶ 32, 34, 38, 41(d), 42, 46. It is highly likely then that Ooki DAO saw a relatively provocative post on its website, especially one that has generated so much attention with Ooki DAO users and throughout the national media. In this case, posting on the defendant's website's online discussion forum, which was dedicated to conversation about the defendant's business, was reasonably likely to apprise the defendant of the ongoing litigation.[12]

Second, the CFTC alleges that Ooki DAO is comprised of the Token Holders, meaning that service reasonably calculated to notify the Token Holders would reasonably notify the DAO itself. And the CFTC asserts that the Token Holders generally take "snapshot votes" of governance proposals before taking binding votes. Compl. ¶¶ 42-43. Those snapshot votes are prompted by topics discussed on the Discussion Forum. Oppo. 9 & Ex. C (showing the "snapshot vote" taken after the CFTC served the summons and complaint via the Chat Box and posted on the

---

[12] Posting in an online forum on the defendant's own website, at least under the facts of this specific case, seems even more likely to apprise the defendant of the ongoing litigation than would service by publication in the newspaper, which is a traditionally accepted—if last resort—method for service of process. California courts permits service by publication, so long as a plaintiff shows a "number of honest attempts to learn the defendant's whereabouts through inquiry and investigation," which is necessary "because it is generally recognized that service by publication rarely results in actual notice." *Rios v. Singh*, 65 Cal. App. 5th 871, 880, 280 Cal. Rptr. 3d 404, 411–12 (2021).

forum, acknowledging the Discussion Forum posts, and providing response options). The CFTC alleges that the Token Holders generally do not vote on proposals that do not pass a snapshot vote—and because those votes are prompted by and directly acknowledge the Discussion Forum, this means that at least some Token Holders are directly informed about what occurs in the Discussion Forum. *See* Compl. ¶¶ 42-43. Posting notice of this litigation in that same Forum, then, is reasonably calculated to notify *at least some* Token Holders of the ongoing litigation. And as the amici concede, the CFTC was not required to serve and notify each and every Token Holder. *See* LeXpunK Repl. 8:1-3. This is particularly true because the CFTC is suing the DAO, not the individual Token Holders. *See* Oppo. 13:4-15:20.

Additionally, at least in this specific case, it seems clear that Ooki DAO received actual notice. Service via the Chat Box and Forum led to a flurry of discussion on the Forum and Ooki DAO's other public communication channels, including its Twitter account. *See* Oppo. Ex. A (posts and discussion in Discussion Forum about this litigation); *id.* Ex. B (Ooki DAO Twitter account discussing this litigation); *id.* Ex. C (Ooki DAO snapshot vote deciding how to respond to this litigation). Notably too, this case has been the subject of significant national media coverage.[13] Four amici heard of the case and filed briefs to join litigation. While none of these facts independently confirm that Ooki DAO received notice of litigation, taken together they provide more than enough support that *in this particular case* Ooki DAO has notice of this lawsuit.

---

[13] *See, e.g.*, Jesse Hamilton, *Ooki DAO Case So 'Egregious,' CFTC Had No Choice, Chair Behnam Says*, CoinDesk (Oct. 11, 2022), https://www.coindesk.com/policy/2022/10/11/ooki-dao-case-so-egregious-cftc-had-no-choice-chair-behnam-says/; Alison Frankel, *You can't serve notice to a crypto collective, say cryto groups in Ooki lawsuit*, Reuters (Oct. 18, 2022), https://www.reuters.com/legal/transactional/how-do-you-serve-dao-you-dont-say-crypto-amici-ooki-lawsuit-2022-10-18; Matthew Bultman, *Where's Ooki? CFTC's Lawsuit Delivery Via Chatbox Raises Eyebrows*, Bloomberg Law (Oct. 24, 2022), https://www.bloomberglaw.com/bloomberglawnews/securities-law/X8RT48B0000000?bna_news_filter=securities-law#jcite; Leo Schwartz, *The obscure DAO at the center of a case that could determine the future of crypto*, Fortune (Oct. 25, 2022), https://fortune.com/crypto/2022/10/25/the-obscure-dao-at-the-center-of-a-case-that-could-determine-the-future-of-crypto/; Cheyenne Ligon, *CFTC Pushes Back Against Amicus Briefs in Ooki DAO Lawsuit*, Yahoo! (Nov. 14, 2022), https://www.yahoo.com/video/cftc-pushes-back-against-amicus-033018080.html.

Therefore, service via the Chat Box and Online Forum meet the service requirements under California's alternative service provision, and also meet constitutional due process requirements.

## C. Service of Individuals

Finally, amici contend that the CFTC should have served individual Token Holders or demonstrated why serving them was impracticable. DEF Mot. 9:12-18; LeXpunK Mot. 8:1-10; a16z Repl. 8:21-10:12. They assert that the CFTC was required to identify individual members and was in fact capable of doing so, since the agency previously filed and settled a proceeding against the bZeroX LLC founders. a16z Mot. 9:3-18; DEF Mot. 10:3-13; Para. Mot. 4:19-24. Because the CFTC should have served individuals, amici argue, permitting alternative service was inappropriate, and the CFTC instead should have sought early discovery "to determine the identity of fictious defendants" or should have instead sued Doe defendants. LeXpunK Mot. 11:5-15:15; a16z Mot. 11:12-14. In response, the CFTC argues that its lawsuit is against Ooki DAO as an entity, not against individual Token Holders, *see* Oppo. 2:19-21, 15:6-14, and the entity was properly served, *id.* 10-12. Moreover, it is unable to identify individual Token Holders because of the decentralized and anonymous nature of Ooki DAO, *id.* 7:25-8:6; 23:2-9.

I agree with the CFTC that it sued Ooki DAO as an entity and did not sue the individual Token Holders. The choice to sue the entity instead of the Token Holders makes sense in light of its focus on Ooki DAO's governance through use of its Treasury funds; there are no allegations— and the amici do not contend—that individual Token Holders could control the Treasury funds. If the CFTC ultimately seeks damages or fees of any kind from the Treasury funds, it is not clear that the agency could require Token Holders to provide those individually. And, as analyzed in the previous section, service of Ooki DAO as an entity was proper because it was reasonably calculated to give the entity actual notice, and indeed apparently gave the entity actual notice. Finally, because the complaint was intentionally and specifically filed against the entity, not individuals, I reject amici's arguments that the CFTC should have sought early discovery to identify fictitious defendants, LeXpunK Mot. 13:11-20, or should amend its pleadings to include Doe defendants, a16z Mot. 11:12-14.

Section 413.30 permits service that is reasonably calculated to give actual notice. As

explained, service here met those requirements, and I do not doubt that Ooki DAO received actual notice. That said, the Constitution also requires that notice is "reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Rio Props.*, 284 F.3d at 1016 (emphasis added) (citation omitted). And the circumstances of this case are certainly unique. Although a feature of Ooki DAO is the anonymity provided to Token Holders, the CFTC indicated at the hearing that Bean and Kistner, the founders of bZeroX LLC who transferred control of the Protocol to Ooki DAO, are also Token Holders. As a result, to achieve the best practicable notice, I ordered the CFTC to serve those individuals. Dkt. No. 59. In this case, requiring the CFTC to serve some individual known Token Holders even after the DAO received actual notice is a belt-and-suspenders procedure to ensure that the due process requirements are met. *See also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 316-18 (1950); DEF Mot. 9:22-10:2; LexPunK Repl. 8:11-20. The CFTC did so promptly. Dkt. No. 61.[14] The CFTC has utilized all of the information reasonably at its disposal to serve Ooki DAO, and it is clear that Ooki DAO has actual notice. Service was proper and complied with due process requirements.

## CONCLUSION

For the foregoing reasons, the Motions for Reconsideration are DENIED. Service is deemed sufficient as of the date of the filing of this order.

**IT IS SO ORDERED.**

Dated: December 20, 2022

William H. Orrick
United States District Judge

---

[14] Counsel for Bean and Kistner confirmed that he was authorized to receive service on their behalf as individuals only and that neither individual is permitted to vote their tokens to govern Ooki DAO anymore. As discussed, so long as an individual holds a token, they "comprise" the DAO under the CFTC's theory. All other arguments on the merits shall wait until a later stage in litigation.

United States District Court
Northern District of California